## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MASSACHUSETTS ASSOCIATION OF PRIVATE CAREER SCHOOLS (MAPCS),<br><br>            Plaintiff,<br><br>  v.<br><br>MARTHA COAKLEY, IN HER OFFICIAL CAPACITY AS MASSACHUSETTS ATTORNEY GENERAL, and<br><br>THE OFFICE OF THE MASSACHUSETTS ATTORNEY GENERAL<br><br>            Defendant. | C.A. No. |

## COMPLAINT AND DEMAND FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Massachusetts Association of Private Career Schools ("MAPCS" or "Plaintiff") for its complaint against Defendants, Attorney General Martha Coakley and The Office of The Massachusetts Attorney General (collectively, the "Attorney General" or "the Attorney General's Office") alleges, by and through its attorneys, on personal knowledge as to itself, and otherwise on information and belief, as follows:

### PRELIMINARY STATEMENT

1.     For years, proprietary schools ("Career Schools") have provided educational and professional opportunities for thousands of students throughout Massachusetts.  These Career Schools, operating under a fully-developed framework of federal and state regulations and the standards of numerous accreditors, train and graduate a diverse array of professionals, technicians, and persons skilled in trades.  These include the electricians, medical and dental assistants, automotive and diesel technicians, chefs, machinists, computer technicians, cosmetologists, IT specialists, heating and cooling technicians, and many others that sustain the

lifeblood of communities across the Commonwealth.

2.      Now, the Attorney General has overstepped her authority under Mass. Gen. Laws ch. 93A ("93A") by issuing an unnecessary and unwarranted new scheme of further regulations surrounding "For-Profit and Occupational Schools" or Career Schools (940 Mass. Code Regs. 31.00) (the "Regulations") that conflict with the pre-existing federal, state, and accreditor oversight of Career Schools.  If not set aside, the Regulations as promulgated will impair the ability of Career Schools to operate in the Commonwealth, and harm the very students that the Regulations should protect by denying them the freedom to make their own educational choices.

3.      Rules promulgated under 93A must be consistent with federal law, federal regulations, and the United States Constitution.  These Regulations are not.  During the rulemaking process, MAPCS, certain Career Schools, and interested students tried to educate the Attorney General's office concerning (a) the benefits Career Schools confer on students and the community; (b) the potential for more informed and consistent regulations; and (c) the myriad problems that would arise should the Regulations be issued as they were with numerous gratuitous and constitutionally impermissible provisions.  Despite these efforts, the Attorney General issued the Regulations in June 2014, when they took effect without further notice or any meaningful transition period.

4.      As set forth in detail below, the Regulations should not stand for at least the following four reasons:

> ***First,*** they impose blanket restrictions on lawful speech *and* compel inaccurate, misleading speech, thus violating in multiple ways the First Amendment of the United States Constitution.
>
> ***Second,*** they violate Due Process requirements by invoking vague and sweeping standards that fail to apprise Career Schools of what is—and is not—permissible conduct.

***Third,*** the regulations exceed the Attorney General's authority and are preempted by federal law because they mandate disclosures and other conduct that is inconsistent with federal requirements, federal court decisions, federal statutes, and Federal Trade Commission regulations.

***Fourth and finally,*** they are arbitrary, capricious and otherwise unlawful, because there is no factual nexus between the purported aims of the regime and the promulgated Regulations.  Indeed, among other things, the Regulations adopt metrics and other requirements with no supporting evidentiary basis.  Even if the Regulations had been supported by evidence and consistent with pre-existing regulations such that compliance could be reasonably achieved—and they were not—the Attorney General arbitrarily made the Regulations effective almost immediately upon their promulgation, without allowing time for compliance.

5.      If left to stand, the Regulations would at a minimum unduly burden small businesses operating schools, limit school choice, exacerbate shortages of skilled labor, and confuse prospective students who would be forced to navigate a labyrinth of conflicting state and federal disclosures, or simply forego the career- and life-enhancing step of further training or education.

6.      Accordingly, this Court should vacate and set aside the Regulations on Career Schools.

## **PARTIES**

7.      Plaintiff Massachusetts Association of Private Career Schools (MAPCS) is a non-profit membership organization of private sector educational institutions that offer career-specific training in a wide variety of fields.  MAPCS is located in North Attleboro, incorporated under Massachusetts law and has over 40 member and associate member institutions.  MAPCS member institutions provide students of all ages and backgrounds with education, training, and job skills.  Career Schools also offer students the opportunity to earn diplomas, certificates, associate degrees, and to qualify for certification and professional licenses.  In Massachusetts, private sector post-secondary schools, colleges and universities serve a diverse student population:  53% of students are age 25 or older; 63% are women; 18% are African-American;

and 18% are Hispanic/Latino.   (Association of Private Sector Colleges and Universities, Massachusetts Fact Sheet (2010-2011), available at https://docs.google.com/file/d/0B361_6vooFy_WEFneEtsRW1sYjg/edit.)

8.      As part of their mission to serve non-traditional students, MAPCS member schools offer, among other things, flexible schedules to accommodate working students.   The schools train students in a wide variety of career fields, including:   health care professionals, manufacturing, automotive repair, commercial art, business administration, construction, cosmetology, culinary and hospitality management, information technology, massage therapy, mechanical engineering, photography, radio and television broadcasting, and web design.

9.      All of MAPCS's member schools are directly subject to the new Regulations.   As such, they face imminent and continuing harm as a result of being forced to attempt to comply with them.   Each of MAPCS's member schools would have standing to sue Defendants in its own right.   This lawsuit seeks to protect MAPCS' interests in promoting access to career education for all.   The claims and relief requested in this lawsuit do not require the participation of individual MAPCS members.

10.      MAPCS members provide unique opportunities for education and advancement, particularly for individuals who do not "fit into the 'standard' college student mold," such as Amber Hiersche.   Ms. Hiersche, who submitted written comments to help shape the Attorney General's rulemaking, described how she attended the Porter & Chester Institute after graduating high school, and returned again 26 years later to advance professionally, thanks to the "great learning facility" and support that has enabled her to attain a 4.0 Grade Point Average.

11.      Defendant Martha Coakley, sued in her official capacity, is the Attorney General of the State of Massachusetts, and currently a Democratic candidate for Governor of

Massachusetts.

12.     The Attorney General's Office is located at One Ashburton Place, Boston, MA 02108-1518.    The Attorney General's Office's authority to "make rules and regulations interpreting the provisions of" 93A, § 2 governing "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" is explicitly limited in that "[s]uch rules and regulations shall not be inconsistent with the rules, regulations and decisions of the Federal Trade Commission and the Federal Courts interpreting the provisions of 15 U.S.C. § 45(a)(1) (The Federal Trade Commission Act ("FTCA")), as from time to time amended."  The Attorney General is responsible for the promulgation of the final Regulations governing For-Profit and Occupational Schools in 940 Mass. Code Regs. 31.00, and for related acts and omissions alleged herein.

## JURISDICTION AND VENUE

13.     This action arises under the United States Constitution and the Massachusetts Administrative Procedure Act, Mass. Gen. Laws ch. 30A, § 7.  Jurisdiction lies in this Court pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and 1367(a).

14.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1), (2), and (3), because the Defendants reside in this judicial district and perform their official duties in this judicial district, and a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

## FACTUAL ALLEGATIONS

**A.     Career Schools Are Subject to Extensive, Pre-Existing Regulations.**

15.     Career Schools operate in a highly-regulated marketplace.  Career Schools are not only subject to federal regulations imposed by the Federal Trade Commission (the "FTC") and the Department of Education ("DOE"), but are also regulated by national and regional

accreditors, as well as the Massachusetts Division of Professional Licensure ("DPL") and the Massachusetts Board of Higher Education. (Small Business Impact Statement for 940 Mass. Code Regs. 31.00, available at http://170.63.70.137/ago/government-resources/ags-regulations/940-cmr-31-00/small-business-impact-statement-for-940-cmr-31-00.html.)

16.    Written comments submitted during, or in connection with the regulatory rulemaking process, including two public hearing hearings sponsored by the Attorney General held in January 2014, demonstrated the intricate workings of the pre-existing federal, state, and accreditation agencies that have traditionally overseen Career Schools. (Comments of Howard E. Horton, President, New England College of Business and Finance (comparing the new Regulations to regulatory requirements imposed by the Massachusetts Board of Higher Education; the Massachusetts Department of Elementary and Secondary Education—Office for Career/Vocational Technical Education; the New England Associations of Schools and Colleges—Commission on Institutions of Higher Education Standards for Accreditation; and the federal Department of Education); Comments of Lawrence T. Fay, Dir. Of Financial Aid, Bay State Tech. (explaining that their Massachusetts schools are subject to the DPL and the Accrediting Commission of Career Schools and Colleges ("ACCSC").)

### 1.    The Federal Trade Commission Issued Relevant Regulations in 2013.

17.    The Federal Trade Commission—the leading federal authority on deceptive practices—just last year issued revised regulations for Career Schools in what are commonly referred to as the Vocational School guides. Issued in November 2013, the guides are administrative interpretations of laws administered by the FTC and thus, represent the FTC's current position on "the application of … the FTCA to … programs or courses of instruction offered by private vocational or distance schools." (16 C.F.R. 254.0) The Guides "are intended to advise proprietary businesses that offer vocational training courses … how to avoid deceptive

practices in connection with the advertising, promotion, marketing and sale of, their courses or programs." (78 Fed. Reg. 68,987, 68,988 (Nov. 18, 2013).)

18.     The Guides outline the types of misrepresentations about institutional programs that qualify as unfair or deceptive practices under the FTCA.  For example, the Guides clarify that it is a deceptive practice for institutions to misrepresent their accreditation, the transferability of credits to other schools, or any government affiliation.  The Guides also caution against misrepresenting teacher or enrollment qualifications, the nature of courses, the availability of financial aid, or the availability of jobs for graduates.

19.     The FTC drafted the Guides to be consistent with the standards of state licensing bodies and accreditors.  Accordingly, the Guides contain no affirmative disclosure requirements and purposefully "do not impose any burden beyond that already associated with complying with section 5 of the [FTCA]."  (78 Fed. Reg. 68,987, 68,988 (Nov. 18, 2013).)

>    **2.     The Massachusetts DPL Was Drafting Regulations When The Attorney General Issued Its Own.**

20.     The DPL and the Office of Private Occupational School Education Advisory Council had been working for "many months" to craft workable regulations when the Attorney General peremptorily ushered in her own Regulations.  (Comments of J. Parker, VP Education, Accreditation and Regulatory Affairs, Premier Education Group.)

21.     Career Schools sought to facilitate cooperation among the Attorney General, the DPL, and the Office of Private Occupational School Education Advisory Council, in order to arrive at "effective, measured, and unambiguous regulations."  (Comments of J. Parker.)

22.     The DPL warned that the proposed regulations would require Career Schools to comply with multiple sets of regulations and disclosure requirements, and urged consistency to avoid undue burdens for schools and confusion for students.  (Comments of Rachel Pauze, Board

Counsel, DPL.)

23.     The Attorney General's office claimed that it "ha[d] worked and [would] continue to work" with agencies such as the DPL "to ensure consistency and clarity across regulations and to help minimize and eliminate any duplicative or conflicting regulations and/or obligations." (Small Business Impact Statement for 940 Mass. Code Regs. 31.00.)

24.     The issued Regulations are neither consistent nor clear.  They are instead plagued by vague, duplicative and conflicting obligations, which impair the ability of Career Schools in the Commonwealth to understand them, let alone comply with them.

25.     Just recently, the DPL's Office of Private Occupational School Education requested additional public comment on its proposed regulations, 230 Mass. Code Regs. 12.00-17.00.  As the notice stated: "The proposed regulations pertain to the licensure and oversight of private occupational schools and sales representatives.  The proposed regulations establish the licensure application process and set forth procedures for DPL approvals, denials, and disciplinary action.  Additionally, the proposed regulations establish qualifications for licensure and standards of practice as they relate to sales representatives, instructors, student enrollment agreements, record keeping, disclosures, representations, advertisements, and the general operation of private occupational schools."  The Attorney General promulgated her Regulations without regard to the DPL's role with respect to Career Schools or the DPL's plans to promulgate its own set of regulations.

### 3.     Even Absent New Regulations, Career Schools Were Already Subject to Chapter 93A.

26.     Chapter 93A broadly governs "any trade or commerce directly or indirectly affecting the people" of Massachusetts.  (93A, § 1(b).)

27.     The new Regulations were not needed to create any new remedy or cause of

action, and they did neither.  Even prior to the Regulations, if a Career School engaged in an unlawful, unfair or deceptive practice in the Commonwealth, the Attorney General or an injured party could already have brought an action under Chapter 93A.  (93A, §§ 4, 11.)  Indeed, the Attorney General has pursued actions against entities it viewed as wrongdoers.

### 4. The Rules' Stated Purpose Does Not Justify The Regulations.

28.     The Attorney General vaguely posits that the Regulations' "purpose" is a response to "[c]ertain widespread acts and practices in the for-profit and occupational school industry."  (940 Mass. Code Regs. § 31.01.)

29.     The Attorney General fails to indicate in any meaningful way what those unnamed, "widespread acts and practices" might be.  Though the Attorney General states that for-profit educational institutions "intensively market" the opportunities they offer, there is nothing unlawful or deceptive about an enterprise marketing itself.  In any event, the rules provide no explanation or justification for any finding that Career Schools doing business in the Commonwealth market themselves any more intensely than public or non-profit schools, which remain wholly exempt from the Regulations.

30.     The Attorney General nowhere provides a meaningful explanation or substantial evidence showing how the specific, enacted Regulations effectuate their stated purpose or address these allegedly widespread but unstated acts.  Instead, the Regulations impose sweeping, arbitrary requirements that unduly burden Career Schools and limit student opportunities, but are not tailored to suit their purported aim.

**B.** **The Record Contains Scant Evidence That the Attorney General Considered The Abundant Testimony That Was Offered During Rulemaking Regarding Problems Created By the Proposed Regulations.[1]**

31.     The Attorney General issued proposed regulations in November 2013.  Because the proposed regulations were neither specific, rational, nor consistent with prior FTC and federal decisions, they provoked substantial commentary from Career Schools and the students they serve.  Career Schools were uniquely positioned to provide informed commentary to help the Attorney General address failings in the proposed regulations, because the Career Schools knew better than anyone the preexisting regulatory background, the benefits they provide to students, and the way new regulations could negatively impact both commerce and the student experience.

32.     Numerous representatives from Career Schools submitted written comments to the Attorney General offering informed comments to assist the Attorney General's Office in promulgating rational, comprehensible, and enforceable regulations.  Witnesses identified multiple problems with the overarching regime, including that the regulations (a) lacked clear definitions of acceptable and unacceptable conduct; (b) applied an unworkable standard that would wrongly treat as deceptive any statement with the "tendency or capacity to mislead"; and (c) deviated from the existing and well-established regulatory structure in costly and confusing ways.

33.     Witnesses further identified the wide gulf between the purported objectives of the rule-making and specific proposed regulations, including:

(a)     the ill-defined, overbroad blanket restriction on communications with prospective students;

---

[1] The relevant public record as of the filing of this Complaint was composed of the Attorney General's proposed regulations, press releases, and Small Business Impact Statement, as well as testimony from public hearings, written testimony submitted during the rule-making process, and the final Regulations.

(b)     the arbitrary requirement that, after disclosures, students had to wait 72 hours before  they could enroll in school;

(c)     the rule that compelled false and misleading speech by forcing Career Schools to state (wrongly) that they were unaware of any schools that would accept their transfer credits beyond those schools with which they held written transfer agreements;

(d)     the harmful restriction on speech that informed students of accelerated options that enabled them to complete programs in less than the median time;

(e)     the vague  requirement compelling Career Schools to disclose "any fact relating to the school or program, disclosure of which is likely to influence the prospective student not to enter into a transaction with the school"; and

(f)     the unworkable mandate that would prohibit enrollment of any student if the school believed the student was unlikely to graduate or meet requirements for employment in the chosen field, based on the student's education level, training, experience, physical condition, or any other material disqualification.

34.     The  record  contains  no  evidence  that  the  Attorney  General  considered  this testimony  from  students  and  representatives  of  Career  Schools,  or  revised  the  proposed regulations in light of this evidence.

### C.     The Regulations Fall outside the Scope of the Enabling Statute.

35.     The  Massachusetts  Legislature  has  circumscribed  the  Attorney  General's rulemaking authority under 93A by mandating that issued regulations "shall not be inconsistent with the rules, regulations, and decisions of the FTC and the Federal Courts interpreting the provisions of [the FTCA], as from time to time amended."  (93(A), § 2.)

36.     The  Regulations targeting Career Schools are inconsistent with the FTC's own recently-revised regulations governing the same practices by the same institutions.  (16 C.F.R. § 254.)  The FTC drafted the Guides to be consistent with state licensing bodies and accreditors, mandated no affirmative disclosure requirements, and explicitly declined to "impose any burden beyond that already associated with complying with section 5 of the [FTCA]."  (78 Fed. Reg. 68,987, 68,988 (Nov. 18, 2013).)  The Attorney General's Regulations, by contrast, mandate

-11-

multiple affirmative disclosures, impose myriad new and inconsistent burdens, and reach far beyond the provisions of the FTCA.

37.     At least one of the Regulations in effect requires Career Schools to violate the FTCA.  On the one hand, the FTCA provides that schools must make truthful disclosures regarding transferability of credits.  On the other hand, the Regulations compel Career Schools to state that they know of no schools that accept their credits other than specific schools with which they have written credit-transfer agreements.  Such a statement—mandated by the Regulations— would frequently be a misrepresentation, because Career Schools are well aware of many schools that (a) have not entered into any written credit-transfer agreement, but (b) accept transfer credits that students earned at Career Schools.

38.     In needlessly creating a new regulatory regime that prohibits any statement that has the "tendency or capacity" to mislead, the Regulations adopt a standard for deceptive conduct that is broader than and inconsistent with the FTC's long-held standard, under which deception arises only where a practice is "likely" to mislead.  Thus the Regulations exceed the Attorney General's authority and are ultra vires.

**D.     The Challenged Regulations Conflict with Preexisting Federal Disclosure Requirements.**

39.     The issued Regulations are inconsistent with existing regulations and reporting requirements established by the U.S. Department of Education ("DOE" or "the Department"), accrediting agencies, and state licensing agencies.

40.     The DOE requires Career Schools to disclose information regarding graduation rates, placement rates, and median loan debt to students and prospective students.  The formulas used to calculate these prescribed rates have been carefully crafted by federal regulators to provide consumers with important information regarding educational programs.  Acting

unilaterally and outside the scope of her statutory authority, the Attorney General eschewed these established measures and imposed her own disclosure requirements.  There was neither any need nor any basis for imposing separate and potentially conflicting metrics.

41.     Multiplying the number of disclosures increases the burden on Career Schools without a corresponding benefit, particularly because the Attorney General's Regulations force Career Schools to use different inputs when calculating the figures they must disclose.  The inputs selected by the Attorney General do not track student cohorts, and are less useful, less helpful, and less meaningful than the federal metrics, which were established after extensive study.  As a result, in many cases, the Attorney General's Regulations require schools to publish different numbers that purport to measure the same metrics measured by the already-mandated federal calculus.  Publishing this multiplicity of information is not only unnecessary, but also more likely to confuse consumers than to improve transparency.

42.     The two primary sources of federal disclosure requirements are The Student Right-to-Know Act and the Gainful Employment Regulations.  The Student Right to Know Act, requires institutions eligible for Title IV funding to calculate graduation rates at the institutional level for certificate- or degree-seeking full-time students entering the institution.  (20 U.S.C. § 1092.)  Under the Gainful Employment Regulations, institutions must publish placement rates, median loan debt, and normal completion time and on-time completion rates for each program. (34 C.F.R. § 668.6(b).)

43.     Despite these well-established reporting requirements, the Attorney General's Regulations require institutions to use different metrics to calculate the same statistics:  for example, program graduation rates (940 Mass. Code Regs. 31.05(2)(b)), median completion time (*Id.*), and graduate placement rate (940 Mass. Code Regs. 31.05(b)).  The Regulations further

require disclosure of these figures, which will inevitably differ from the federally-required rates, because they rely on different inputs and different formulas.  There is no basis or evidence anywhere in the public record as to the reasons, if any, the Attorney General decided to depart from federal precedent and impose conflicting Regulations.  Even if there were such evidence supporting the Attorney General's inconsistent approach, and there is not, the Attorney General would still have failed to provide fair notice and adequate time for Career Schools to comply with these widespread, divergent new demands.

44.     The following Table compares the existing reporting requirements under the DOE regulations, accreditation requirements and the state AG's new Regulations:

**Table 1.       Conflicting Disclosure Obligations**

| | DOE – Gainful Employment (for each program)[2] | DOE – Student Right-To-Know Act (by institution) | Accreditation Requirements[3] | AG's Regulations |
|---|---|---|---|---|
| **Graduation Rate** | N/A | *First-time, full-time students* who graduate *within 150% of the normal time to completion*.<br><br>(Excludes students who serve in armed forces, on official church missions, or for the Federal Government, or are deceased, or permanently disabled)[4] | *First-time students who graduate within 150% of the normal time to completion*.<br><br>(Excludes students who serve in armed forces, have a medical condition that prevents continued enrollment, or are deceased, are incarcerated)[5] | *All* students who graduated from the program during the last 2 calendar years, divided by all students who enrolled in the program *during the last 2 calendar years*.[6]<br><br>(Provides no exclusions) |

---

[2] 34 C.F.R. 668.6(b).

[3] For this chart, we have selected the Accrediting Commission of Career Schools and Colleges ("ACCSC") to represent national accreditation agencies.  ACCSC is one of the largest national accrediting agencies in the country.

[4] 34 C.F.R. 668.41(a) - (d); 34 C.F.R. 668.45; 34 C.F.R. 668.8(b)(1)(ii).

[5] ACCSC glossary definition of Graduation Rate, available at
https://www.google.com/url?q=http://www.accsc.org/UploadedDocuments/2014%2520Forms/Graduation_and_Em

| | | | | |
|---|---|---|---|---|
| **Job Placement Rate** | The job placement rate for students completing the program as reported to the institution's accrediting agency and/or state licensing agency. | The school must disclose any placement rates it calculates (whether for internal purposes or required by an external agency). Schools must identify the source of the placement information, and any timeframes and methodology associated with calculating the rate.[7] | Rate of placement of students who graduated within 150% of normal completion time and employed in field. (Excludes students who serve in the armed forces, are deceased, incarcerated, have a medical condition, or international students who returned to county of origin.)[8] | The number of students obtaining full time (***32 hrs. a week***) employment in the field of study ***during the last 2 calendar years*** for which the school has obtained verification, divided by the number of all students graduating from the program during the last 2 calendar years.[9] |
| **Completion Time** | ***The normal time to complete the program, as published in the institutional catalog*** or other publications; and Of the students who completed the program during the most recent full year extending from July 1 to June 30, the number who completed the | N/A | N/A | ***The median duration of attendance in months***, rounded to the nearest month, of all students who obtained a certificate, diploma, or degree from a program ***during the latest 2 calendar years***.[10] |

ployment_Chart2014.xls&sa=U&ei=mxgGVKmiK4O8igL7roDoDg&ved=0CAUQFjAA&client=internal-uds-cse&usg=AFQjCNH7EukIPebhiqAVGfViiESfnBtb6A (last accessed September 2, 2014).

[6] 940 Mass. Code Regs. 31.03.

[7] *See* 34 C.F.R 668.41(d)

[8] ACCSC glossary definition of "Employment Rate," *available at* https://www.google.com/url?q=http://www.accsc.org/UploadedDocuments/2014%2520Forms/Graduation_and_Employment_Chart2014.xls&sa=U&ei=mxgGVKmiK4O8igL7roDoDg&ved=0CAUQFjAA&client=internal-uds-cse&usg=AFQjCNH7EukIPebhiqAVGfViiESfnBtb6A (last accessed September 2, 2014).  Note, this includes the number of graduates employed in jobs for which the program trained them

[9] Employment in field is defined as a job specified in the name of the program or in the certificate, diploma, or degree conferred by a school upon graduation from the program, or the reasonable equivalent thereof, such as those set forth in the "Sample of reported job titles" and "Related Occupations" listed in the Summary Report for each Standard Occupational Classification (SOC) code obtained by entering the program's Classification of Instructional Program (CIP) code on O*NET crosswalk, http://www.onetonline.org/crosswalk/CIP.

[10] 940 Mass. Code Regs. 31.05(2)(b).

| | program within normal time. | | | |
|---|---|---|---|---|
| | | | | |

45.     The DOE and accrediting agencies consistently track graduation and employment rates based on student cohorts to ensure that the rates reflect outcomes from similarly-situated students who have had the same, sufficient time-period in which to complete the educational program.   The rates also exclude certain students unable to complete a program or find employment (such as those who are deceased or serve in the armed forces).   These fundamental and logical considerations are inexplicably omitted from the rates required under the Attorney General's Regulations.[11]

46.     Where the Attorney General's requirements do not impose inconsistent obligations, they are, at best, redundant of preexisting federal regulations.   For example, schools must already disclose to prospective and enrolled students information about the academic program of the school, including instructional, laboratory, and other physical plant facilities relevant to the academic program.   (34 C.F.R. 668.43).   Schools must disclose to prospective and enrolled students a statement of the school's transfer of credit policies that includes established criteria the school uses regarding the transfer of credit earned at another school and a list of schools with which the school has established an articulation agreement.   (*Id.*).   And each school must make available to prospective and enrolled students names of associations, agencies, or governmental bodies that accredit, approve, or license the school and its programs.   (*Id.*).

47.     The Attorney General's Regulations are both unnecessary and counterproductive. For example, to the extent that the AG's metrics do not align with disclosures already required

---

[11] Table 1 does not include yet another set of proposed reporting requirements, which were recently released for public comment by the Massachusetts Division of Professional Licensure.

under federal law and accrediting agency standards, or they call for conflicting disclosures, consumers will likely be confused by multiple, conflicting percentages that claim to measure the program's "graduation and employment rate."

      **E.    Federal Law Preempts the Challenged Regulations.**

      48.    Federal law preempts one or more of the Attorney General's Regulations.  For example, the Regulations impose an unlawful blanket restriction on initiating communication with a prospective student, prior to enrollment, including "via telephone" or "text messaging," more than two times in a seven-day period.  (Mass. Code Regs. § 31.06 (9).)  This regulation unlawfully imposes a "do not call" obligation on the Career Schools inconsistent with federal law.

      49.    The federal "do not call" laws, including the Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227 ("TCPA"), the Telemarketing & Consumer Fraud & Abuse Prevention Act of 1994, 15 U.S.C. §§ 6101-6108 ("Telemarking Act"), and regulations issued pursuant to the TCPA and Telemarketing Act, explicitly permit telemarketing calls to consumers with the consumer's express consent.

      50.    The federal "do not call" laws, including the TCPA, preempt states from imposing requirements or regulations on interstate calls that are more restrictive than the federal requirements provided for in the statute.

      51.    Many of the Career Schools make calls from outside of Massachusetts to prospective students inside of Massachusetts.  These interstate calls are subject exclusively to federal regulation.

      **F.    The Challenged Regulations Will Impair Commerce.**

      52.    The Attorney General's Regulations nowhere claim that they will enhance the fiscal health of the Commonwealth.  The strongest, most positive claim that the Attorney General

can muster is still a net negative.  (940 Mass. Code Regs. at 2 (asserting that the Regulations will have no fiscal effect on the public sector, while the private sector will suffer from the purportedly "nominal" costs of compliance).)   Nothing in the record shows the bases for concluding the costs are "nominal," or that there will be no negative fiscal effect on Massachusetts.

53.     The mandatory Small Business Impact Statement requires the Attorney General to "[a]nalyze whether the proposed regulation is likely to deter or encourage the formation of new businesses in the Commonwealth."  (Small Business Impact Statement.)  The Attorney General fails to answer the question.   Instead, the Attorney General pronounces that "Massachusetts already has a robust market" for Career Schools, and claims that, if successful, the "regulations will allow these institutions to continue providing services…"  (*Id.*)  The Attorney General has presented no facts to support this conclusion.

54.     The services the Career Schools provide have a salutary effect on commerce, because (a) the schools are viable businesses, (b) they help students secure practical education experience leading to authentic job opportunities that might not otherwise be available, and (c) they create better-trained workers that benefit communities.

55.     Career Schools cater to non-traditional students, and can make the difference between an unskilled, and potentially unemployed individual, and a person who is able to join the workforce and make a meaningful contribution.  For example, Jessica Dasila, a Medical Assistant who received her training at a MAPCS Career School, "always wanted to become part of the medical field" and was able to accomplish that goal as a 23-year-old mother of two young children, because of financial aid, friendly teachers, and a career services department that helped her secure employment in a local hospital.

56.     By the Attorney General's own account, the Regulations impose costs upon "nearly 200" small businesses that "operate with a physical presence in the Commonwealth." (Small Business Impact Statement.)    Yet, even as the Attorney General imposes novel requirements and disclosures *at odds with* existing state and federal regulations, she declares that the compliance costs these businesses will endure are "[in]significant."   (*Id.*)   The Attorney General has presented no facts and offered no analysis to support this opinion.

57.     For the small business owners whose schools must now grapple with another set of regulations, the compliance costs are neither nominal nor insignificant.   For these business, invalidating or retaining the Regulations can mean life-or-death.   For example, the owner of a Career School in the Western Massachusetts town of Athol protested that the Regulations would drive her to close her business.

58.     Students closed out of Career Schools by the Regulations will have few, if any, viable options for education and advancement.   (Comments of Ashlee Giovanella, Dental Assistant (describing how she "had a very hard time" at a traditional college, but was a "very hands on learner" who thrived at a Career School and realized that "[t]hey provide outstanding education that not only helps you to build a career but also will change your life forever").)

59.     The Attorney General nowhere address the likely negative impact that would arise from Career Schools curtailing or canceling programs or denying enrollment to eligible students, leading to a workforce with less or inadequate training and education.

60.     The economic consequences of the Regulations ripple far beyond the schools' walls.   Imposing burdens that drive Career Schools out of business will exacerbate shortages of essential tradespeople.   For example, David Thompson, Operations Manager, UG-2 Integrated Facility Services praised technical trade schools because they help to address "[o]ne of the

biggest challenges facing the Electrical and HVACR fields," the shortage of trained, qualified entry-level candidates.  The Attorney General does not address this impact.

61.     Just as the broader community benefits from a more educated, employable workforce, the community will suffer if the Regulations force these schools to close or cut back. For example, Linda Woodacre of Woodacre Fuel & HVAC, Inc. stated:  "If the focus is on the employability of our population, the direction of education needs to be preparing individuals for REAL nuts & bolts jobs, not just the paper-management-money side of businesses."  Indeed, the Massachusetts Systems Contractors Association, Inc. stated that "the regulations, fees, and compliance requirements [of the Attorney General's Regulations]" could lead to the school's closing, despite a "dire" shortage of system technicians licensed to install security systems, and the "need [for] more schools, not fewer!"

62.     Chapter 93A protects consumers from abusive practices in trade or commerce. Leaving aside the fact that the new Regulations are an unnecessary regulatory layer atop an already robust consumer protection statute, 93A was not designed to regulate so arbitrarily and onerously that valuable businesses have to close their doors.  Such regulations are all the more unwise when the very businesses they injure are the businesses that create the next generation of more valuable employees.

### F.     The Regulations Are Inflicting Irreparable Harm.

63.     The Regulations are causing, and will continue to cause, irreparable harm to MAPCS and its member schools,  thereby entitling them to injunctive relief for multiple reasons, including the following:

64.     *First*, the denial of constitutional rights constitutes immediate and irreparable harm.  As described above, not only do the Regulations constitute a clear violation of due

process rights, but the looming Regulations and their mandates of restrained and compelled speech violate MAPCS members' First Amendment free speech rights.

65.     *Second*, the existence of the Regulations is causing and will cause turmoil, expense, and enormous time and effort, as MAPCS members struggle to determine how to comply with the unreasonable and confusing Regulations and take steps to ameliorate their effects.  Significant resources previously devoted to educational offerings for students must now be diverted to compliance, legal advice and interpretation, and litigation that will likely arise as a result of the Regulations' vague and overbroad scope.  By forcing Career Schools to incur unrecoverable costs or to reduce or eliminate educational and training opportunities to students, the Regulations impose unwarranted taxes on Career Schools.

66.     *Third*, the Regulations require numerous additional disclosures by MAPCS members under complex, ambiguous, and irrational reporting requirements.  Because it will be very difficult, if not impossible, to avoid any errors and inconsistencies in complying with these new detailed reporting requirements, MAPCS members are likely to face disproportionate, extreme sanctions.

67.     For these and other reasons, the regulations are causing and will continue to cause MAPCS members immediate and irreparable harm, entitling them to preliminary and permanent injunctive relief.

## CLAIMS FOR RELIEF

### COUNT I
### THE REGULATIONS VIOLATE THE FIRST AMENDMENT OF THE UNITED STATES CONSTITUTION BY UNLAWFULLY COMPELLING SPEECH

68.     Plaintiff incorporates by reference the allegations of the preceding paragraphs.

69.     The Regulations violate the First Amendment by unlawfully compelling inaccurate or misleading speech.  These violations include, among other things, the following:

70.     *First*, the Regulations unlawfully compel Career Schools to utter false speech when informing students or prospective students about transferability of credit.  Career Schools must identify those schools with which they have written agreements regarding transfers, and must state that, beyond such agreements, they are "aware of no other schools that accept the transfer of [their] credits."  (940 Mass. Code Regs. § 31.05 (7).)  Such a disclosure would be false, however, because Career Schools are aware of numerous cases where, even in the absence of any written agreement, other schools accept the transfer of their credits.  Compelling false disclosures cannot withstand constitutional scrutiny.

71.     *Second*, the Regulations unlawfully compel Career Schools to make non-factual disclosures voicing the Attorney-General's opinion, such as "[f]ailure to repay student loans is likely to have a serious negative effect on your credit, future earnings, and your ability to obtain future student loans."  (940 Mass. Code Regs. 31.05 (3)(a).)

72.     The compelled disclosures do far more than merely make a proposal for a commercial transaction, and are not commercial speech, and therefore strict scrutiny applies. They cannot survive strict scrutiny because the compelled disclosures are not narrowly tailored to promote a compelling Government interest.  Moreover, in the alternative, even if intermediate scrutiny or some lesser scrutiny applies, the Attorney-General still cannot show that the rules pass constitutional muster.

## COUNT II
### THE REGULATIONS VIOLATE THE FIRST AMENDMENT OF THE UNITED STATES CONSTITUTION BY UNLAWFULLY RESTRAINING SPEECH

73.     Plaintiff incorporates by reference the allegations of the preceding paragraphs.

74.     The Regulations violate the First Amendment by unlawfully restraining speech.

75.     The Regulations impose an unlawful blanket restraint on speech that bars

"initiating communication with a prospective student" more than twice in seven days.  (940 Mass. Code Regs. § 31.06 (9).)  This blanket restraint is in no way tailored to deceptive or unfair conduct.  The restraint further fails to recognize that prospective students often need information regarding their program that is communicated in several conversations that may, of necessity, occur within seven days.  This blanket prohibition on lawful speech violates the Free Speech guarantees of the Constitution of the United States.

## COUNT III
## FEDERAL LAW PREEMPTS THE REGULATIONS

76.     Plaintiff incorporates by reference the allegations of the preceding paragraphs.

77.     The prohibition on initiating communication with a prospective student prior to enrollment "via telephone" or "text messaging" more than two times in a seven-day period is inconsistent with federal law, which permits businesses to contact consumers with the consumer's express consent.  (Mass. Code Regs. § 31.06 (9).)

78.     Calls that Career Schools make from outside of Massachusetts to prospective students inside of Massachusetts are subject solely to federal regulation.

79.     Federal law, including the TCPA, preempts the Attorney General's Regulations to the extent they conflict with and impose more restrictive obligations on interstate calls than those provided by federal law.

## COUNT IV
## THE REGULATIONS VIOLATE THE DUE PROCESS CLAUSE OF THE UNITED STATES CONSTITUTION

80.     Plaintiff incorporates by reference the allegations of the preceding paragraphs.

81.     The Regulations violate Plaintiff and its members' rights under the Due Process Clause of the United States Constitution because of, among other things, the following:

82.     *First*, the Regulations are so vague that they fail to give Plaintiffs adequate notice

of what constitutes prohibited conduct.  As a result, Career Schools are incapable of determining whether, and how, their conduct will conform to the Regulations.  By failing to provide clear definitions in the Regulations, the Attorney General has obtained unbridled authority.

83.     For example, the Regulations term it unfair or deceptive for a school to fail to inform a prospective student of "any fact relating to the school or program, disclosure of which is likely to influence the prospective student not to enter into a transaction with the school." (Mass. Code Regs. § 31.05 (1).)  Such open-ended Regulations fail to provide the guidance that valid regulations must provide, because Career Schools cannot know which factor(s) might or might not influence a particular student.

84.     *Second*, the Regulations provide that it is a deceptive practice to enroll or induce retention of a student if the school "knows or should know" that a student is unlikely to graduate or meet requirements for employment in the chosen field based on the student's "education level, training, experience, physical condition, or other material disqualification."  (Mass. Code Regs. § 31.06 (6).)  Career Schools cannot lawfully or reasonably be held liable if they fail to predict such multi-factor outcomes or perform the open-ended investigation the regulation appears to require.  Career Schools would also be inviting litigation by denying enrollment to students who they "should know" may not succeed, including potential violations of the Americans with Disabilities Act.  Valid regulations would not place the regulated parties in that impossible position, where—even if they could understand the dictates of the rule—they could not lawfully comply.

85.     *Third*, the broad, vague prohibition on any statement that has "the tendency or capacity to mislead or deceive" violates Due Process, because it does not provide ascertainable certainty regarding what conduct is, and is not, prohibited.  (Mass. Code Regs. § 31.04 (7).)

## COUNT V
## THE REGULATIONS ARE INVALID AS ULTRA VIRES

86.     Plaintiff incorporates by reference the allegations of the preceding paragraphs.

87.     The Attorney General's Regulations are inconsistent with the regulations of the FTC and the Federal Courts interpreting the FTCA.  Neither the general standards purported to guide conduct nor the specific provisions promulgated comport with these federal precedents. For example, when making disclosures regarding transferability of credits, Career Schools cannot comply with both the FTCA and the Regulations.  The FTCA requires truthful disclosure, but the Regulations mandate the (often false) disclosure that a Career School knows of no school that accepts its transfer credits other than those schools that have entered into a written credit-transfer agreement with the Career School.

88.     The Regulations' inconsistencies with decisions by the FTC and federal courts place them beyond the scope of the enabling statute, and thus render them invalid as ultra vires.

## COUNT VI
## THE REGULATIONS ARE ARBITRARY AND CAPRICIOUS

89.     Plaintiff incorporates by reference the allegations of the preceding paragraphs.

90.     The Attorney General's Regulations are arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, untethered to the rules' stated purpose, and otherwise not in accordance with law, in violation of the Massachusetts Administrative Procedure Act, Mass. Gen. Laws ch. 30A, § 7, because of, among other things, the following:

91.     *First*, the Attorney General failed to articulate a satisfactory explanation for the Regulations issued; failed to explain the need for this additional layer of regulation in light of the preexisting regimes; failed to explain why the Regulations target only Career Schools; failed to provide a rational connection between the facts found and the Regulations; and issued Regulations that not only conflict with established metrics and compel false and inaccurate

-25-

statements, but that also fail to measure program outcomes and graduation rates in any rational or meaningful way.

92.     For example, the DOE and accreditors have traditionally and sensibly tracked graduation rates by student cohorts.  The prescribed Graduation Rate that Career Schools must disclose under the Regulations, however, is arbitrarily defined by a two-year window—the purported rate takes into account neither the length of the program nor the normal time to completion.  (Mass. Code. Regs. § 31.03 (6) (2014); *id.* at § 31.05.)  Nor does the formula provide a meaningful comparison.  The numerator in the Attorney General's formula (students who graduated during the last two years) is not a subset of the denominator (students who enrolled during the last two years).  Indeed, with rolling admissions and varying program length, there is little relationship between enrollees and graduates in a given time period, so the number generated is arbitrary, and offers scant value.

93.     *Second*, although the regulations are ostensibly intended to aid the Commonwealth's students as consumers of career-oriented education, they impose burdens on only one type of educational institution—proprietary schools.  But proprietary schools are far from the only institutions offering such programs.  The same or similar programs are offered by many non-profit institutions.  Many such institutions in fact compete for the same students as proprietary schools.  The Commonwealth recognized this in establishing the DPL in 2012, which has jurisdiction over all career schools.  There is scant basis in the record for discriminating against all proprietary institutions by imposing vague and burdensome new requirements, while entirely exempting their competitors.  In so doing, the Attorney General has made an unsubstantiated distinction that is arbitrary and capricious.

94.     *Third*, the regulations arbitrarily impose a 72-hour waiting period on enrollment,

which is not supported by any record evidence, and is not a realistic solution for students who seek to benefit from programs that, in many cases, commence every week.

95.     Such failures render the Regulations invalid, because they are arbitrary and capricious.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for an order and judgment:

**A.** Declaring that the For-Profit and Occupational Schools Regulations in 940 Mass. Code Regs. 31.00 were promulgated by Defendant without statutory authority within the meaning of 93A, § 2; that the Regulations are contrary to the Constitution of the United States; and that the Regulations are arbitrary and capricious;

**B.** Declaring that any action previously taken by Defendant pursuant to the final Regulations is null and void;

**C.** Enjoining Defendant and her officers, employees, and agents from implementing, applying, or taking any action whatsoever pursuant to the final Regulations;

**D.** Vacating the final Regulations;

**E.** Awarding Plaintiff its reasonable costs, including attorneys' fees, incurred in bringing this action, to the extent authorized; and

**F.** Granting such other and further relief as this Court deems just and proper.

Respectfully submitted,

/s/ Robert B. Lovett
Robert B. Lovett (BBO #561691)
Adam Gershenson (BBO #671296)
Courtney Caruso (BBO # 687642)
COOLEY LLP
500 Boylston Street
Boston, MA 02116-3736
Tel.: (617) 937-2300
Fax: (617) 937-2400
rlovett@cooley.com
agershenson@cooley.com
ccaruso@cooley.com

*Counsel to the Massachusetts Association of Private Career Schools*

## **CERTIFICATE OF SERVICE**

IT IS HEREBY CERTIFIED that on this 25th day of September, 2014, Massachusetts Association of Private Career Schools' Complaint and Demand for Declaratory and Injunctive Relief, filed through the ECF system will be sent electronically to the registered participants on the Notice of Electronic Filing and paper copies will be sent by hand to any non-registered participants.

/s/ Robert B. Lovett
Robert B. Lovett (BBO #561691)
*rlovett@cooley.com*
COOLEY LLP
500 Boylston St.
Boston, MA  02116-3736
Tel.:  (617) 937-2300
Fax:  (617) 937-2400

-29-

110391691 v3