**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MASSACHUSETTS ASSOCIATION OF PRIVATE CAREER SCHOOLS (MAPCS), <br><br>       Plaintiff, <br><br>       v. <br><br> MAURA HEALEY, in her official capacity as the MASSACHUSETTS ATTORNEY GENERAL, <br><br>       Defendant. | **C.A. No. 14-cv-13706-FDS** |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND IN REPLY TO DEFENDANT'S <u>OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>**

**Table of Contents**

**Page**

PRELIMINARY STATEMENT ............................................................................. 1

FACTUAL BACKGROUND .............................................................................. 2

ARGUMENT ................................................................................................. 4

I.      THE AG HAS NOT MET ITS BURDEN TO SATISFY THE FIRST
AMENDMENT ...................................................................................... 4

    A.     The AG Cannot Escape *Sorrell* or the Long-Standing Rule Against
Content and Viewpoint Discrimination ................................................. 5

    B.     The AG Never Squarely Addresses the Regulations' Fatal Flaw: Content-
and Viewpoint-Discrimination ............................................................ 6

         1.     The AG Cannot Justify Restraints on Disfavored Speech By
Attacking the Disfavored Speakers ........................................... 7

         2.     The AG Cannot Justify Restraints by Citing "Pain-Based"
Marketing ................................................................................ 8

         3.     The AG Ignores Listeners' Rights ............................................. 8

             a.     The Communication Restraint Bars Consensual Calls .................. 9

             b.     Prospective Students Are Not "Captives." .................................. 9

         4.     The AG Contradicts *Sorrell* and Requests Limited Judicial Review ...... 10

             a.     *Sorrell* Requires Heightened Scrutiny: "Commercial speech
is no exception." ........................................................ 10

             b.     *Sorrell* is the Court's "last word" on Commercial Speech .......... 11

    C.     The AG Claims *Central Hudson* Applies, But Never Performs the
Analysis Required Under *Central Hudson*, Which the Regulations Cannot
Survive ........................................................................................ 11

         1.     Under *Central Hudson*, the "outcome is the same" as under
Sorrell: Content- and Viewpoint-Based Regulations are Invalid ........... 11

         2.     *Central Hudson* Cannot Excuse Prohibitions on Speech That Is
Not Actually Misleading ......................................................... 12

         3.     The AG Neither Performs Nor Satisfies the *Central Hudson*
Analysis .................................................................................. 13

             a.     The State Fails to Assert a Substantial Interest ........................... 13

             b.     The AG Nowhere Proves that the Regulations Directly
Advance a Substantial Interest .......................................... 14

             c.     The AG Nowhere Proves that the Restrictions Burden No
More Speech Than Necessary ........................................... 15

# Table of Contents
(continued)

Page

D. The AG's Invocation of *Zauderer* Cannot Rescue Content- and Viewpoint-Based Disclosures ............................................................ 16

    1. *Zauderer* Cannot Excuse Content and Viewpoint Discrimination .......... 17

    2. *Zauderer* Cannot Rescue Non-Factual or Controversial Disclosures ...... 18

    3. Disclosures May Be Compelled Only Where Speech Is Otherwise "Inherently" Misleading ............................................................................ 19

II. THE AG CANNOT CURE THE REGULATIONS' VAGUENESS ............................ 20

    A. Schools Need Some Guidance to Order Their Affairs ......................................... 21

    B. The AG's Arguments against Facial Challenges Do Not Apply When Speech is Involved .............................................................................................. 22

    C. Compelling Disclosure of "Any Fact" Provides Scant Guidance ....................... 23

    D. No Clear Boundaries Show What Schools "Should Know" About "Any" Material Disqualification ................................................................................... 23

III. THE AG CANNOT AVOID PREEMPTION BY CITING AN INAPPLICABLE PRESUMPTION THAT CONTRAVENES THE STATUTORY SCHEME ................. 24

    A. The Presumption Against Preemption Does Not Apply to Interstate Calls ........ 24

    B. Congress Intended to Preempt State Regulation of Interstate Telemarketing ...................................................................................................... 26

        1. The FCC Has Exclusive Jurisdiction over Interstate Telemarketing ............................................................................................ 26

        2. Legislative Intent Supports Implied Preemption ........................ 28

        3. The FCC's Interpretation Supports Preemption .......................... 28

    C. The Regulations Undermine Federal Approval of Consensual Telemarketing ...................................................................................................... 29

CONCLUSION ................................................................................................................. 30

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Commc'n Ass'n v. Douds*,
339 U.S. 382 (1950)..............................................................................................24

*Arizona v. United States*,
132 S. Ct. 2492 (2012).........................................................................................30

*Bates v. State Bar of Arizona*,
433 U.S. 350 (1977)..............................................................................................13

*Benanti v. United States*,
355 U.S. 96 (1957)................................................................................................27

*Berg v. Merchs. Ass'n Collection Div. Inc.*,
586 F. Supp. 2d 1336 (S.D. Fla. 2008) ...............................................................16

*Bolger v. Youngs Drugs Prods. Corp.*,
463 U.S. 60 (1983)................................................................................................10

*Boyce Motor Lines v. United States*,
324 U.S. 337 (1952)..............................................................................................24

*Buckman Co. v. Plaintiffs' Legal Comm.*,
531 U.S. 341 (2001)........................................................................................25, 26

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*,
447 U.S. 557 (1980)..............................................................................................14

*Citizens United v. Fed. Election Comm'n*,
558 U.S. 310 (2010)..............................................................................................23

*City of Arlington, Texas v. FCC*,
133 S. Ct. 1863 (2013).........................................................................................29

*City of Cincinnati v. Discovery Network, Inc.*,
507 U.S. 410 (1993).....................................................................................9, 11, 16

*Courtney v. Mitsubishi Motors Corp.*,
926 F. Supp. 223 (D. Mass. 1996) .......................................................................27

*Massachusetts ex rel. Div. of Marine Fisheries v. Daley*,
170 F.3d 23 (1st Cir. 1999).....................................................................................2

*Edenfield v. Fane*,
    507 U.S. 761 (1993) ................................................................................13, 15

*FCC v. Fox Television Stations, Inc.*,
    132 S. Ct. 2307 (2012) .......................................................................................23

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) ..........................................................................................27

*First Nat'l Bank of Boston v. Bellotti*,
    435 U.S. 765 (1978) ............................................................................................9

*FTC v. Direct Mktg. Concepts, Inc.*,
    569 F. Supp. 2d 285 (D. Mass. 2008) ..............................................................13

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) ............................................................................................6

*Gresham v. Peterson*,
    225 F.3d 899 (7th Cir. 2000) ...........................................................................5, 6

*Hightower v. City of Boston*,
    693 F.3d 61 (1st Cir. 2012) ...............................................................................23

*Ibanez v. Florida Dep't of Bus. & Prof'l Regulation, Bd. of Accountancy*,
    512 U.S. 136 (1994) ..........................................................................................12

*Ji v. Bose Corp.*,
    647 F. Supp. 2d 77 (D. Mass. 2009) ...................................................................8

*Linmark Assoc., Inc. v. Willingboro Twp.*,
    431 U.S. 85 (1977) ............................................................................................15

*44 Liquormart, Inc. v. Rhode Island*,
    517 U.S. 484 (1996) .......................................................................................7, 15

*Milavetz, Gallop & Milavetz, P.A. v. United States*,
    559 U.S. 229 (2010) ..........................................................................................20

*Moser v. FCC*,
    46 F.3d 970 (9th Cir. 1995) ..........................................................................16, 29

*Nat'l Ass'n of Tobacco Outlets v. City of Providence*,
    731 F.3d 71 (1st Cir. 2013) ...............................................................................11

*Nat'l Ass'n of Tobacco Outlets, Inc. v. City of Worcester*,
    851 F. Supp. 2d 311 (D. Mass. 2012) .............................................................8, 11

iv

*Nat'l Endowment for the Arts v. Finley*,
     524 U.S. 569 (1998)...................................................................................22

*Olsen v. United States*,
     414 F.3d 144 (1st Cir. 2005).......................................................................2

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of California*,
     475 U.S. 1 (1986)........................................................................................19

*Patriotic Veterans, Inc. v. Indiana*,
     736 F.3d 1041 (7th Cir. 2013) ...................................................................30

*In re R.M.J.*,
     455 U.S. 191 (1982)....................................................................................13

*Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*,
     487 U.S. 781 (U.S. 1988)................................................................6, 9, 17, 19

*In re Rules and Regulations Implementing the Telephone Consumer Protection
     Act of 1991, Report and Order*,
     18 F. .........................................................................................25, 26, 29

*Sabri v. United States*,
     541 U.S. 600 (2004)....................................................................................23

*Sorrell v. IMS Health Inc.*,
     131 S. Ct 2653 (2011).......................................................................... *passim*

*Southwell v. Mortgage Investors Corp. of Ohio*,
     No. C13-1289 MJP, 2013 WL 6049024 (W.D. Wash. Nov. 15, 2013)...................30

*Teltech Systems, Inc. v. Bryant*,
     702 F.3d 232 (5th Cir. 2012) ...............................................................26, 30

*Thompson v. W. States Med. Ctr.*,
     535 U.S. 357 (2002)...............................................................................7, 8, 15

*Turner Broad. Sys., Inc. v. FCC*,
     520 U.S. 180 (1997)......................................................................................6

*United States v. Locke*,
     529 U.S. 89 (2000)................................................................................25, 26

*United States v. Massachusetts*,
     724 F. Supp. 2d 170 (D. Mass. 2010), ..................................................25, 26

*United States v. Nat'l Dairy Prods. Corp.*,
     372 U.S. 29 (1963)......................................................................................23

*Van Bergen v. Minnesota,*
    59 F.3d 1541 (8th Cir. 1995) .......................................................................... 30

*Van Wagner Boston, LLC v. Davey,*
    770 F.3d 33 (1st Cir. 2014) .............................................................................. 23

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
    455 U.S. 489 (1982) ........................................................................................ 23

*Virginia State Bd. of Pharm. v. Virginia Citizens Consumer Council, Inc.,*
    425 U.S. 748 (1976) .......................................................................................... 9

*Zauderer v. Office of Disciplinary Counsel of Sup. Ct. of Ohio,*
    471 U.S. 626 (1985) ..................................................................... 17, 18, 19, 20

**Statutes**

U.S.C. § 152 .......................................................................................................... 27

47 U.S.C. 151 et seq. ............................................................................................. 27

47 U.S.C. § 152(a) ........................................................................................... 27, 28

47 U.S.C. § 227(f)(1) ............................................................................................. 28

Mass Code Regs 31.03 ............................................................................................. 5

940 Mass. Reg. 31.04(2) ................................................................................... 13, 20

Mass Code Regs 31.05 ............................................................................................. 5

Mass Code Regs 31.05(1) .................................................................................... 5, 21

Mass. Code Regs. 31.05(3) ..................................................................................... 18

Mass Code Regs 31.05(7) ......................................................................................... 5

Mass Code Regs 31.05(9) ......................................................................................... 5

Mass Code Regs 31.06 (6) ....................................................................................... 21

Mass Code Regs 31.06(9) ...................................................................................... 5, 9

Mass. Code Regs. 31.01 ........................................................................................... 25

**Other Authorities**

47 C.F.R. § 64.1200(f)(12) ..................................................................................... 25

47 C.F.R. § 64.1200(f)(5) ............................................................................................30

*GAO bias evident in report on for-profit college industry*, The Hill, Jan. 14, 2011 ........................3

*GAO report revisions lead to lawsuit by for-profit college group*, CNN.com, Feb. 8, 2011 ................................................................................................................3

*GAO revises its report critical of practices at for-profit schools*, Wash. Post, December 7, 2010 ................................................................................................3

S. Rep. No. 102–178, at 3, *reprinted in* 1991 U.S.C.C.A.N. 1968 ..............................................28

## PRELIMINARY STATEMENT

MAPCS' opening brief demonstrated that the AG's Regulations on Proprietary Schools contravened federal statutes, Supreme Court precedent, and the United States Constitution. To rescue the Regulations, the AG's opposition ignores or distorts relevant law, asks this Court to apply little or no scrutiny to the State's actions, and relies on biased sources the AG never considered in rulemaking. The AG's opposition confirms that the AG overreached in its fervor to regulate Proprietary Schools, because the Regulations: (1) impose content and viewpoint based restrictions and disclosures that fail First Amendment review under any standard; (2) are ripe for, and vulnerable to, MAPCS' vagueness challenge because they impact speech, provide scant notice of prohibited conduct, and allow for arbitrary enforcement; and (3) conflict with federal laws designed to govern consensual communications.

As the AG admits, this suit addresses "a [n]arrow [s]ubset of [the] Regulations" (AG Br. 5)—the subset where the AG goes too far. The AG goes too far when it unlawfully interferes with communications between consenting adults; endows itself with unbridled prosecutorial discretion; and attempts to obscure the Regulations' defects by introducing information from outside the public record that has long been discredited as biased. This Court should decline the AG's repeated invitations to "presume" the Government is right, apply lesser scrutiny than the law requires, or to otherwise bless these Regulations. The AG has written this law, but is not *above* the law. No matter how intensely the AG disapproves of for-profit education, the State cannot strip Proprietary Schools of legal protections enshrined in federal statutes and the United States Constitution. State laws must comport with the Supremacy Clause; the Regulations do not. The Court should grant MAPCS' motion for summary judgment.

**FACTUAL BACKGROUND**

MAPCS' opening brief established that the public record could not support the Regulations.[1]  In recognition of this fatal weakness, the AG now attempts to save the Regulations by selectively using "Other Sources of Information"—sources that are not part of the public record on which the Regulations were based.  (Dkt. No. 42, AG Statement of Undisputed Material Facts ("SUMF" at 26).)  Indeed, those sources are a much-derided report from the Government Accountability Office ("GAO"), and a Senate Committee Report that relied on the dubious and biased GAO investigation.  (*Id.* at 27, 29.)  The AG does not even claim to have read the entire Senate Committee report, or to have read the GAO report at all when considering the Regulations.  (*See id.* at ¶ 252 (claiming to have "considered the findings and conclusions" of the Senate Committee Report); *id.* at ¶¶ 272 (making no claim to have reviewed or considered any part of the GAO Report, even while purporting to "append" the Report to the SUMF).)

Even if these materials were properly in the record, and they are not, they would carry precious little weight because of their unreliable provenance.  The Senate Committee Report commissioned and relied on testimony arising from the GAO investigation, but the GAO investigation was so riddled with errors, *all of them slanted against Proprietary Schools*, that the report could only be salvaged through subsequent amendments, and the GAO had to be reorganized to prevent further damage to its credibility.  (*See, e.g.*, Ex. 1, Memorandum to GAO Employees, Executive Announcements, March 1, 2011 ("announcing several changes . . . [to] ensure greater attention to the issues that led to the need to produce the errata to the for-profit

---

[1]  "Where agency action is taken upon an administrative record, it must . . . be reviewed based on that record."  *Massachusetts ex rel. Div. of Marine Fisheries v. Daley*, 170 F.3d 23, 28 n. 4 (1st Cir. 1999); *see Olsen v. United States,* 414 F.3d 144, 155-56 (1st Cir. 2005) (Supplementing the record is reserved for exceptional circumstances such as "where there is a strong showing of bad faith or improper behavior by agency decision makers.").  These fundamental tenets ensure that the sources considered during the public comment period are truly public, and prevent government bodies from conjuring belated rationalizations for unsupported regulations.

schools report," and recognizing that a "report on the for-profit school work identified areas to improve quality control");[2] Ex. 2, *GAO report revisions lead to lawsuit by for-profit college group*, CNN.com, Feb. 8, 2011 (recounting how the GAO presented to the Senate Committee a "report[] that went awry" and later had to issue "a substantially changed report and all of it changed in favor of the for-profit schools").)   The GAO's inaccuracies went directly to the marketing practices at stake here.  (Ex. 3, *GAO revises its report critical of practices at for-profit schools*, Wash. Post, December 7, 2010 (highlighting changes from the original to the revised report on issues such as completion time, earnings, and graduation rates).)[3]

The Senate Committee relied heavily on the GAO report and other sources biased against Proprietary Schools—the same bias that the AG now seeks to disclaim.  Indeed, committee members wrote the chairman because hearings were not "broadly focused on the challenges faced by students attending *all* institutions of higher education" and were "most remarkable for a concerning lack of objectivity . . . false testimony . . . [and] biased and unprofessional conduct." (Ex. 5, Ltr. from Sen. M. Enzi to T. Harkin, April 13, 2011.)  MAPCS can find no evidence that the report was ever used as a basis for legislation or even voted on by Senate committee members.  It thus appears to be the work product of just one member, the Committee Chairman.

In attempting to have this Court go outside the record to consider other sources, the AG did not include the foregoing and other ample and public criticisms levied against a defective, slanted process that created a biased, unreliable report.   Yet the AG relies on the Senate HELP Report, the GAO Report, or both to support *every one* of the Regulations that the State would

---

[2] All exhibits cited herein are exhibits attached to the Declaration of Adam Gershenson, July 14, 2015.

[3] "Flagrant errors and misrepresentations [remained  even in the] heavily amended and revised version of the study."  (Ex. 4, *GAO bias evident in report on for-profit college industry*, The Hill, Jan. 14, 2011) (finding that out of 65 original findings, only 14 could be verified as credible, whereas others were "outright false [],  entirely fitting for a whole process riddled with mistakes, failed analysis and a fundamental lack of understanding.")

defend on First Amendment grounds.[4]  (Dkt. No. 40-1, Ex. A.)  The vast majority of commenters cited by the AG explicitly rely on the same dubious sources.  (*Id.*)[5]  The AG's defense, constructed to appear as a massive wall of facts, is in reality little more than a single data point, worthy of deep skepticism, repeated over and over.  The AG cannot invoke error-filled testimony and a partisan report that went nowhere as a post-hoc justification for constitutionally infirm Regulations.

## ARGUMENT

## I.   THE AG HAS NOT MET ITS BURDEN TO SATISFY THE FIRST AMENDMENT.

As the Supreme Court recently held, "***it is all but dispositive to conclude that a law is content-based and, in practice, viewpoint-discriminatory***." *Sorrell v. IMS Health Inc.*, 131 S. Ct 2653, 2664 (2011) (emphasis added) (Pl. Br. 7-9).  This fundamental rule guides and simplifies the analysis here, because it governs the inquiry—and compels invalidation—regardless of the level of scrutiny applied, and regardless of whether the Court treats certain provisions as speech restrictions or compelled disclosures.  The AG does not, and cannot, refute that the Regulations are content and viewpoint based.  From this starting point, the AG contorts Supreme Court precedents, skips mandated stages of First Amendment analysis, and pleads for minimal judicial scrutiny, but never squarely addresses this inescapable conclusion.  As a result, the AG has failed to meet its burden, mandating that the following provisions be held invalid:[6]

- The **Communication Restraint** (Mass Code Regs 31.06(9)), which, after two communications in a week, bars *all* communications from Proprietary Schools to prospective students, including all manner of truthful, consensual speech;

---

[4] The AG's Ex. A makes no reference to the Disqualification Obligation or the Any Fact Disclosure, though the latter is a compelled disclosure subject to First Amendment scrutiny.

[5] The AG also relies on comments from those who would benefit directly from injuries to—and reduced enrollments in—Proprietary Schools, such as AASCU, a trade association for competing "public colleges." (AR 442.)

[6] *See also* Pl. Br. 5-6 (describing the challenged provisions).

- The **Credit Transfer Assertion** (Mass Code Regs 31.05(7)), which forbids Proprietary Schools from truthfully stating that credits "are or may be transferable" unless they also *falsely* state that they are aware of no other schools, beyond those for which they have documentary evidence, that accept such credits;

- The **Completion Time Prohibition**, (Mass Code Regs 31.05(9)), which prohibits the indisputably true statement that "a program can be completed" in less than the "median completion time";

- The **Negative Effect Prediction** (Mass Code Regs 31.05), which requires Proprietary Schools to mislead students by implying that failure to repay an educational loan is likely to diminish their future earnings;

- The **Any Fact Requirement** (Mass Code Regs 31.05(1)), which leaves Proprietary Schools vulnerable to arbitrary prosecution for failure to disclose "any fact" likely to influence any student's enrollment in any way;

- The **Graduation Rate Calculus** (Mass Code Regs 31.03; 31.05(2)(b) and dependent **Total Placement Rate Calculus** (Mass Code Regs 31.03; 31.05(4)(b)(2)), which mandate confusing disclosures that conflict with preexisting, unquestionably truthful, federally-mandated rate disclosures.

All these provisions impose content and viewpoint based discrimination, and all are presumptively invalid. The AG's opposition fails to prove that such rules survive First Amendment scrutiny, and ample Supreme Court precedent demonstrates that they do not.

### A.      The AG Cannot Escape *Sorrell* or the Long-Standing Rule Against Content and Viewpoint Discrimination.

"[C]ontent-and-speaker-based restrictions" demand strict, or "heightened judicial scrutiny." *Sorrell*, 131 S. Ct at 2664; (Pl. Br. 7-9). Accordingly, a law that "disfavors marketing, that is, speech with a particular content" and "disfavors specific speakers" such as Proprietary Schools, cannot stand. *Id.* at 2663. *Sorrell* is directly on point.

The AG cites fifty-six cases, and one after another, they reaffirm the Regulations' invalidity. The AG's invocation of *Gresham v. Peterson*, 225 F.3d 899 (7th Cir. 2000) is instructive, particularly when contrasted with the Supreme Court's decision in *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 799 (U.S. 1988). In *Gresham*, the 7th

Circuit upheld an ordinance banning aggressive panhandling because the law was "content neutral" and viewpoint neutral—it "applie[d] with equal force to anyone who would solicit a charitable contribution, whether for a recognized charity, a religious group, a political candidate or organization, or for an individual." *Gresham*, 225 F.3d at 903, 906. By contrast, in *Riley*, the Supreme Court *invalidated* a law like these Regulations because it compelled disclosures *only* from professional fundraisers engaged in solicitations, and thus imposed unconstitutional viewpoint discrimination, because "the identical solicitation with its high costs and expenses, if carried out by the employees of a charity or volunteers, results in no compelled disclosure." *Riley*, 487 U.S. at 799.

Nor do the AG's other cases excuse content or viewpoint discrimination. *See, e.g., Grayned v. City of Rockford*, 408 U.S. 104, 107-08, 115, 120 (1972) (upholding in part anti-noise ordinance that barred everyone, regardless of viewpoint, from interfering with school activities, because the law gave "no license to punish anyone because of what he is saying"); *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 186 (1997) (upholding "content-neutral regulation" that "does not distinguish favored speech from disfavored speech").

The Regulations do not apply with equal force to all parties pursuing the same conduct. Every restraint and every compelled disclosure applies *only* to for-profit schools. The "identical solicitation" carried out by a competing community college offering the same programs and absorbing more public money would result in no restraint and no compelled disclosure. That discrimination is exactly what the First Amendment, and the Supreme Court, forbids.

**B.     The AG Never Squarely Addresses the Regulations' Fatal Flaw: Content- and Viewpoint-Discrimination.**

Black-letter constitutional law bars the Regulations' discrimination, and the State cannot divert this Court's focus when it (1) paints Proprietary Schools as bad actors, which cannot

justify restraining their speech; (2) seizes on so-called "pain-based" marketing, which is neither

unlawful nor misleading; (3) ignores consumers' rights to receive consensual information about

their own educations; and (4) invites the Court to skirt Supreme Court precedent.

### 1.    The AG Cannot Justify Restraints on Disfavored Speech By Attacking the Disfavored Speakers.

The AG maligns Proprietary Schools to justify restraining their speech.   The AG

disclaims its bias, but has no response whatsoever to the current Attorney General's publishing—

during the public comment period—her opinion that likened Proprietary Schools to "predators,"

and declared that "[t]aking on these schools . . .  is a moral issue."  (Pl. Br. 4, Ex. 13.)  Nor is

bias against a disfavored group erased merely by making a verbal exception for some members

of the group.   Such statements bring cold comfort here, where the State imposed speech

restraints and compelled disclosures on *all* members of the disfavored group, and *only* on group

members.

The First Amendment would be a thin shield indeed if it did not protect disfavored

groups.  Accordingly, the Supreme Court has consistently blocked such efforts to burden speech

from unpopular commercial actors.    Attempts to restrain marketing for alcohol,[7] drug

compounds,[8] and tobacco[9] have all been struck down, regardless of their ostensibly benevolent

aims, because paternalism cannot trump the First Amendment.  The State may prefer that citizens

adopt one course of conduct over another, but the State cannot tilt public opinion by burdening

---

[7] *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 503 (1996) ("The First Amendment directs us to be especially skeptical of regulations that keep people in the dark for what the government perceives to be their own good.").

[8] *See, e.g.*, *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 374 (2002) (Government has no legitimate interest in restricting commercial speech "to prevent members of the public from making bad decisions").

[9] *Nat'l Ass'n of Tobacco Outlets, Inc. v. City of Worcester*, 851 F. Supp. 2d 311, 317 (D. Mass. 2012) (striking down ban on outdoor advertising for tobacco products because the government "may not promote its policy preferences 'by keeping the public in ignorance'").

or silencing one side's speech.   "It is precisely this kind of choice, between the dangers of suppressing information, and the dangers of its misuse if it is freely available, that the First Amendment makes for us."  *Thompson*, 535 U.S. at 375.

### 2.     The AG Cannot Justify Restraints by Citing "Pain-Based" Marketing.

For regulations to fit within the authorizing statute, Ch. 93A, barred practices must fall outside the bounds commonly experienced in "the rough and tumble of the world of commerce." *Ji v. Bose Corp.*, 647 F. Supp. 2d 77, 79 (D. Mass. 2009).  To justify the Regulations, the AG raises the specter of "pain-based" marketing, as if this catch-phrase reflects conduct that is somehow untoward and unlawful.  (AG Br. 2, 17.)  Pain-based marketing, however, is standard business practice taught at the Harvard Business School ("HBS") and Wharton.  (*See, e.g.*, Ex. 6, Harvard Business School, News (profiling a recent successful graduate and publishing the following exchange: Q: "What did you learn from HBS?" A: "The coursework and the [HBS] Accelerator program taught me to focus on the pain point."); Ex. 7, (Wharton Professor of Marketing explaining that "[y]ou should try to understand the pain point of customers and reinforce their pain.  The aim is to remind them how painful it is to do without these goods and services and bring these things to them.")  These practices are neither unfair nor deceptive, and it is hard to imagine the AG can outlaw as beyond the pale marketing techniques long-accepted and consistently endorsed by business schools training generations of industry leaders.

### 3.     The AG Ignores Listeners' Rights.

In defending the Communication Restraint, the AG ignores the prospective student's right to receive consensual information on a "telephone number provided by the student."  (940 Mass. Code. Regs. 31.06(9).)  Supreme Court jurisprudence, however, enshrines listeners' rights to receive marketing messages.  *Virginia State Bd. of Pharm. v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 757, n.15 (1976) (citing "the independent right of the listener to

receive the information sought to be communicated."); *Riley*, 487 U.S. at 791 ("[T]he government. . . may not substitute its judgment as to how best to speak for that of speakers and listeners."); *Sorrell*, 131 S. Ct at 2671 ("the defect in [the Regulations] is made clear by the fact that many listeners find [the restrained speech] instructive.").[10]   Listeners' rights are all the more vital when the subject, such as continued education, is itself protected by the First Amendment. *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 437 (1993) (Blackmun, J., concurring) (invalidating ban on news racks where handbills advertised adult education, given "the importance of education to the professional and personal development of the individual.")

### a.    The Communication Restraint Bars *Consensual* Calls.

Despite these precedents, the AG cites the GAO's oft-criticized report from outside the record to claim that a tiny sample of four students from an undisclosed location received a large number of calls from unidentified schools.  Even if such factually-bare claims could constitute evidence, and even if there was any indication that these "undercover" students were from Massachusetts, this would still not render the Communication Restraint constitutional because *inter alia* the real-life communications the State seeks to silence are consensual.  Prospective students who provided their phone number can always decline a call or stop unwanted calls by making a do-not-call request.  (Pl. Br. 30 (demonstrating the ease of invoking the do-not-call statutes, and their strict enforcement).)

### b.    Prospective Students Are Not "Captives."

"The First Amendment does not permit the government to prohibit speech as intrusive unless the 'captive' audience cannot avoid objectionable speech."  *Bolger v. Youngs Drugs Prods. Corp.*, 463 U.S. 60, 72 (1983) (affirming that even a ban on *unsolicited, non-consensual,*

---

[10] *See also First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 783 (1978) ("A commercial advertisement is constitutionally protected not so much because it pertains to the seller's business as because it furthers the societal interest in the 'free flow of commercial information.'")

objectionable mass mailings violated the First Amendment because recipients could "give notice to a [marketer] that [they] wish no further" communications, or throw out unwanted solicitations, because the "short, though regular, journey from mail box to trash can . . . is an acceptable burden, at least so far as the Constitution is concerned."). This case is easier than *Bolger*, though the Regulations are equally infirm, because prospective students have sought the information, and are in no way captive when they can decline a call or utter a single "do-not-call" phrase and receive no further communications. As *Sorrell* reaffirmed, complaints about allegedly coercive and "harassing sales behaviors" cannot sustain content-based regulations, because recipients can "simply decline" to interact with such salespeople. 131 S. Ct. at 2669.

### 4. The AG Contradicts *Sorrell* and Requests Limited Judicial Review.

To nullify the result compelled by *Sorrell*, the AG argues that "the Challenged Regulations Apply to Commercial Speech" and are thus "Subject only to Limited Judicial Review." (AG Br. 7.)[11]

#### a. *Sorrell* Requires Heightened Scrutiny: "Commercial speech is no exception."

*Sorrell* forecloses the government's argument for lesser scrutiny, nearly word-for-word. *Sorrell* holds that "[t]he First Amendment requires heightened scrutiny *whenever* the government" creates content- or speaker-based regulations, and "*commercial speech is no exception*." 131 S. Ct. at 2664 (emphasis added). The Court's recognition that content and viewpoint discrimination is no more permissible in the realm of commercial speech than elsewhere is hardly novel. *See, e.g., City of Cincinnati*, 507 U.S. at 437 (Blackmun, J.,

---

[11] The Communication Restraint stretches beyond "commercial speech," as it silences *all* speech from a Proprietary School to a prospective student beyond two exchanges a week. (*See* Pl. Br. 8-9.) Revealingly, while the AG would style the Communication Restraint as a mere "limited restriction" for First Amendment purposes, when it suits the State's (misguided) preemption argument, the AG would have this Court treat the same provision as a blanket "prohibition" on communication. (*Compare* AG Br. 16 *with* AG Br. 26.)

concurring) ("The commercial publications [advertising adult education] illustrate the absurdity of treating all commercial speech as less valuable than all noncommercial speech.")

     **b.**  ***Sorrell* is the Court's "last word" on Commercial Speech.**

Nor is *Sorrell* ripe to be ignored.  Despite the AG's suggestion that the First Circuit sidestepped *Sorrell* in a *Tobacco Outlets* case (AG Br. 12), the *Sorrell* analysis was unnecessary there because the case did not involve speech, but rather price restrictions that "fall[] outside the ambit of the First Amendment" like "other forms of direct economic regulation [that] do not implicate First Amendment concerns."  *Nat'l Ass'n of Tobacco Outlets v. City of Providence*, 731 F.3d 71, 76-79 (1st Cir. 2013).  By contrast, in the *Tobacco Outlets* case that *did* concern a restriction on the tobacco sellers' speech and marketing, a court in this district explicitly recognized *Sorrell* as "the [Supreme] Court's last word [] regarding restrictions on commercial speech."  *Tobacco Outlets*, 851 F. Supp. 2d at 319 ("Under *Sorrell*, the [state] may not seek to remove a popular but disfavored type of products" from the marketplace by restraining speech).  Try as the AG might to avoid the inexorable conclusion mandated by *Sorrell*, this Court cannot, and should not, ignore the Supreme Court's "last word."

  **C.**  **The AG Claims *Central Hudson* Applies, But Never Performs the Analysis Required Under *Central Hudson*, Which the Regulations Cannot Survive.**

The AG contends that the Court should not apply *Sorrell*, but only "*Central Hudson* intermediate scrutiny."  (AG Br. 10.)  Even if *Sorrell* were inapplicable, however, the Regulations would still not survive, for three primary reasons.

    **1.**  **Under *Central Hudson*, the "outcome is the same" as under *Sorrell*: Content- and Viewpoint-Based Regulations are Invalid.**

Because the Regulations impose content and viewpoint restrictions, "the outcome is the same whether a special commercial speech inquiry or a stricter form of judicial scrutiny is applied."  *Sorrell*, 131 S. Ct. at 2667 ("[T]here is no need to determine whether speech hampered

by [the law in question] is commercial, as our cases have used that term" because "[c]ontent-based regulations are presumptively invalid."). The Regulations cannot overcome this presumptive invalidity, particularly where the State uses previously-rejected justifications of "harassment" to broadly ban speech between non-captive, consensual parties.

### 2.   *Central Hudson* **Cannot Excuse Prohibitions on Speech That Is Not Actually Misleading.**

The AG has not made, and cannot make, any claim that the sweeping Communication Restraint targets misleading speech. Yet to avoid judicial scrutiny of the other challenged provisions, the AG argues that they target only misleading speech, and should thus be upheld without review. (AG. Br. 9 (requesting "no First Amendment scrutiny at all").)

But as the Supreme Court has repeatedly held, the State may not ban speech that is not "actually or inherently misleading." *Ibanez v. Florida Dep't of Bus. & Prof'l Regulation, Bd. of Accountancy*, 512 U.S. 136, 145-46 (1994). The speech governed by the Regulations is not, and has not been proven to be, actually or inherently misleading. For example:

- The Communication Restraint unconstitutionally silences vast streams of communications that have not, and will not, mislead anyone;

- The Completion Time Prohibition bars the indisputably true communication that some students can finish academic programs in less than the median time; and

- In the Credit Transfer Assertion, the only false statement comes in the compelled disclosure that forces Proprietary Schools to claim they know of no other schools that accept their credits—even when they *do* know of such schools.

By their terms, the Regulations sweep beyond actually misleading speech and purport to ban any speech with "*the tendency or capacity to mislead* or deceive." (940 Mass. Reg. 31.04(2) (emphasis added).) But as the AG's own case held, the States may not prohibit "*potentially* misleading information.*" *In re R.M.J.*, 455 U.S. 191, 200, 203 (1982) (citing Supreme Court precedent that where "advertising was not 'inherently' misleading, and therefore [it] could not be

prohibited on that basis.") (emphasis added); *Edenfield v. Fane*, 507 U.S. 761, 774 (1993) (same); *Bates v. State Bar of Arizona*, 433 U.S. 350, 372 (1977) (invalidating advertising ban because speech was not "inherently," meaning "inevitably," misleading).  A court in this district has already held as much, recognizing that *Central Hudson* permits blanket bans only where the targeted speech is "actually misleading"—a state cannot bar "*potentially* misleading information." *FTC v. Direct Mktg. Concepts, Inc.*, 569 F. Supp. 2d 285, 306 (D. Mass. 2008).[12] Even if the speech at issue were potentially misleading, the First Amendment does not allow the State to cite the threat of potentially misleading speech, in order to justify silence.

### 3.    The AG Neither Performs Nor Satisfies the *Central Hudson* Analysis.

Under *Central Hudson*, for the state to meets its burden:

- "The State *must* assert a substantial interest to be achieved";
- "[T]he restriction *must* directly advance the state interest involved";
- "The limitation on expression *must* be designed carefully to achieve the State's goal"; and
- "[I]f the governmental interest could be served as well by a more limited restriction on commercial speech, the excessive restrictions cannot survive."

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 564 (1980) (emphasis added).  The Regulations must pass every step of the test, and they cannot.

### a.    The State Fails to Assert a Substantial Interest.

The desire to "protect" customers from purchasing a product the State would prefer they avoided is not a legitimate interest.  The AG's own case again supports MAPCS' position.  In *Florida Bar v. Went For It, Inc.*, to defend a ban on attorneys' direct mail solicitations to victims immediately following accidents, the Government *gave up on* claiming that it was "protecting people against undue influence and overreaching," and instead asserted an interest in preserving

---

[12] The AG's reliance on *Rocket Learning, Inc. v. Sanchez* further proves the point, because the speech at issue was "actually misleading"—it promoted gifts that by law could not be given, and would thus "necessarily mislead" the audience.  715 F.3d 1, 13, (1st Cir. 2013).

the reputation of the state bar.  515 U.S. 618, 625 n.1, 632 n.2 (1995) (recognizing the "obvious difference" between permissibly legislating to protect a state agency's reputation and impermissibly restraining marketplace speech to protect consumers from their own choices, where "the government is motivated primarily by paternalism").

Such paternalism is especially misguided for the Graduation and Placement Rates, because the state has *no* cognizable interest in presenting misleading statistics.  The AG contends that its interest lies in filling a hole in Federal statistics, but cannot explain why any such hole should be filled with, for example, a Graduation Rate that penalizes Proprietary Schools by counting students who have not even had time to complete their program.  (Pl. Br. 18-20.)[13]

### b.    The AG Nowhere Proves that the Regulations *Directly* Advance a Substantial Interest.

The State could directly advance its interests in myriad ways, including public messaging, subsidies, or tax breaks to "create inducements" for prospective students to choose public colleges over for-profit schools.  *Linmark Assoc., Inc. v. Willingboro Twp.*, 431 U.S. 85, 97 (1977); (Pl. Br. 15). The State may not, however, "achieve its policy objectives through the indirect means of restraining certain speech by certain speakers."  *Sorrell*, 131 S. Ct. at 2670-71.

Where the law demands "evidentiary support" as proof of direct, material advancement, the AG purports to rely on "common sense."  *Compare* AG Br. 10 *with 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 505 (1996) (holding "common sense" insufficient evidence to support a factual finding that the law would "significantly advance the State's interest").  Views also vary regarding what constitutes common sense.  For example, the AG suggests that students might choose "not to enroll" in Proprietary Schools if they learned classes were "self-taught," or

---

[13] The AG defends compelling publication of multiple, conflicting rates because "the result is *more*, not less information available to prospective students"—a perspective sorely lacking in the Communications Restraint, which ensures that prospective students receive *less*, not more information.

"taught in multiple locations." (AG Br. 21.)  In fact, in today's mobile, interconnected world, prospective students, especially under-represented populations with current jobs and families, could well embrace such flexibility as *advantages*, since they could study when and where they want.

Given these different perspectives, the state can of course "express [its] view [of Proprietary Schools] through its own speech." *Sorrell*, 131 S. Ct. at 2671.  The AG can campaign against Proprietary Schools, write more opinion articles attacking the schools, or otherwise promote its policies directly.  The state, however, "may not burden the speech of others in order to tilt public debate in a preferred direction." *Id.*

### c.   The AG Nowhere Proves that the Restrictions Burden No More Speech Than Necessary.

Under *Central Hudson*, "if the Government could achieve its interests in a manner that does not restrict speech, or that restricts less speech, the Government must do so." *Thompson*, 535 U.S. at 371.

The State argues the blanket ban imposed by the Communication Restraint is sufficiently tailored (AG Br. 18), but its support consists of one case that *struck down* an ordinance, and three that involved *non-consensual* communications. *City of Cincinnati*, 507 U.S. at 430 (invalidating ban on commercial handbills that left newspapers unaffected because it was "neither content neutral nor . . . 'narrowly tailored'"); *see also Florida Bar*, 515 U.S. at 628 (permitting regulation of attorneys' "*unsolicited* . . . ambulance chasing" mailings to victims immediately after accidents) (emphasis added); *Moser v. FCC*, 46 F.3d 970, 972 (9th Cir. 1995) (upholding statute that permitted prerecorded messages "*if the consumer consents*") (emphasis added); *Berg v. Merchs. Ass'n Collection Div. Inc.*, 586 F. Supp. 2d 1336, 1345 (S.D. Fla. 2008) (denying

motion to dismiss where the statute barred debt collectors from leaving messages that third parties could hear without the consumer's "prior consent.") .

These cases do not, and cannot, demonstrate that the Communication Restraint's blanket ban on consensual communications is somehow a "reasonable fit." The AG attempts to rewrite the Regulation to fit the law, claiming that the Communication Restraint arises only "after it should be reasonably clear that a student does not wish to speak with the school." (AG Br. 18.) But even setting aside that students can readily make any such wish clear through a binding do-not-call request, there is nothing in the Communication Restraint that suggests it operates after such clarity. Rather, the prospective student could be calling as frequently as the school, or indeed more often, and the school could still not initiate more than two communications over seven days, on any topic—including course offerings, schedules, prerequisites, or campus events. Where the Regulations stifle *all* speech from Proprietary Schools after the second communication in a week, the AG cannot realistically claim to have narrowly tailored the rules.

D.     **The AG's Invocation of *Zauderer* Cannot Rescue Content- and Viewpoint-Based Disclosures.**

*Zauderer* offers a narrow exception to First Amendment protections in certain contexts, permitting states to compel "purely factual and noncontroversial" disclosures. *Zauderer v. Office of Disciplinary Counsel of Sup. Ct. of Ohio*, 471 U.S. 626, 651 (1985). The AG makes no argument that *Zauderer* has *any* impact on provisions such as the Communication Restraint and the Completion Time Prohibition, which silence Proprietary Schools. (*See* AG Br. 9.) The AG, however, does attempt to salvage the following provisions by invoking *Zauderer* and urging this Court to apply "at most . . . reasonable basis review." (*Id.*):

- The Credit Transfer Assertion that compels Proprietary Schools to falsely tell students that they are aware of no schools that will accept their transfer credits, other than those specifically-identified schools with which a school has written documentation of credit-transfers (*see* Pl. Br. 5-6, 18);

16

- The Negative Effect Prediction that forces Proprietary Schools to voice the Attorney Generals' unfounded opinion that failure to repay loans will negatively affect a student's "future earnings" (*see* Pl. Br. 6, 21-22); and

- The Graduation Rate Calculus and Total Placement Rate Calculus, which deviate from logic and standard practice and provide misleading and confusing statistics (*see* Pl. Br. 6, 18-20).

### 1.     *Zauderer* Cannot Excuse Content and Viewpoint Discrimination.

*Zauderer* does not upend First Amendment jurisprudence and empower the State to mandate disclosures based on content and viewpoint discrimination.  The State has provided no support for such an approach.  Indeed, it would make no sense to bar content- and viewpoint-discrimination when restricting speech, only to permit it when the state compels speech.  *Riley*, 487 U.S. at 796-97 (invalidating as viewpoint discriminatory law that compelled disclosure from professional charity-fundraisers but not their non-profit counterparts because the difference between compelled speech and compelled silence "is without constitutional significance.").

Accordingly, under *Zauderer*, the government could presumably require a pharmaceutical company to disclose, for example, a compound's side effects.  But the state could *not* require brand-name sellers of pharmaceuticals to disclose those side effects while allowing generic sellers to proceed unhindered, merely because the government viewed generic products as a better bargain.  Yet that is precisely what the Regulations would do here, merely because the AG contends that other types of schools deliver more "value" that those she has chosen to target.

Similarly, the State could not lawfully compel disclosure of the compound's efficacy rate based on individuals who took only half or a quarter of the clinical dosage.  That would hardly be factual, or non-controversial.  But that is what the Regulations do in compelling disclosure of

Graduation and Placement Rates that include students who have only had half or a quarter of the expected time to complete their programs.

## 2.    *Zauderer* **Cannot Rescue Non-Factual or Controversial Disclosures.**

Though the Negative Effects Prediction, the AG would force students to parrot the government's supposition that a loan default would likely have a negative effect on a student's "future earnings."  (Mass. Code Regs. 31.05(3).)  This compelled disclosure is not fact, but opinion.  Moreover, there is no evidence that loan defaults actually lead to decreased earnings. The potential "negative effect" at issue is apparently the risk that the government itself might garnish a student's wages to obtain repayment.  If that is what the State wants prospective students to know, the government can disclose that in its loan documents, rather than create the sweeping misimpression that students who borrow necessary funds to improve their employment prospects (only) at Proprietary Schools may wind up earning less money.

Similarly, through the Credit Transfer Assertion, the Regulations would force Proprietary Schools to make the *non-factual* statement that they are aware of no other schools that accept their credits beyond those for which they have written agreements or other documents—even though they *do* know of other schools that accept their transfer credits.  In claiming that Proprietary Schools should be forced to "prove" every school that accepts their credits, the Regulations ignore the basic reality that anyone who has ever transferred schools knows well: transferee schools routinely accept transfer credits and have no reason, cause or justification to send documentation to the student's prior school.  It is simply not done.

Such disclosures—telling students that they should expect a "negative effect" on future earnings, or misleading them into thinking they have fewer exit opportunities than they actually have—are well-designed to extinguish a prospective student's interest in improving her employment prospects through enrollment in a Proprietary School.  Of course, the same student

seeking the same loan from a public or community college need not be told anything of the sort. As *Riley* made clear, compelling a for-profit enterprise to make a disclosure that "will be the last words spoken as the [listener] closes the door or hangs up the phone," while allowing a non-profit enterprise to forego the same disclosure, reflects impermissible viewpoint discrimination. *Riley*, 487 U.S. at 800.   *Zauderer* does not, and cannot, change that calculus.     "Nothing in *Zauderer* suggests . . .  that the State is equally free to require corporations to carry the messages of third parties, where the messages themselves are biased against or are expressly contrary to the corporation's views."  *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of California*, 475 U.S. 1, 16 n.12 (1986).  *Zauderer*'s limits operate powerfully here, as the exception for "factual, non-controversial" disclosures cannot swallow the rule that content and viewpoint discrimination violate the First Amendment.

### 3.     Disclosures May Be Compelled Only Where Speech Is Otherwise "Inherently" Misleading.

*Zauderer* operates in circumscribed straits, allowing presentation of cold, hard facts where advertising would otherwise be "inherently misleading."  471 U.S. at 640-41 (striking down restrictions of attorney's advertising the pursuit of specific legal claims that may or may not have been time-barred, while requiring contingency-fee advertising to disclose the indisputable fact that costs would be charged regardless of outcome); *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 257 (2010) (requiring disclosure "to combat the problem of inherently misleading commercial advertisements" that promised debt relief without referencing the "inherent costs" of bankruptcy).  This rule provides coherence and symmetry to the rules limiting State interference with private speech.  Just as the State may only restrain "actually" misleading speech, the State may only compel disclosures where silence would be "inherently" misleading.

Here, however, the AG goes far beyond any speech that the AG has proven to be "inherently" misleading. Even on their face, the Regulations seek to compel disclosures wherever any practice might have merely the "capacity" to mislead. (940 Mass. Reg. 31.04(2).) But "*Zauderer* does not stand for the proposition that government can constitutionally compel the use of a scripted disclaimer in any circumstance in which its interest in preventing consumer deception might plausibly be at stake." *Milavetz*, 559 U.S. at 257 (Thomas, J., concurring in part and concurring in judgment). "In other words, a bare assertion by the government that a disclosure requirement is 'intended' to prevent consumer deception, standing alone, is not sufficient to uphold the requirement as applied to all speech that falls within its sweep." *Id.*

Yet that is all the AG can offer here. The graduation and placement rates that Proprietary Schools *already* provide are not inherently misleading—they are federally-mandated statistics designed by the Department of Education to inform prospective students. Nor is a statement that students may transfer credits inherently misleading, when Proprietary Schools know the statement is true. Nor would it be inherently misleading to provide loan information without further delivering a dire and inaccurate warning that any default would likely impair a student's future earnings. Far from curing inherently misleading speech, the Regulations compel non-factual, controversial statements steeped in content- and viewpoint-discrimination. The compelled disclosures, like the speech restraints, sweep too broadly, and cannot be squared with the First Amendment.

## II.    THE AG CANNOT CURE THE REGULATIONS' VAGUENESS.

MAPCS opening brief demonstrated that the Regulations are void for vagueness because they fail to provide fair notice of what is prohibited, and they give the AG carte blanche for arbitrary or discriminatory enforcement. (Pl. Br. 22-23.) The AG's response offers scant

reassurance on either front.  Instead, by invoking inapposite case law regarding facial challenges in other realms, the AG strives to delay—or evade—reckoning on the following provisions:

- The Any Fact Disclosure, which punishes any Proprietary School that fails to disclose "*any fact*. . . disclosure of which is likely to influence the prospective student not to enter into a transaction with the school."  (Mass Code Regs. 31.05(1) (emphasis added).); and

- The Disqualification Obligation, which bars enrollment or retention where a school "knows or should know" a student is unlikely to graduate or satisfy requirements in her chosen field based on her "education level, training, experience, physical condition, *or other material disqualification*."  (Mass Code Regs. 31.06 (6) (emphasis added).)

From the outset, the State's argument is difficult to swallow, because in one breath the AG seeks deference based on a purportedly "extensive hearing record" (AG Br. 19), and in the next claims that MAPCS' vagueness challenge is premature due to "barebones records."  (AG Br. 20.) Moreover, the AG's efforts fail for at least the following three additional reasons:

### A.      Schools Need *Some* Guidance to Order Their Affairs.

The AG claims the State need not "systematically list out every fact" covered by the Regulations, because schools are in the education business, " regularly interact with prospective students," and have greater expertise—realities the AG did *not* take into account in passing Regulations that ignored voluminous feedback from the schools and their students.  (AG Br. 21; Pl. Br. 5.)  Critically, however, the AG nowhere refutes that the Any Fact Disclosure provides *no guidance* as to what fact(s) might influence any particular student's enrollment choice.  And the AG nowhere disputes that factors listed in the Disqualification Obligation are *neither* exhaustive nor exemplary.  These provisions have created an untenable state of affairs where Proprietary Schools are vulnerable to arbitrary prosecution at any time, for enrolling any student who struggles for any reason.

**B.      The AG's Arguments against Facial Challenges Do Not Apply When Speech is Involved.**

While Proprietary Schools must immediately strive to comply with a law whose boundaries they cannot discern, the AG argues that they should proceed blind and await prosecution, claiming that facial challenges are disfavored.  (AG Br. 20.)  For example, the AG responds to MAPCS' First Amendment challenge by citing *United States v. Salerno* for the proposition that "[a] facial challenge . . . is . . . the most difficult."  481 U.S. 739, 745 (1987); (AG Br. 19.)  The next sentence of *Salerno*, however, clarifies that this is only the case "outside the [] context of the First Amendment."  *Id.*  Similarly, the AG cites *Finley* to assert that facial challenges are "strong medicine" (AG Br. 19), but *Finley* explicitly stated that in cases like this one, "viewpoint discrimination [] would prompt this Court to invalidate a statute on its face." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 583 (1998).

The AG's other cases similarly demonstrate that where laws like the Any Fact Disclosure concern a party's speech, facial challenges are essential vehicles to right constitutional wrongs:

- *Hightower v. City of Boston*, 693 F.3d 61, 78 (1st Cir. 2012) (evaluating vagueness under the Second Amendment and recognizing that First Amendment challenges were of a different order because *Salerno* was not "a speech case")[14];

- *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 37 (1963) ("[T]he approach to 'vagueness' . . .  is different . . . in cases arising under the First Amendment.  There we are concerned with vagueness of the statute 'on its face' because such vagueness may in itself deter constitutionally protected and socially desirable conduct.")

- *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982) ("The most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights.  If, for

---

[14] *See also Sabri v. United States*, 541 U.S. 600, 610 (2004) (noting that facial attacks are discouraged *except* in specific settings, such as "free speech" and "substantive First Amendment law.").

example, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply.")[15]

In cases like this, "[w]hen speech is involved," vagueness must be actively policed, "to ensure that ambiguity does not chill protected speech." *FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012); *Van Wagner Boston, LLC v. Davey*, 770 F.3d 33-34, 41 (1st Cir. 2014) (recognizing the need for "facial challenges" to speech restrictions because "First Amendment rights are fragile, and it is not only the occasional abuse of censorship power but also the threat inherent in the existence of that power that may chill protected expression."). Indeed, as the Supreme Court recently held, a law "which chills speech *can and must be invalidated* where its facial invalidity has been demonstrated." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 336 (2010) (emphasis added).

C.      **Compelling Disclosure of "Any Fact" Provides Scant Guidance.**

To avoid the hard look at the Regulations' fuzzy boundaries as required by the First Amendment, the AG asks the Court to "presume" that the Regulations are "reasonably clear." (AG Br. 22.)  In reality, the failure to impose *any* discernible limits on the Any Fact Disclosure imposes a constant threat, as schools must live in constant fear that anything they say, or fail to say, will be held against them.

D.      **No Clear Boundaries Show What Schools "Should Know" About "*Any*" Material Disqualification.**

The AG argues that the Regulations provide sufficient direction by imposing liability whenever Proprietary Schools "know *or should know*" unnamed qualities that would disqualify

---

[15] In *Hoffman Estates*, the village ordinance at issue governed stores' physical placement of paraphernalia for illegal drug use and thus did "not restrict speech."  455 U.S. at 496.  Moreover, the village could take "further steps to minimize the dangers of arbitrary enforcement [by] adopt[ing] administrative regulations that will sufficiently narrow potentially vague or arbitrary interpretations of the ordinance."  *Id.*at 504.  Here, by contrast, the Regulations themselves are the last defense against arbitrary enforcement.

potential students.  (AG Br. 21.)  The AG's cases, however, brook no such uncertainty: liability requires actual knowledge or intent to violate the law in question.  *Boyce Motor Lines v. United States*, 324 U.S. 337, 331 (1952) (holding the law was not vague because "[t]he statute punishes only those who *knowingly* violate the Regulation") (emphasis added) (collecting Supreme Court cases); *Am. Commc'n Ass'n v. Douds*, 339 U.S. 382, 413 (1950) (holding statute gave fair warning because "punishment is restricted to acts done with knowledge that they contravene the statute," and "[a] mind intent upon willful evasion is inconsistent with surprised innocence."). The State's failure to similarly cabin the Regulations—combined with its failure to provide meaningful guidance on which facts are relevant and which disqualifications are material— means that unwary schools have been set up to trip over an invisible line, with severe consequences.  That approach thwarts rational planning, allows for arbitrary enforcement, and is impermissibly vague.

## III.   THE AG CANNOT AVOID PREEMPTION BY CITING AN INAPPLICABLE PRESUMPTION THAT CONTRAVENES THE STATUTORY SCHEME.

MAPCS opening brief showed that the Regulations are preempted because they purport to regulate interstate calls, and frustrate Congress' clear intent to promote a uniform regulatory telemarketing scheme.  (Pl. Br. 25-27.)  Accepting the AG's response would require this Court to (1) rely on an inapplicable presumption; (2) ignore Congress' intent to preempt state regulation of interstate calls; and (3) undermine Congress' approach to consensual telemarketing.

### A.   The Presumption Against Preemption Does Not Apply to *Interstate* Calls.

MAPCS established in its opening brief that a presumption against preemption does not apply when a State regulates in an area such as *interstate* telemarketing, which has historically been governed by federal law.  (Pl. Br. 24-25.)  The AG's response distorts the Regulations' text and governing law, but cannot create a presumption where none exists.  *See, e.g.*, *Buckman Co.*

*v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001) (declining to apply a presumption against preemption because policing fraud against federal agencies is not traditionally a state-occupied field); *United States v. Locke*, 529 U.S. 89, 108-09 (2000); (declining to apply presumption because national and international maritime commerce are not historically regulated by the states); *United States v. Massachusetts*, 724 F. Supp. 2d 170, 205-06 (D. Mass. 2010), *rev'd in part, vacated in part on other grounds sub nom. United States v. Coal. for Buzzards Bay*, 644 F.3d 26 (1st Cir. 2011) (same, holding *Locke* is still good law after *Wyeth*).

First, for preemption purposes, the AG claims that the Communication Restraint "is not a telemarketing statute." (AG Br. 23.)   But under federal law, "telemarketing" means "the initiation of a telephone call or message for the purpose of encouraging the purchase [of] property, goods, or services, which is transmitted to any person."   47 C.F.R. § 64.1200(f)(12). Here, the Restraint explicitly targets *telephone* calls, and the Regulations' stated Purpose is to address how Proprietary Schools "*market* degree and non-degree programs to students."   (940 Mass. Code Regs. § 31.01 (emphasis added).)   Rather than call a spade a spade and suffer the consequences of preemption, the AG now claims that the Communication Restraint is not a telemarketing law, but rather a "consumer protection" regulation designed to avoid a "false sense of urgency."   *Id.* at 23.[16]   This inventive interpretation has *zero* textual support. Nothing in the Communication Restraint regulates any so-called "urgent" message.   Indeed, if the Communication Restraint were such a regulation, it would not reach *every* communication beyond two calls a week as it does; it would target false messages, such as "there is only one spot left."   Nor do the Regulations leave the Court guessing as to whether the Communication

---

[16] To avoid preemption, the AG asserts that the Regulations address a "consumer protection concern," and cites *Teltech Systems, Inc. v. Bryant*, 702 F.3d 232, 236 (5th Cir. 2012).  *Teltech*, however, actually held that a state *consumer protection* act meant to address concerns with caller identifications was preempted, and the same result applies here.  *Id.* at 234.

Restraint indeed targeted a purported "false urgency." The AG dedicates an entire section (31.04) to defining false or misleading statements or representations. Nowhere does the regulation mention the "false sense of urgency" that the AG has conjured to avoid preemption. The Communication Restraint aims to arbitrarily impede consensual, interstate telemarketing, and must be analyzed for what it is.

Second, the AG relies on *Wyeth v. Levine* to invoke a presumption against preemption—a presumption that applies only when Congress legislates "in a field which the States have traditionally occupied." 555 U.S. 555, 565 (2009). States have *not* traditionally occupied *interstate* telecommunications; that is the province of the federal government. Where state laws "bear upon national . . . commerce, . . . there is no beginning assumption that concurrent regulation by the State" is valid. *United States v. Massachusetts*, 724 F. Supp. 2d at 205-06 (distinguishing *Wyeth*). As in *Buckman*, *Locke* and *United States v. Massachusetts*, no presumption against preemption operates here, because the federal government, rather than the states, has historically regulated *interstate* telemarketing. (Pl. Br. 26 n.12.)

## B. Congress Intended to Preempt State Regulation of Interstate Telemarketing.

MAPCS opening brief showed that the TCPA *impliedly* preempts the AG's Regulations because they "overstep state boundaries" and "undermine Congress' goal for unified rules." (Pl. Br. 25.) The AG attacks a straw man, arguing against *express* preemption. (AG Br. 24-26.) But the plain language of the statutory and regulatory framework, the legislative intent, the FCC's interpretation of the TCPA, and the savings clause all evidence implied preemption.

## 1. The FCC Has Exclusive Jurisdiction over Interstate Telemarketing.

"In determining whether Congress has specifically addressed the question at issue," a court must "interpret the statute as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into a harmonious whole." *FDA v. Brown & Williamson Tobacco Corp.*, 529

U.S. 120, 133 (2000); *Courtney v. Mitsubishi Motors Corp.*, 926 F. Supp. 223, 224 (D. Mass. 1996) (statute's multiple provisions together "operate to preempt" state law). The AG would instead proceed myopically, first by severing the TCPA from the overarching Communications Acts in which it is incorporated, and then slicing the issue finer still, to view the TCPA's savings clause in splendid, but misleading, isolation.

Here the regulatory scheme includes the Communications Act of 1934, as amended, 47 U.S.C. 151 et seq. (the "Communications Act"). The Communications Act, of which the TCPA is part and parcel, grants the FCC exclusive jurisdiction over "all interstate and foreign communication by wire." 47 U.S.C. § 152(a).[17] Congress nowhere carved out telemarketing under the TCPA from the FCC's purview. Nor would it make sense to do so here. *Benanti v. United States*, 355 U.S. 96, 104 (1957) (the "Communications Act is a comprehensive scheme for the regulation of interstate communication" such that, "had Congress intended to allow the States to make exceptions . . . it would have said so.")

Faced with a comprehensive statutory scheme that expressly grants the FCC plenary authority over telephone communications, the AG improperly narrows its focus to argue that the "savings clause alone cannot preempt State law, absent an express preemption provision." (AG Br. 24.) Again, the AG fails to interpret the TCPA's savings clause in the context of Section 152(a) of the Communications Act. When Congress enacted the TCPA, it had *already* granted the FCC, in the Communications Act, exclusive jurisdiction over all interstate communications, necessarily including interstate telemarketing. It would have been superfluous to re-grant that authority in the TCPA. Under the plain language of the Communications Act and the TCPA, Congress extended the FCC's jurisdiction to reach interstate and intrastate telemarketing, and

---

[17] This exclusive jurisdiction over interstate telecommunications directly governs the TCPA. Under U.S.C. § 152, "[t]he provisions of this chapter shall apply to all interstate [] communication by wire . . . ." Chapter 5, encompasses Sections 151-621, including the TCPA, codified at Section 227.

saved from preemption only state laws that imposed more restrictive *intrastate* regulations. 47 U.S.C. § 227(f)(1). That clause cannot save the Communication Restraint, which sweeps beyond the Commonwealth's border and conflicts with FCC exclusive jurisdiction over interstate calls.[18]

### 2. Legislative Intent Supports Implied Preemption.

If any ambiguity existed in the statute's plain language, legislative intent confirms the federal regulatory scheme's preemptive effect. In passing the TCPA, Congress noted that states have not historically regulated interstate telemarketing "because States do not have jurisdiction over interstate calls." S. Rep. No. 102–178, at 3, *reprinted in* 1991 U.S.C.C.A.N. 1968, 1970.

The AG argues that earlier un-enacted drafts of the TCPA containing explicit preemption language demonstrate that Congress did not intend to expressly preempt state laws regulating interstate communication. But federal law implicitly preempts state law where, as here, Congress intended to grant the FCC exclusive jurisdiction over interstate telemarketing. As the AG's own case succinctly observed, the TCPA was essential precisely because "states may not regulate interstate calls." *Moser*, 46 F.3d at 972.

### 3. The FCC's Interpretation Supports Preemption.

Courts grant *Chevron* deference to the FCC's statutory interpretation regarding the scope of its own jurisdiction. *City of Arlington, Texas v. FCC*, 133 S. Ct. 1863, 1871-75 (2013). On this critical question, the AG nonetheless insists that "the FCC simply gets it wrong." (AG Br. 26.) Even setting aside the question of how the AG would presume to know more about the FCC's jurisdiction than the agency itself, the test is not whether the Court agrees with the FCC.

---

[18] The AG argues that the savings clause prevents preemption because the Communication Restraint is a "prohibition" as opposed to a requirement or regulation. (AG Br. 26.) This directly contradicts the AG's First Amendment argument, where the AG instead describes the Communication Restraint as merely a "[l]imited [r]estriction[]" that "imposes a limited delay on some speech." (AG Br. 6.)

"If the agency's answer is based on a permissible construction of the statute, that is the end of the matter." *City of Arlington*, 133 S. Ct. at 1874-75 (quotation marks omitted).

Here, the FCC's reasonable construction—and the end of the matter—is that "states traditionally have had jurisdiction over only intrastate calls, while the Commission has had jurisdiction over interstate calls." *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Report and Order*, 18 F.C.C. Record 14014, 14064 (2003) at ¶ 83. In addressing the TCPA's preemptive effect, the FCC recognized Congress' "clear intent . . . to promote a uniform regulatory scheme under which telemarketers would not be subject to multiple, conflicting regulations," and concluded that "inconsistent interstate rules frustrate the federal objective of creating uniform national rules, to avoid burdensome compliance costs for telemarketers and potential consumer confusion." (*Id.* & nn. 267-68.) Consequently "any state regulation of interstate telemarketing calls that differs from [FCC] rules almost certainly would conflict with and frustrate the federal scheme and almost certainly would be preempted." (*Id.* ¶¶ 83-84.) The AG's inconsistent interstate rules frustrate Congress' purposes, and are preempted.

### C.    The Regulations Undermine Federal Approval of Consensual Telemarketing.

The AG's unduly restrictive approach to intrastate telemarketing frustrates the federal objective to permit consensual telemarketing, and is accordingly also preempted. (MAPCS Br. 27-29.) [19] The AG does not even address consent, but preemption applies wherever, as here, a comprehensive regulatory scheme *permits* certain activity and state law *would bar* what Congress allowed. *Arizona v. United States*, 132 S. Ct. 2492, 2505 (2012) (state's harsher enforcement mechanism was "an obstacle to the regulatory system Congress chose"); *Teltech*, 702 F.3d at 238 (preempting state law that reached "non-harmful spoofing" of caller-

---

[19] The AG claims schools lack business relationships with prospective students who have provided their phone numbers, but an "established business relationship," arises from a purchase (and lasts 18 months) *or* an application or inquiry (in which case it lasts three months). 47 CFR 64.1200(f)(5).

identification displays, which Congress implicitly protected when federal law outlawed only harmful spoofing).

The AG primarily relies on three cases to argue that state telemarketing laws pose no obstacles to federal telemarketing laws.  But two involved state laws that expressly *carved out from regulations* consensual calls, and the third essentially tracked federal law.  *Patriotic Veterans, Inc. v. Indiana*, 736 F.3d 1041, 1044 (7th Cir. 2013) (expressly carved out consensual calls); *Van Bergen v. Minnesota*, 59 F.3d 1541, 1546, 1548 (8th Cir. 1995) (expressly exempted consensual calls and "callers with a prior [] business relationship," including schools); *Southwell v. Mortg. Investors Corp. of Ohio*, No. C13-1289 MJP, 2013 WL 6049024, at *4 (W.D. Wash. Nov. 15, 2013) (negligible differences in timing provisions posed no conflict with federal laws). By contrast, the AG Regulates consensual calls, and flatly prohibits consensual calls that federal laws protect.  This approach is unwise, unnecessary, invalid under the First Amendment as demonstrated above, and preempted.

## CONCLUSION

The Court should declare the Regulations, either in whole or in part, invalid.

Respectfully submitted,


*/s/ Robert B. Lovett*

Robert B. Lovett (BBO #561691)
Adam Gershenson (BBO #671296)
COOLEY LLP
500 Boylston Street
Boston, MA 02116-3736
Tel.: (617) 937-2300
Fax: (617) 937-2400
rlovett@cooley.com
agershenson@cooley.com

*Counsel to the Massachusetts Association*
*of Private Career Schools*

**<u>CERTIFICATE OF SERVICE</u>**

I, Adam Gershenson, certify that this document was filed on July 14, 2015, through the

ECF system and will be sent electronically to the registered participants as identified on the

Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-

registered participants.


*/s/ Adam Gershenson* _____
Adam Gershenson