UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                )
MASSACHUSETTS ASSOCIATION OF     )
PRIVATE CAREER SCHOOLS,               )
                                                )
        Plaintiff,                              )
                                                )        Civil Action No.
        v.                                      )        14-13706-FDS
                                                )
MAURA HEALEY, in her official capacity   )
as the Massachusetts Attorney General,      )
                                                )
        Defendant.                            )
_____)

MEMORANDUM AND ORDER ON
CROSS-MOTIONS FOR SUMMARY JUDGMENT

SAYLOR, J.

        This is an action challenging regulations promulgated by the Massachusetts Attorney

General concerning for-profit schools.  Plaintiff Massachusetts Association of Private Career

Schools ("MAPCS") has brought suit against defendant Maura Healey, in her official capacity as

the Massachusetts Attorney General, challenging nine recently adopted regulations that are

generally intended to prevent unfair practices in the recruiting and enrollment of students at for-

profit schools.  The amended complaint alleges claims for violation of the First Amendment,

violation of the Due Process Clause of the Fourteenth Amendment, and federal preemption.

        The allegations of the amended complaint fall into three separate groups.  First, the

complaint alleges that seven of the regulations facially violate the First Amendment because they

impose content-based restrictions that target disfavored speech from disfavored speakers.

Second, it alleges that two other regulations are unconstitutionally vague and therefore fail to

provide fair notice in violation of the Due Process Clause and chill free speech in violation of the

First Amendment.  Finally, it alleges that one of the regulations (which it also challenges on First

Amendment grounds) is preempted by federal laws regulating telemarketing.  MAPCS seeks an

order from the Court vacating the regulations and enjoining the Attorney General from

implementing or taking enforcement action pursuant to them.

The parties have filed cross-motions for summary judgment.  For the following reasons,

both motions will be granted in part and denied in part.

I.      **Background**

A.      **Factual Background**

1.      **MAPCS**

MAPCS is a non-profit membership organization of more than forty for-profit and

occupational schools.  (Pl. SMF ¶¶ 1-2).  Its stated goal is to help member schools provide

professional training for Massachusetts students who are eager to advance their careers.  (*Id.*).

MAPCS member institutions provide training in a variety of areas, including allied medical,

automotive servicing, broadcasting, construction, cosmetology, culinary management,

photography, and web design.  (*Id.* at Ex. 15).

2.      **Regulatory Framework**

Chapter 93A prohibits "[u]nfair methods of competition and unfair or deceptive acts or

practices in the conduct of any trade or commerce."  Mass. Gen. Laws ch. 93A, § 2(a).  Conduct

is unfair or deceptive under Chapter 93A if it falls "within any recognized or established

common law or statutory concept of unfairness."  *VMark Software v. EMC Corp.*, 37 Mass. App.

Ct. 610, 620 (1994); *see also Cummings v. HPG Int'l Inc.*, 244 F.3d 16, 25 (1st Cir. 2001)

("Conduct is unfair or deceptive if it is 'within at least the penumbra of some common-law,

statutory, or other established concept of unfairness' or 'immoral, unethical, oppressive, or

unscrupulous.'"  (quoting *PMP Assocs. Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 596

(1975))).  Under Chapter 93A, the Attorney General has the authority to "make rules and

regulations interpreting the provisions of subsection 2(a)."  Mass. Gen. Laws ch. 93A, § 2(c).

Pursuant to that authority, former Attorney General Martha Coakley published draft

regulations on November 20, 2013, that modified existing regulations concerning for-profit

schools.  *See* 940 Mass. Code Regs. § 3.10 (1978) (since superseded).  The stated purpose of the

existing regulations was to:

> [P]rotect Massachusetts consumers seeking to enroll in any course of instruction
> or educational service offered by certain private business, vocational, and career
> schools, and to ensure that the private career school industry was operating fairly
> and honestly by means of legitimate and responsible business acts and practices
> that [were] neither unfair nor deceptive.

*Id.*  The Attorney General sought to "update[ ] and amend[ ] the 1978 regulations" in order to

"address problems experienced by consumers when they seek or are enrolled in for-profit

schools or occupational programs."  940 Mass. Code Regs. § 31.01 (2014).  Among those

problems, according to the regulations, are "widespread acts and practices in the for-profit and

occupational school industry [that] continue to unfairly harm consumers."  *Id.*

The Attorney General received extensive written comments and evidence in response to

the draft regulations.  (Def. SMF ¶ 7).  In addition, she heard testimony from for-profit schools,

current and former students of for-profit schools, trade groups, and consumer organizations

during two public hearings in January 2014.  (*Id.* at ¶¶ 6, 8).

After amending the draft regulations in response to public comment, the Attorney

General published the regulations, effective June 20, 2014.

### 3.     The Challenged Regulations

MAPCS challenges nine of the regulations for a variety of reasons.  The nine regulations are the following:

- Deceptive Language in General:  940 Mass. Code Regs. § 31.04(2):

  > It is an unfair or deceptive act or practice for a school to use language or make a claim or representation in any form, including but not limited to spoken, electronic, or printed form, which has the tendency or capacity to mislead or deceive students, prospective students, or any other person.

- Time to Complete Program:  940 Mass. Code Regs. § 31.04(9):

  > It is an unfair or deceptive act or practice for a school to misrepresent the amount of time it takes to finish a program, including a representation that a program can be completed "in weeks" or similar language suggesting that the length of time to complete the program is shorter than the actual median completion time to obtain a certificate, diploma, or degree.

- Failure to Disclose Facts:  940 Mass. Code Regs. § 31.05(1):

  > It is an unfair or deceptive act or practice for a school to conceal or fail to disclose to a prospective student any fact relating to the school or program, disclosure of which is likely to influence the prospective student not to enter into the transaction with the school.

- Graduation-Rate Disclosure:  940 Mass. Code Regs. § 31.05(2)(b):

  > It is an unfair or deceptive act or practice to fail to make the following disclosure to consumers and prospective students, clearly and conspicuously, at least 72 hours prior to entering into an enrollment agreement with a consumer or prospective student:
  >
  > . . . .
  >
  > (b) Graduation.  [Graduation rate[1]] of students graduated from the program during [the last two calendar years for which data are available].

---

[1] The "graduation rate" is defined as the "number of students who received certificates, diplomas, or degrees in the program during the latest two calendar years, divided by the number of students who enrolled in the program during the latest two calendar years.  The graduation rate shall be determined within 180 days from the end of each calendar year."  940 Mass. Code Regs. § 31.03.

- Consequences of Loan Default:  940 Mass. Code Regs. § 31.05(3):

    For any school that accepts federal Title IV funds, or that provides
    institutional loans, it is an unfair or deceptive act or practice for a school
    to fail to make the following disclosure to consumers and prospective
    students, clearly and conspicuously, at least 72 hours prior to entering into
    an enrollment agreement with such consumer or prospective student:

    > (a)  Your Loan Debt.  You must repay money that you borrow as
    > student loans to pay for this program, including interest.  You must
    > repay any portion of the money you borrow to pay for this
    > program, even if you fail to complete or drop out of the program.
    > Failure to repay student loans is likely to have a serious negative
    > effect on your credit, future earnings, and your ability to obtain
    > future student loans.

    > (b)  Loan Nonpayment Statistics.  [loan nonpayment percentage] of
    > [school name] students defaulted on, or failed to repay, their loans
    > during the period [years covered in corresponding federal cohort
    > default rate used to calculate loan nonpayment rate].

- Total Placement-Rate Calculus:  940 Mass. Code Regs. § 31.05(4)(b)(1):

    For any occupational program that:  . . . (b) refers in advertising, recruiting
    or promotional materials to statements to employment prospects or job
    placement, it is an unfair or deceptive act or practice for a school to fail to
    make the following disclosure to consumers and prospective students,
    clearly and conspicuously, at least 72 hours prior to entering into an
    enrollment agreement with such consumer or prospective student:

    > (1)  Placement Rates.  [Graduation placement rate[2]] of graduates
    > during [latest two calendar years] obtained full-time, non-
    > temporary jobs in the field of study.  [Total placement rate[3]] of
    > students that enrolled in the program during [latest two
    > calendar years] obtained full-time, non-temporary jobs in their
    > field of study.

---

[2] The "graduation placement" rate is defined as the "number of students obtaining full time (at least 32 hours per week) and non-temporary employment in the field of study during the last two calendar years for which the school has obtained verification, divided by the number of all students graduating from the program during the latest two calendar years.  The graduate placement rate shall be determined within 180 days from the end of each calendar year."  940 Mass. Code Regs. § 31.03.

[3] The "total placement rate" is defined as the "product of the graduate placement rate and the graduation rate.  The total placement rate shall be determined within 180 days from the end of each calendar year."  940 Mass. Code Regs. § 31.03.

- Credit Transfer: 940 Mass. Code Regs. § 31.05(7):

    It is an unfair or deceptive act or practice for a school to represent to a student or prospective student or to any other person that its credits are or may be transferable to another educational institution without:

    > (a) identifying the school(s) with which it has written agreements or other documentation verifying that credits can be transferred to said school(s); and

    > (b) indicating it is aware of no other schools that accept the transfer of its credits.

- Enrolling Unqualified Students: 940 Mass. Code Regs. § 31.06(6):

    It is an unfair or deceptive act or practice for a school to enroll or induce retention of a student in any program when the school knows, or should know, that due to the student's educational level, training, experience, physical condition, lack of language proficiency, or other material qualification, the student will not or is unlikely to:

    > (a) graduate from the program; or

    > (b) meet the requirements for employment in the occupation to which the program is represented to lead. If a student has a disability, the determination shall be made based on the student's ability to graduate from the program or meet the requirements for employment with the provision of a reasonable accommodation for that disability. In addition, in no event shall [the regulations] contravene the requirements of, or obligations of a school to accommodate students in accordance with the Americans with Disabilities Act, the Rehabilitation Act, or any other applicable law concerning students with disabilities.

- Engaging in High-Pressure Sales Tactics: 940 Mass. Code Regs. § 31.06(9):

    It is an unfair or deceptive act or practice for a school to initiate communication with a prospective student, prior to enrollment, via telephone (either voice or data technology), in person, via text messaging, or by recorded audio message, in excess of two such communications in each seven-day period to either the prospective student's residence, business or work telephone, cellular telephone, or other telephone number provided by the student.

### 4.     Public-Comment Evidence

As justification for the seven regulations that MAPCS challenges under the First Amendment, the Attorney General points to public-comment evidence that allegedly demonstrates unfair and deceptive practices by for-profit schools.  (*See* Def. Mem. Ex. A; Stipulated public-hearing record (cited as "R:[page number]"); Public-hearing transcripts (cited as "Tr:[page number]").  Below is a selection of some of that public-hearing evidence and testimony.

- Deceptive Language in General:  940 Mass. Code Regs. § 31.04(2).  In written comments, the Massachusetts Department of Higher Education ("DHE") stated that the Massachusetts for-profit school industry is responsible for a "disproportionate share of the consumer complaints received by the Board."  (R:258).  For-profit schools comprise only 8 percent of the schools under the Board's purview, but they are responsible for 22 percent of consumer complaints that the DHE has received since 2009.  (*Id.*).  Those consumer complaints concerned false and misleading statements by for-profit schools to prospective students during recruitment.  (*Id.*).  Toby Merrill, an attorney working on the Legal Services Center of Harvard Law School's project on predatory student lending, commented that many for-profit schools use deceptive advertisements to attract students, and then employ "draconian contracts" to keep students enrolled.  (R:452).  Former students of for-profit schools submitted comments about how recruiters misled them about program quality and accreditation (R:64), instructors' credentials (R:645), and resources available for student instruction (R:647).  For example, one school told a single mother that its program would guarantee that she would receive a Medical Coding Certificate.

(R:643).  When that guarantee turned out to be false, the woman was left with

$13,000 in student loans that she had to repay.  (*Id.*).

- Time to Complete Program:  940 Mass. Code Regs. § 31.04(9).  A coalition of

   veterans groups named Veterans Education Success submitted written comments.  It

   directed the Attorney General to the findings and conclusions of a two-year

   investigation into the for-profit school industry conducted by the United States Senate

   Committee for Health, Education, Labor, and Pensions (HELP).  (R:361-370).  That

   investigation concluded that many for-profit schools misled recruits about the time

   needed to complete programs.  One school's advertisement for its medical assistant

   training programs read "Start NOW and Get CERTIFIED in JUST WEEKS!"

   (R:582).  Its two medical programs, however, required at least nine and seven months

   to complete, and the median times to graduation were 409 days and 315 days,

   respectively.  (*Id.*).  Other comments and testimony supported required disclosures of

   average or median completion times.  (R:461).

- Graduation-Rate Disclosure:  940 Mass. Code Regs. § 31.05(2).  The Attorney

   General received testimony that existing federally-mandated graduation-rate

   disclosures do not capture the performance of the many non-traditional and part-time

   students that attend for-profit schools.  (*See* R:141-42; 20 U.S.C. §§ 1092(a)(1)(L),

   (a)(3)).  Federal graduation-rate metrics measure a cohort comprised of only first-

   time, full-time students.  20 U.S.C. § 1092(a)(1)(L).  In one survey of 3,000 students

   that attended for-profit schools, including part-time students, 42 percent of students

   reported withdrawing from school before graduating or completing their program.

   (R:405).  Other commenters testified that graduation rates advertised by for-profit

schools are misleading because they do not capture part-time students, and others

pointed to "a need for [s]tate [r]egulation" to supplement federal disclosures.  (R:442-

43, 461, 471).

- Consequences of Loan Default:  940 Mass. Code Regs. § 31.05(3).  The

  Massachusetts Department of Higher Education commented that for-profit schools

  enroll 12 percent of all post-secondary students nationally and represent 24 percent of

  all federal student-loan dollars, but represent 43 percent of all federal student-loan

  defaults.  (R:257).  In 2009, students attending Massachusetts for-profit four-year

  schools had a 15 percent three-year default rate, compared with rates of 5 percent and

  6 percent at non-profit institutions and public institutions, respectively.  (*Id.*).  The

  Attorney General also received public-hearing evidence that students who default on

  loan obligations may face garnishment of future earnings (R:402, 453, 474), may find

  it difficult to find employment (R:474), and may be ineligible for benefits such as the

  Earned Income Credit.  (R:402).  One former for-profit school student, a United

  States Army veteran, testified that a for-profit school deceived him into believing that

  his student loans were federal loans, when they were actually private loans with

  higher interest rates.  (R:645).  As a result, the man had $96,000 in student-loan debt,

  and was unable to find employment requiring more than a high-school degree.  (*Id.*).

- Total Placement-Rate Calculus:  940 Mass. Code Regs. § 31.05(4)(b)(1).  The

  Attorney General received public-hearing evidence that the job-placement rates of

  for-profit schools are often misleading.  (R:442-43, 447-48).  Commenters also stated

  that federal regulations on placement-rate disclosures are "not sufficient to protect

  consumers" because they allow for the use of different placement-rate metrics, many

of which calculate job placement based on the number of graduates instead of the number of enrolled students.  (R:471).  According to some commenters, the federal statistics fail to capture the outcomes of the many students at for-profit schools who drop out after learning that their employment prospects are worse than originally promised by school recruiters.  (R:364-65).

- Credit Transfer:  940 Mass. Code Regs. § 31.05(7).  The Attorney General received public-hearing evidence that some for-profit schools mislead prospective students by implying that credits they earn are, or may be, transferrable to other schools when they often are not.  (R: 335-39, 410, 525, 610).

- Engaging in High-Pressure Sales Tactics:  940 Mass. Code Regs. § 31.06(9).  Many commenters testified that some for-profit schools often employ high-pressure sales tactics and "pain-based" recruiting strategies to induce students to enroll in programs under a false sense of urgency.  (R:268-73, 278-80, 442-43, 515-19).  Commenters pointed the Attorney General to the Senate HELP Committee report, which found that in 2010, for-profit schools across the nation employed 35,202 recruiters, compared with 3,512 career-services staff and 12,452 support-services staff.  (R:361).  The report states that it uncovered internal documents that demonstrated that enrollment quotas were recruiters' highest priority, and that the recruitment process "created a boiler-room atmosphere."  (R:363).  The group Veterans Education Success directed the Attorney General to the findings of an undercover report of for-profit schools conducted by the United States Government Accounting Office.  (Def. SMF ¶ 42).  That report, using undercover testers to submit inquiries to lead-generation websites,

found that testers received an average of five telephone calls per day for a month

from non-profit schools.  (R:295, 363-64; Def. SMF ¶¶ 42-43).

### B.      Procedural Background

On September 25, 2014, MAPCS filed the complaint in this case.  On December 26,

2014, MAPCS filed an amended complaint and a demand for declaratory and injunctive relief.

The complaint alleges claims for violation of the First Amendment, violation of the Due Process

Clause of the Fourteenth Amendment, and federal preemption.  Specifically, MAPCS contends

that the regulations variously (1) violate the First Amendment because they unlawfully compel

and restrict speech based on its content, (2) violate the Due Process Clause and the First

Amendment because they are unconstitutionally vague, and (3) are preempted by federal

telemarketing law.

The parties have cross-moved for summary judgment on all counts.

## II.     Legal Standard

The role of summary judgment is to "pierce the pleadings and to assess the proof in order

to see whether there is a genuine need for trial."  *Mesnick v. General Elec. Co.*, 950 F.2d 816,

822 (1st Cir. 1991) (internal quotation marks omitted).  Summary judgment is appropriate when

the moving party shows that "there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Essentially, Rule 56[ ]

mandates the entry of summary judgment 'against a party who fails to make a showing sufficient

to establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial.'"  *Coll v. PB Diagnostic Sys.*, 50 F.3d 1115, 1121 (1st Cir.

1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  In making that

determination, the court must view "the record in the light most favorable to the nonmovant,

drawing reasonable inferences in his favor." *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009).  When "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)).  The non-moving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id*. at 256-57.

### III.   Analysis

#### A.   First Amendment Challenges

The cross-motions on Counts One and Two involve First Amendment challenges to seven of the regulations.  They essentially require the Court to answer two questions:  (1) what level of First Amendment scrutiny applies to each regulation, and (2) whether each regulation satisfies the applicable level of scrutiny.  MAPCS contends that the regulations facially violate the First Amendment because they impose content and viewpoint-based speech restrictions that are unconstitutional under strict scrutiny or any other standard of review.  The Attorney General contends that strict scrutiny is not the appropriate standard of review because the regulations are either mandatory disclosures that trigger reasonable-basis review, or, at most, restrictions on commercial speech that warrant only intermediate scrutiny.  Moreover, the Attorney General contends that the regulations survive even under an intermediate scrutiny test because they directly advance the government's substantial interest in preventing unfair and misleading practices in the for-profit school industry.

The Court will address each of the issues in turn, beginning with the appropriate level of scrutiny for each of the seven challenged regulations.

1.      **Level of Scrutiny**

a.      **Intermediate Scrutiny under *Central Hudson***

It is well-established that commercial speech, including advertising, has an "informational function" and is not "valueless in the market place of ideas." *See Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 563 (1980); *Bigelow v. Virginia*, 421 U.S. 809, 826 (1975). Moreover, as the Supreme Court has noted, "[t]here is no longer any room to doubt that what has come to be known as 'commercial speech' is entitled to the protection of the First Amendment, albeit to protection somewhat less extensive than that afforded 'noncommercial speech.'" *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Oh.*, 471 U.S. 626, 637 (1985); *see also El Dia, Inc. v. P.R. Dep't of Consumer Affairs*, 413 F.3d 110, 115 (1st Cir. 2005) (noting that commercial speech, or "expression related solely to the economic interests of the speaker and its audience," is ordinarily accorded less First Amendment protection than other forms of constitutionally guaranteed expression).

The contours of that "somewhat-less-extensive" protection depend on both the specific character of the commercial speech and the purpose of the regulation. As the Supreme Court has explained:

> When a State regulates commercial messages to protect consumers from misleading, deceptive, or aggressive sales practices, or requires the disclosure of beneficial consumer information, the purpose of its regulation is consistent with the reasons for according constitutional protection to commercial speech and therefore justifies less than strict review. However, when a State entirely prohibits the dissemination of truthful, nonmisleading commercial messages for reasons unrelated to the preservation of a fair bargaining process, there is far less reason to depart from the rigorous review that the First Amendment generally demands.

*44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 501 (1996) (plurality opinion). Accordingly, "[t]he mere fact that messages propose commercial transactions does not in and of itself dictate

13

the constitutional analysis that should apply to decisions to suppress them." *Id.*

Although commercial-speech restrictions may warrant higher or lower scrutiny depending on the "nature both of the expression and of the government interests served by its regulation," the default test is the four-part intermediate-scrutiny approach first promulgated in *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557, 563 (1980). Pursuant to that approach, a court must first determine whether the commercial speech is actually false, deceptive, or misleading, or whether it proposes an unlawful activity. *See Central Hudson*, 447 U.S. at 566. "Misleading advertising may be prohibited entirely," including where commercial speech is "inherently likely to deceive or where the record indicates that a particular form or method of advertising has in fact been deceptive." *In re R.M.J.*, 455 U.S. 191, 202-03 (1982). Thus, if a court finds in the affirmative on the first prong, the analysis ends and the speech is not entitled to any First Amendment protection.

But if the commercial speech is only "potentially misleading," the court must apply the remainder of the *Central Hudson* factors to assess the constitutionality of the regulation. *See id.* at 203. A court must make three additional inquiries: (1) whether the asserted governmental interest is substantial; (2) whether the regulation directly advances the government interest asserted; and (3) whether the regulation is not more extensive than is necessary to serve that interest. *Central Hudson*, 447 U.S. at 566.[4] In order for the regulation to survive, a court must answer the final three prongs in the affirmative.

### b.     Strict Scrutiny under *Sorrell* and *Reed*

MAPCS contends that strict scrutiny, not intermediate scrutiny, should apply to the

---

[4] As the Supreme Court has acknowledged, "several Members of the Court have expressed doubts about the *Central Hudson* analysis and whether it should apply in particular cases." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 554 (2001). However, at this point no majority decision has rejected the analysis of *Central Hudson*.

regulations at issue for two reasons:  (1) the Supreme Court has implicitly overturned the *Central Hudson* standard in two recent decisions and (2) the regulations restrict more than commercial speech.

First, MAPCS relies heavily on a recent Supreme Court decision in *Sorrell v. IMS Health Inc.*, for the proposition that "'[t]he First Amendment requires heightened scrutiny whenever the government creates' creates content or speaker-based regulations, and 'commercial speech is no exception.'"  (Pl. Reply Mem. 10) (quoting *Sorrell*, 131 S. Ct. 2653, 2664 (2011)).  MAPCS contends that *Sorrell*, as "the [Supreme] Court's last word [ ] regarding restrictions on commercial speech," effectively overruled *Central Hudson* to the extent that intermediate scrutiny is no longer the proper test for content-based restrictions on commercial speech.  (Pl. Reply Mem. 11) (quoting *National Ass'n of Tobacco Outlets, Inc. v. City of Worcester*, 851 F. Supp. 2d 311, 319 (D. Mass. 2012)).

In *Sorrell*, the Supreme Court considered a challenge to a Vermont law preventing pharmacies from sharing prescriber-identifying information for marketing purposes.  The Court, noting that the only two government interests that Vermont asserted in promulgating the law were the protection of medical privacy and improving public health, applied "heightened judicial scrutiny" and held that the statute violated the First Amendment.  *Sorrell*, 131 S. Ct. at 2659.

But *Sorrell* is not as expansive as MAPCS asserts, and the many caveats of its holding are consistent with the well-established principle that the applicable level of scrutiny for commercial-speech regulations depends on the specific "nature both of the expression and of the government interests served by its regulation."  *See Central Hudson*, 447 U.S. at 563.  MAPCS contends that "[t]he AG's attempt to distinguish *Sorrell* by claiming that case had 'nothing to do

with consumer protection' is *neither accurate nor consequential*."  (Pl. Supp. Mem. 2) (emphasis added).

That contention is incorrect on both fronts.  In *Sorrell*, the state of Vermont did not try to justify the statute based on the government's interest in protecting consumers from misleading commercial speech.  *See* 131 S. Ct. at 2672.  In contrast, the Attorney General justifies the regulations at issue here on the ground that they are necessary to address "widespread acts and practices in the for-profit and occupational school industry [that] continue to unfairly harm consumers."  940 Mass. Code Regs. § 31.01.  That distinction is surely consequential, because the level of First Amendment scrutiny depends on the "nature both of the expression and of the government interests served by its regulation."  *See Central Hudson*, 447 U.S. at 563.

*Sorrell* is replete with language indicating that the Supreme Court would not categorically apply strict scrutiny to content-based commercial-speech regulations that are justified on consumer-protection grounds.  Three examples are noteworthy.  First, the Court noted that "a State may [still] choose to regulate price advertising in one industry but not in others, because the risk of fraud . . . is in its view greater there . . . [h]ere, however, Vermont has not shown that its law has a neutral justification."  *Sorrell*, 131 S. Ct. at 2672 (citation and internal quotation marks omitted).  Second, the Court explicitly acknowledged its holding's limited effect on regulations justified by alleged consumer deception:

> [Vermont] nowhere contends that [the marketing] is *false or misleading* within the meaning of this Court's First Amendment precedents . . . [n]or does the State argue that the provision challenged here will prevent *false or misleading speech* . . . [t]he State's interest in burdening the speech of detailers instead turns on nothing more than a difference of opinion.

*Id.* (emphasis added).  Third, the Court further reasoned that Vermont could not eliminate disfavored marketing wholesale, just as a state "may not seek to remove a popular but disfavored

product from the market place by prohibiting *truthful, nonmisleading* advertisements that contain impressive endorsements or catchy jingles." *Id.* at 2671 (emphasis added).  In short, *Sorrell* does not stand for the proposition that strict scrutiny applies to all commercial-speech restrictions, especially regulations that have neutral justifications, such as consumer protection.[5]

MAPCS also contends that the Supreme Court's recent decision in *Reed v. Town of Gilbert, Arizona*, 135 S. Ct. 2218 (2015), controls this case.  In *Reed*, the Court explained that "[a] law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." 135 S. Ct. at 2228 (quoting *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993)).  *Reed* concerned a law that banned outdoor signs without a permit, and created 23 exemptions for specific types of signage, placing varying restrictions on the signage depending on which exemption it fell into.  135 S. Ct. at 2224.  For example, the law exempted "ideological signs" or "political signs" from the outright ban. Plaintiffs, a local church, challenged the law after the Town of Gilbert repeatedly cited them for failure to comply with the requirements imposed by the "Temporal Directional Signs Relating to a Qualifying Event" exemption.  The exemption encompassed signs directed at motorists or other passers-by, which advertised for events sponsored by a non-profit.  *Id.* at 2225. The law required that those signs be:

> [N]o larger than six square feet.  They may be placed on private property or on a public right-of-way, but no more than four signs may be placed on a single property at any time.  And, they may be displayed no more than 12 hours before the "qualifying event" and no more than 1 hour afterward.

---

[5] MAPCS also points the Court to a case in this district for support of its contention that *Sorrell* controls, but it too is distinguishable on the same grounds.  In *National Association of Tobacco Outlets, Inc. v. City of Worcester*, 851 F. Supp. 2d 311 (D. Mass. 2012) (Woodlock, J.), the district court, relying on *Sorrell*, struck down a city ordinance that prohibited outdoor advertising of tobacco products.  There, however, the court noted that the city did not "contend that the advertisements prohibited by the Ordinance [were] misleading." 851 F. Supp. 2d at 314.

*Id.* (internal citations omitted).  Those restrictions were more severe than those placed on ideological signs or political signs.

Justice Thomas, joined by five other Justices, struck down the law, finding that the exemptions were content-based, and could not withstand strict scrutiny.  *Id.* at 2224.  In arriving at that conclusion, the Supreme Court emphasized two guiding principles that compelled the result.  First, a content-based restriction on speech is subject to strict scrutiny regardless of the government's motive; therefore, "an innocuous justification cannot transform a facially content-based law into one that is content neutral."  *Id.* at 2228.  Second, "'[t]he First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic.'"  *Id.* at 2230 (quoting *Consolidated Edison Co. of N.Y. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 530, 537 (1980)).  Therefore, the mere fact that a law is viewpoint-neutral does not necessarily insulate it from strict scrutiny.  Justice Alito, joined by Justices Kennedy and Sotomayor, took part in the majority opinion but wrote separately to "add a few words of further explanation" outlining a non-exhaustive list of signage regulations that would not trigger strict scrutiny.  *Id.* at 2233 (Alito, J., concurring).  Justices Ginsburg, Breyer, and Kagan rejected the notion that a content-based regulation must necessarily trigger strict scrutiny, and concurred only in the judgment.  *Id.* at 2234-39.

However, as with its reliance on *Sorrell*, MAPCS's reliance on *Reed* appears to be misplaced.  Although only a small number of courts have addressed First Amendment challenges to commercial-speech regulations since *Reed*, almost all of them have concluded that *Reed* does not disturb the Court's longstanding framework for commercial speech under *Central Hudson*. *See Contest Promotions, LLC v. City and Cty. of S.F.*, 2015 WL 4571564, at *4 (N.D. Cal. July 28, 2015) (appeal pending) ("*Reed* does not concern commercial speech, and therefore does not

disturb the framework which holds that commercial speech is subject only to intermediate

scrutiny as defined by the *Central Hudson* test."); *Citizens for Free Speech, LLC v. County of*

*Alameda*, 2015 WL 4365439, at *13 (N.D. Cal. July 16, 2015) (holding that *Reed* does not alter

the analysis for laws regulating off-site commercial speech); *California Outdoor Equity Partners*

*v. City of Corona*, 2015 WL 4163346, at *10 (C.D. Cal. July 9, 2015) ("*Reed* does not concern

commercial speech, let alone bans on off-site billboards.  The fact that *Reed* has no bearing on

this case is abundantly clear from the fact that *Reed* does not even cite *Central Hudson*, let alone

apply it." (emphasis deleted)); *see also Chiropractors United for Research & Educ., LLC v.*

*Conway*, 2015 WL 5822721, at *5 (W.D. Ky. Oct. 1, 2015) (appeal pending) ("Because the

[challenged] [s]tatute constrains only commercial speech, the strict scrutiny analysis of *Reed* is

inapposite."); *CTIA-The Wireless Ass'n v. City of Berkeley*, 2015 WL 5569072, at *10 (N.D. Cal.

Sept. 21, 2015) ("[Plaintiff] completely ignores the fact that the speech rights at issue here are its

members' *commercial* speech rights . . . .  The Supreme Court has clearly made a distinction

between commercial speech and noncommercial speech . . . and nothing in its recent opinions,

including *Reed*, even comes close to suggesting that that well-established distinction is no longer

valid." (emphasis in original)).

Accordingly, *Sorrell* and *Reed* do not appear to overrule, or diminish, the well-

established principle that "[w]hen a State regulates commercial messages to protect consumers

from misleading, deceptive, or aggressive sales practices, or requires the disclosure of beneficial

consumer information, the purpose of its regulation is consistent with the reasons for according

constitutional protection to commercial speech and *therefore justifies less than strict review*." *44*

*Liquormart*, 517 U.S. at 501 (emphasis added); *accord In re R.M.J.*, 455 U.S. at 200-01 ("False,

deceptive, or misleading advertising remains subject to restraint . . . .  [In *Bates v. Arizona*] [t]he

Court suggested that claims as to quality or in-person solicitation might be so likely to mislead as to warrant restriction . . . [and] a warning or disclaimer might be appropriately required . . . in order to dissipate the possibility of consumer confusion or deception." (citations omitted)); *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 771-72 (1976) ("[M]uch commercial speech is not provably false or even wholly false, but only deceptive or misleading.  We foresee no obstacle to a State's dealing effectively with this problem.  The First Amendment, as we construe it today, does not prohibit the State from insuring that the stream of commercial information flow cleanly as well as freely." (citations omitted)).

In this case, the regulations, unlike those in *Sorrell*, are motivated by a "neutral justification":  preventing for-profit schools from misleading or deceiving consumers.  Some permutation of the words "false," "deception," or "mislead" appears 79 times in the regulations. *See* 940 Mass. Code Regs. §§ 31.01-31.08.  Moreover, the Attorney General submitted a public-comment record of 1,346 pages, much of which focuses on reports, statistics, and testimony that demonstrate allegedly unfair and deceptive practices by for-profit schools, both nationally and in Massachusetts.  Therefore, *Sorrell* and *Reed* are not controlling, and *Central Hudson*'s intermediate scrutiny is the appropriate level of scrutiny.  Whether the regulations directly advance a substantial government interest and do so without restricting more speech than is necessary are questions reserved for the application of the *Central Hudson* standard.

MAPCS contends that there is a second reason why strict scrutiny is the appropriate standard for the challenged regulations:  the regulations restrict not only for-profit schools' commercial speech, but also their expressive speech.  Specifically, MAPCS contends that the regulations restrict speech concerning topics that extend far beyond the proposal of a commercial

transaction, such as how an "individual's personal history intersects with her educational opportunities." (Pl. Mem. 8).

The "core notion of commercial speech [is] 'speech which does no more than propose a commercial transaction.'" *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983) (quoting *Virginia State Bd. of Pharm.*, 425 U.S. at 762). But even speech that merely "refer[s] to a specific product," or "has an economic motivation," can also be commercial speech. *See Bolger*, 463 U.S. at 66-67. In determining whether speech is commercial, "a court must evaluate the content, form, and context of the speech as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147-48 (1983) (citations omitted).

Here, the public-comment record demonstrates that the speech covered by the regulations is economically motivated and primarily concerned with recruiting students to enroll. The Attorney General received comments that recruiters employed by for-profit schools "often have direct financial interests in the success of those schools" and therefore, their communications with prospective students are "focus[ed] on revenue generation." (Def. SMF ¶¶ 51, 98). Moreover, courts have found that similar regulations regulate primarily commercial speech, even if they touch on some non-commercial aspects of that speech. *See, e.g.*, *Association of Private Career Colls. and Univs. v. Duncan*, 681 F.3d 427, 455-56 (D.C. Cir. 2012) (concluding that Department of Education regulations were subject to intermediate scrutiny, at least in the context of a facial challenge, because they regulated primarily commercial speech). Even when commercial speech is intertwined with some speech that is not economically motivated, the Supreme Court has held that the speech proposes a commercial transaction. *See Bolger*, 463 U.S. at 67-68 (finding that information pamphlets distributed by a contraceptive manufacturer were commercial speech even though "they contain[ed] discussions of important public issues

such as venereal disease and family planning").  Here, even though for-profit schools may have personal discussions with prospective students about their families, interests, and goals, the ultimate purpose of the speech is commercial in nature.

Therefore, at most, the appropriate level of First Amendment scrutiny for the seven challenged regulations is intermediate scrutiny under *Central Hudson*.

### c.      Reasonable-Basis Scrutiny under *Zauderer*

The Attorney General concedes that intermediate scrutiny is the applicable standard for the three challenged regulations that restrict speech.[6]  The Attorney General contends, however, that unlike those regulations, the other four challenged regulations require only disclosures, and are therefore subject to a lower level of scrutiny.  Specifically, the Attorney General contends that those regulations require only factual, uncontroversial disclosures.  Therefore, according to the Attorney General, they are subject to reasonable-basis review under the Supreme Court's decisions in *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626 (1985), and *Milavets, Gallop & Milavets, P.A. v. United States*, 559 U.S. 229 (2010).

In *Zauderer*, the Court held that a more lenient standard than strict or intermediate scrutiny is appropriate for First Amendment challenges to disclosure requirements, reasoning that "disclosure requirements trench much more narrowly on an advertiser's interests than do flat prohibitions on speech."  471 U.S. at 651.  When a disclosure "take[s] the form of a requirement that [a speaker] include in his advertising purely factual and uncontroversial information about the terms under which his services will be available" a court should apply less scrutiny "[b]ecause the extension of First Amendment protection to commercial speech is justified

---

[6] *See* Def. Mem. 16-19.  Those three regulations are:  "Deceptive Language in General," 940 Mass. Code Regs. § 31.04(2); "Time to Complete Program," 940 Mass. Code Regs. § 31.04(9); "Engaging in High-Pressure Sales Tactics," 940 Mass. Code Regs. § 31.06(9).

principally by the value to consumers of the information such speech provides, [thus a speaker's] constitutionally protected interest in *not* providing any particular factual information in his advertising is minimal." *Id.* (citations omitted) (emphasis in original).  While the Court noted that "unjustified or unduly burdensome disclosure requirements might offend the First Amendment," it held that disclosure requirements do not violate a commercial speaker's First Amendment rights where the requirements "are reasonably related to the State's interest in preventing deception of consumers." *Id.*

Under that standard, the Court found that the Ohio regulation, which required an attorney advertising contingency-fee rates to disclose that clients may still have to pay costs, "easily passe[d] muster." *Id.* at 652.  The possibility that clients would confuse the terms "fees" and "costs" was "hardly [ ] speculative," the Court reasoned, and thus, it minimized the burden on the government to provide evidence of deception:  "[W]hen the possibility of deception is [ ] self-evident . . . we need not require the State to conduct a survey of the . . . public before it [may] determine that the [speech] had a tendency to mislead." *Id.*

In *Milavetz*, the Court clarified the *Zauderer* standard and distinguished factual, uncontroversial disclosures from other mandatory disclosures that would warrant intermediate scrutiny.  *Milavetz* involved challenges to revisions of the Bankruptcy Code that required certain professionals providing debt-relief assistance to disclose in their advertising that their services were related to bankruptcy relief and to further identify themselves as "debt-relief agencies." 559 U.S. at 232.  The Court explained that the debt-relief advertising was "inherently misleading" because it offered "debt relief without any reference to the possibility of filing for bankruptcy, which has inherent costs." *Id.* at 250.  Because the speech was inherently misleading and the regulation required only a disclosure, the Court upheld the regulation under

*Zauderer*.  The Court noted, however, that the "same characteristics of [the *Milavetz* regulation] that make it analogous to the rule in *Zauderer* serve to distinguish it from those at issue in *In re R.M.J.*, 455 U.S. 191 (1982), to which the Court applied the intermediate scrutiny of *Central Hudson*." *Id.*  According to the *Milavetz* Court, the *R.M.J.* regulations, which prohibited attorneys from advertising their practice areas in terms other than those prescribed by the state supreme court, "were not inherently misleading" and "the State had failed to show that the appellant's advertisements were themselves likely to mislead consumers." *Id.*  Therefore, the *R.M.J.* Court applied the *Central Hudson* standard of intermediate scrutiny.  In contrast with *R.M.J.*, the *Milavetz* Court concluded that "evidence in the congressional record demonstrating a pattern of advertisements that hold out the promise of debt relief without alerting consumers to its potential cost . . . is adequate to establish [that] the likelihood of deception in this case 'is hardly a speculative one.'" *Id.* at 251 (quoting *Zauderer*, 471 U.S. at 652).

   *Milavetz* thus established that *Zauderer* applies where a disclosure requirement targets speech that is *inherently* misleading.  But there is some ambiguity whether *Zauderer* reasonable-basis review is the appropriate standard when the speech at issue is only *potentially* misleading.  Here, MAPCS argues that *Zauderer* is not the correct standard for the disclosures at issue because the Attorney General has not demonstrated that the speech in question is inherently misleading.  But the better reading of *Zauderer* and *Milavetz* appears to be that reasonable-basis review is the appropriate standard when a disclosure requirement targets speech that is likely to mislead consumers, as demonstrated by a record that shows the potential for deception is far from speculative.  The speech need not be inherently deceptive on its face in all circumstances.  At least two other courts to address the same issue have also followed that approach.  *See Public Citizen Inc. v. Louisiana Attorney Disciplinary Bd.*, 632 F.3d 212, 218 (5th Cir. 2011) ("A

24

regulation that imposes a disclosure obligation on a *potentially* misleading form of advertising will survive First Amendment review if the required disclosure is reasonably related to the State's interest in preventing deception of consumers." (emphasis added)); *International Dairy Foods Ass'n v. Boggs*, 622 F.3d 628, 641 (6th Cir. 2010) ("*Milavetz* thus established that *Zauderer* applies where a disclosure requirement targets speech that is *inherently* misleading. We conclude that *Zauderer* also controls our analysis where, as here, the speech at issue is *potentially* misleading." (emphasis in original)).

MAPCS nonetheless contends that *Zauderer* reasonable-basis review applies only in situations where commercial speech is *inherently* misleading—that is, where speech is deceptive in its basic nature or essential character.  (*See* Pl. Reply 19-20).  But there are at least two reasons why *Zauderer* should apply as well to *potentially* misleading speech.  First, while the language of the majority opinion in *Milavetz* does not fully resolve the issue, the distinction between the majority and concurring opinions appears to indicate that *Zauderer* reasonable-basis review is the correct standard for potentially misleading speech.  *Compare Milavetz*, 559 U.S. at 249 ("[T]he Government maintains that [the regulation] is directed at *misleading* commercial speech.  For that reason, and because the challenged provisions impose a disclosure requirement rather than an affirmative limitation on speech, the Government contends that the less exacting scrutiny described in *Zauderer* governs . . . .  We agree." (emphasis in original)), *with id.* at 258 (Thomas, J. concurring) ("[A] disclosure requirement passes constitutional muster *only* to the extent that it is aimed at advertisements that, *by their nature*, [are inherently likely to deceive or have in fact been deceptive]." (emphasis added)).  Second, as the Court recognized in *Milavetz*, the fundamental reason for the *Zauderer* standard was that "First Amendment protection for commercial speech is justified in large part by the information's value to consumers."  *Id.* at 249

(majority opinion).  Therefore, in the context of disclosures, an advertiser's "constitutionally

protected interest in *not* providing the required factual information is 'minimal.'"  *Id.* (citing

*Zauderer*, 471 U.S. at 651).  That reasoning applies to all regulations requiring disclosures,

regardless of whether the commercial speech in question is inherently or only potentially

misleading.

Therefore, *Zauderer* reasonable-basis review is applicable to the four disclosure

regulations in this case if two conditions are met:  (1) the speech is potentially misleading and

(2) the regulations require the schools to disclose factual and uncontroversial information.  Under

that framework, the Court will determine whether reasonable-basis review is the appropriate

standard for each of the four regulations in turn.

### i.       Consequences of Loan Default

The first regulation that the Attorney General contends should be governed by *Zauderer*

is the "Consequences of Loan Default" regulation, 940 Mass. Code Regs. § 31.05(3).  That

regulation, in relevant part, requires that a for-profit school make a disclosure at least 72 hours

before entering into an enrollment agreement with a prospective student that details the loan non-

payment percentage for its students, and warns the student that "[f]ailure to repay student loans is

likely to have a serious negative effect on your . . . future earnings . . . ."  *See* 940 Mass. Code

Regs. § 31.05(3).  MAPCS contends that *Zauderer* reasonable-basis review is not the correct

standard because the regulation "compels controversial speech regarding students' future

earnings."  (Pl. Mem. 21).  Specifically, it contends that the Attorney General has presented no

facts to support her opinion that loan defaults may lead to decreased future earnings.  But it does

not appear to be a controversial proposition that a loan default will likely have a negative effect

on a person's future earnings, and certainly the record supports it.  Students who default on loans

may face garnishment of future earnings (R:402, 453, 474), may find it difficult to find employment because of employee background checks (R:474), and may be ineligible for benefits such as the Earned Income Credit (R:402).  Moreover, the proposition that default can hurt a person's future earnings is no less factual than disclosures that courts have considered factual and uncontroversial in the past.  *See, e.g.*, *Zauderer*, 471 U.S. at 652 (upholding a disclosure that distinguished legal fees from legal costs in contingency-fee advertisements); *International Dairy Foods*, 622 F.3d at 641 (explaining that a disclaimer about the production process of milk was not controversial).

Furthermore, MAPCS does not contend that there is insufficient evidence of potential consumer deception caused by the practices in question.  The difference in student default rates between for-profit schools and non-profit schools is stark (R:257), and at least one former student testified that he was deceived by a for-profit school into believing that his student loans were federal loans when they were in fact high-interest private loans.  (R:645).  Accordingly, the Court will apply *Zauderer* reasonable-basis review to the "Consequences of Loan Default" regulation, 940 Mass. Code Regs. § 31.05(3).

## ii.    Graduation-Rate Disclosure

The second regulation that the Attorney General contends should be governed by *Zauderer* is the "Graduation-Rate Disclosure" regulation, 940 Mass. Code Regs. § 31.05(2). That regulation requires that a for-profit school disclose its graduation rate at least 72 hours before entering into an enrollment agreement with a prospective student.  MAPCS contends that the graduation rate—defined in § 31.03 as the number of students who receive degrees in the program during the last two years divided by the total number of students who enrolled in the program during the last two years—is misleading and controversial.  Specifically, MAPCS

27

contends that the rate's definition (unlike federal regulations) fails to use a student cohort:  a group of students who start the program at the same time and have been enrolled long enough to graduate.[7]  The Attorney General contends that the formula is a factual disclosure that is reasonably related to closing reporting loopholes under federal regulations.  The Attorney General further contends that the formula is publicly available, uses factual data from schools, and does nothing more than generate a mathematical result.

There is evidence in the public-comment record that the graduation rates of for-profit schools are potentially deceptive.  Multiple commenters testified that those graduation rates are misleading because, under existing federal regulations, they do not capture repeat and non-full-time students.  (*See* R:141-42, 442-43, 461, 471).

Moreover, the Attorney General's graduation-rate formula is factual.  It is factual because it is a mathematical formula based on publicly-available data.  And although MAPCS contends that the formula can result in artificially low graduation rates for some for-profit schools, it does so by filling a potential gap in federal regulation, which can produce artificially high graduation rates, at least according to the public-comment evidence.

The metric is unquestionably flawed to some degree, and the Attorney General perhaps would have been wise to adopt a different standard.  However, the fact that a statistic is not perfect does not make it "controversial" under *Zauderer*.  It is well-established that disclosures of imperfect statistical information are commonplace in regulatory law.  *See, e.g.*, *Pharmaceutical Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 316 (1st Cir. 2005) (Boudin and Dyk,

---

[7] MAPCS contends that the rate is misleading because it results in an artificially low graduation rate if a school experiences an increase in enrollment.  It further contends that because the rate uses all enrolled students in the denominator, programs that take longer to complete will have to publish artificially low graduation rates. Finally, it contends that many for-profit schools that enroll students on a rolling basis will be forced to publish non-factual graduation rates because some students have not had time to complete the program.

JJ., concurring) ("The idea that these thousands of routine regulations require an extensive First Amendment analysis is mistaken.").  The graduation-rate formula does not prevent for-profit schools from explaining the differences between the federal and state formulas to prospective students, or providing their own, perhaps more meaningful, statistic (assuming, of course, that the statistic is truthful and not misleading).  And the underlying assumption of *Zauderer* was that more truthful information in the hands of consumers, not less, best serves the First Amendment.  *See Zauderer*, 471 U.S. at 651 (noting that a person's "constitutionally protected interest in *not* providing any particular factual information in his advertising is minimal").

In short, while the merits of the Attorney General's graduation-rate formula are certainly debatable, the Court finds that it is sufficiently factual and uncontroversial to permit the application of *Zauderer* reasonable-basis review.

### iii. <u>Total Placement-Rate Calculus</u>

The third regulation that the Attorney General contends is a *Zauderer* disclosure is the "Total Placement-Rate Calculus" regulation, 940 Mass. Code Regs. § 31.05(4)(b).  That regulation requires that a for-profit school disclose its placement rate of initially-enrolled students into full-time, non-temporary jobs in their field of study at least 72 hours before entering into an enrollment agreement with a prospective student.  The "total placement rate" is defined in § 31.03 as the product of a school's graduation rate, and its "graduation-placement rate," which is the percentage of students who have graduated in the past two years who obtain full-time, non-temporary jobs in their field of study.  Essentially, the total placement rate is the percentage of students who have *initially enrolled* in a for-profit school who go on to obtain full-time employment, rather than the percentage of students who *graduate*.  MAPCS contends that the total placement rate is not only controversial because it incorporates the flawed graduation rate,

but also that it is non-factual because, as a formula that relies on multiplication rather than division, it is not a "rate," or ratio, in the strict sense of the word.

The total placement rate is uncontroversial based on the same reasoning underlying the conclusion that the graduation rate is uncontroversial.  But MAPCS's second contention, that the total placement rate is non-factual because it involves multiplication, warrants fuller explanation.  In short, MAPCS's contention appears to be a semantic distinction without a mathematical difference, much less a constitutional one.[8]  It is not important whether a percentage is calculated by division (the number of students who obtain jobs divided by the total number of enrolled students) or multiplication (the percentage of enrolled students who graduate multiplied by the percentage of graduated students who obtain jobs).  The number measures the same mathematical percentage regardless of how it is calculated.  Accordingly, the Court will apply *Zauderer* reasonable-basis review to the "Total Placement-Rate Calculus" regulation, 940 Mass. Code Regs. § 31.05(4)(b).

### iv.    Credit Transfer

The fourth regulation that the Attorney General contends is a *Zauderer* disclosure is the "Credit Transfer" regulation, 940 Mass. Code Regs. § 31.05(7).  That regulation specifies that it is an unfair or deceptive practice for a school to represent to a prospective student that its credits "are or may be transferable" to another school without (1) identifying the schools with which it has a "written agreement" verifying that credits can be transferred, and (2) "indicating it is aware of no other schools that accept the transfer of its credits."  940 Mass. Code Regs. § 31.05(7).  MAPCS contends that the regulation compels false speech, and is therefore not a factual

---

[8] Consider a school with 100 students who initially enroll, 50 who graduate, and 25 who obtain jobs.  The percentage of total enrolled students who obtain jobs is 25 percent.  That 25 percent can be calculated by division (25/100) or multiplication (50 percent–the graduation rate–multiplied by 50 percent–the graduate-placement rate).

disclosure under *Zauderer*.  The Attorney General contends that MAPCS confuses what another school *may* do with what another school *must* do.  Essentially, the Attorney General contends that the natural reading of subpart (b) of the regulation is that a school must disclose that "it is aware of no other schools that [must] accept the transfer of its credits."

If that was how the regulation read, the Court would agree with the Attorney General that it would be a factual disclosure under *Zauderer*.  But that is not what the plain language of the regulation says.  Consider an example where School A is aware that School B has accepted transferred credits from School A students in the past, but has no written agreement with School B.  If School A represented to a prospective student that its credits are commonly transferrable, under the regulation as it reads, not only would it have to disclose the schools with which it has written transfer agreements, but also that disclosure would have to affirmatively state that School A "is aware of no other schools that accept the transfer of its credits."  Mass. Code Regs. § 31.05(7).  On its face, such a disclosure would be false.  School A is aware that School B frequently accepts its credits, but it must state that it is not aware of any other school that accepts its transfer credits.  It would be factual if School A had to disclaim that it "is aware of no other schools that *must* accept the transfer of its credits," because it has no written agreement with School B.  But the Court cannot read words into the regulation that contradict its plain meaning in order to save it.  The Attorney General contends that the regulation does not prevent a school, as long as a school makes the initial disclosure, from having a conversation with a student about its informal credit-transfer agreements.  That may be true; however, that conversation does not save the initial disclosure from being an untrue statement at the time that it is made.  Accordingly, the credit transfer regulation is not a factual disclosure that warrants reasonable-

basis review under *Zauderer*, and the Court will instead apply intermediate scrutiny under *Central Hudson*.

### 2.   **Application**

Having decided the applicable First Amendment standards for each of the seven challenged regulations, the second step is to apply the standards to the regulations.  First, the Court will apply *Zauderer* reasonable-basis review to the three factual, uncontroversial disclosure regulations.  Second, the Court will apply *Central Hudson* intermediate scrutiny to the remaining four regulations.

### a.   ***Zauderer* Disclosures—Reasonable-Basis Scrutiny**

Under *Zauderer*, the Attorney General must show that the mandated disclosures are "reasonably related to the State's interest in preventing deception of consumers," and the disclosures must not be "unjustified or unduly burdensome."  *Zauderer*, 471 U.S. at 651.  In determining whether a disclosure is reasonably related to the state's interest in preventing potential deception, courts apply a fairly lenient standard.  *See id.* at 652 (explaining that the possibility of deception was "self-evident," and holding that to justify the state's imposition of a disclosure requirement for attorney advertising, the state need not "conduct a survey of the public before it may determine that the advertisement had a tendency to mislead" (citations and alterations omitted)); *see also Milavetz*, 559 U.S. at 251 (explaining that "evidence in the congressional record demonstrating a pattern of [misleading] advertisements . . . is adequate to establish that the likelihood of deception in this case is hardly a 'speculative one'" (citing *Zauderer*, 471 U.S. at 652)); *International Dairy Foods*, 622 F.3d at 642 (noting that "[a]lthough the [record] relied on by the State constitute[s] weak evidence of deception, they at least demonstrate that the risk of deception in this case is not speculative.  At a minimum, the [record]

32

supports the conclusion that production claims *can be* misleading and the comments show that there is general confusion among *some* Ohio consumers . . . ." (emphasis added)).

### i.       Consequences of Loan Default

It appears that the public-comment record supports the conclusion that there is at least some confusion among for-profit-school students about their student loans.  The record supports two conclusions:  (1) students of for-profit schools default on their loans at a significantly higher rate than students at other schools, and (2) such defaults have deleterious effects on students' future employment and earnings.  Therefore, it is not merely speculative that students are being deceived or pressured into taking out loans that they will have difficulty paying, or are unaware of the future harms caused by defaulting on those loans, or perhaps both.  The loan-default regulation is reasonably related to the Commonwealth's interest in preventing students from being deceived into taking out loans that they cannot repay.  It requires schools to publish their student-default rates and disclose the potential harms of default.  Furthermore, MAPCS does not contend that the loan-disclosure regulation is unjustified or unduly burdensome, nor could it. The regulation does not appear to present any serious financial or operational challenges.  The regulation simply requires that schools make a factual disclosure to students about the possible consequences of loan default at least 72 hours before signing an enrollment agreement.

Accordingly, the Court finds that the "Consequences of Loan Default" regulation, 940 Mass. Code Regs. § 31.05(3), satisfies the *Zauderer* reasonable-basis standard, and therefore it does not violate the First Amendment rights of MAPCS members.

### ii.       Graduation and Total-Placement Rates

The Court will address the "Graduation-Rate Disclosure," 940 Mass. Code Regs. § 31.05(2), and the "Total Placement-Rate Calculus," 940 Mass. Code Regs. § 31.05(4)(b),

together because they are based on similar evidence and require similar disclosures.  The

Attorney General heard substantial evidence that for-profit schools attract many part-time and

non-first-time students whose subsequent graduation outcomes are not captured by existing

federal regulations.  The Attorney General also heard evidence that federal placement-rate

disclosures are inaccurate because they fail to capture the employment outcomes of the many

students who enroll in for-profit schools and subsequently drop out.  Some commenters pointed

to specific cases of actual deception and urged the Attorney General to supplement the federal

disclosures.  There is therefore a non-speculative risk that prospective students may be misled by

the graduation and placement rates required under existing federal regulations.  The two

mandated disclosures are reasonably related to the Commonwealth's interest in preventing

consumer deception.  Moreover, MAPCS does not contend that there is any meaningful

operational or financial burden imposed by the regulations, which require schools to disclose two

simple calculations.

Accordingly, the Court finds that the "Graduation-Rate Disclosure," 940 Mass. Code

Regs. § 31.05(2), and the "Total Placement-Rate Calculus," 940 Mass. Code Regs. § 31.05(4)(b),

also satisfy the *Zauderer* reasonable-basis standard, and therefore do not violate the First

Amendment rights of MAPCS members.

### b.  *Central Hudson* Restrictions—Intermediate Scrutiny

It is well-established that "the party seeking to uphold a restriction on commercial speech

carries the burden of justifying it."  *Edenfield v. Fane*, 507 U.S. 761, 770 (1992).  "This burden

is not satisfied by mere speculation or conjecture; rather a governmental body seeking to sustain

a restriction on commercial speech must demonstrate that the harms it recites are real and that its

reduction will in fact alleviate them to a material degree."  *Id.* at 770-71.  Under *Central Hudson*,

the Attorney General must first show that the Commonwealth's asserted interest is substantial.
*See* 447 U.S. at 566.  In this case, the Commonwealth's asserted interest is to "protect
Massachusetts consumers seeking to enroll in any course of instruction or educational service
offered by certain private business, vocational, and career schools, and to ensure that the private
career school industry was operating fairly and honestly by means of legitimate and responsible
business acts and practices that [were] neither unfair nor deceptive."  *See* 940 Mass. Code Regs.
§ 3.10 (since superseded).

The last two steps of the *Central Hudson* test are complementary.  The Attorney General
must show that each regulation directly advances the asserted governmental interest of
preventing consumer deception to a "material degree."  *44 Liquormart*, 517 U.S. at 505.  A
commercial-speech restriction "may not be sustained if it provides only ineffective or remote
support for the government's purpose."  *Central Hudson*, 447 U.S. at 564.  Moreover, each
regulation must not be "more extensive than necessary to serve [that]  interest."  *Id.* at 591.
Essentially, the last two steps involve "asking whether the speech restriction is not more
extensive than necessary to serve the interests that support it."  *Lorillard Tobacco Co. v. Reilly*,
533 U.S. 525, 556 (2001) (citation omitted).  "[I]f there are numerous and obvious less-
burdensome alternatives to the restriction on commercial speech, that is certainly a relevant
consideration in determining whether the 'fit' between ends and means is reasonable."  *City of
Cincinnati*, 507 U.S. at 417 n.13; *see also Thompson v. Western States Med. Ctr.*, 535 U.S. 357,
371 (2002) ("In previous cases addressing this final prong of the *Central Hudson* test, we have
made clear that if the Government could achieve its interests in a manner that does not restrict
speech, or that restricts less speech, the Government must do so."); *Rubin v. Coors Brewing Co.*,
514 U.S. 476, 490-91 (1995) (finding a law that prohibited beer labels from displaying alcohol

content unconstitutional in part because of the availability of alternatives "such as directly limiting the alcohol content of beers, prohibiting marketing efforts emphasizing high alcohol strength . . . or limiting the labeling ban only to malt liquors"); *44 Liquormart*, 517 U.S. at 507 (plurality opinion) (striking down a prohibition on advertising the price of alcoholic beverages in part because "alternative forms of regulation that would not involve any restriction on speech would be more likely to achieve the State's goal of promoting temperance").  At the same time, the tailoring requirement under intermediate scrutiny is less demanding than the least-restrictive means test imposed by strict scrutiny.  *See Board of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989) ("What [the Court's] decisions require is a fit between the legislature's ends and the means chosen to accomplish those ends—a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served . . . ." (internal quotation marks omitted)).

MAPCS first contends that the regulations are not supported by a substantial state interest because the Attorney General's "vague basis as alleged 'consumer harm' is simply not enough, and, the Attorney General cannot belatedly manufacture other purported interests for the sake of litigation." (Pl. Mem. 14).  Second, it contends that the public-comment evidence is insufficient to prove that the regulations directly prevent consumer deception to a material degree.  Third, it contends that even if the regulations directly advanced the government's interest in preventing consumer deception, the regulations restrict more speech than is necessary.

The Attorney General contends that the regulations are based on voluminous evidence of for-profit schools' deceptive practices and that they directly advance the Commonwealth's interest in ensuring that "the private career school industry [is] operating fairly and honestly by means of legitimate and responsible business acts and practices."  940 Mass. Code Regs. § 3.10

(since superseded).  The Attorney General further contends that each regulation targets only deceptive speech and is reasonably tailored.

The Court will apply intermediate scrutiny to each of the four remaining regulations in turn.

### i.     **Deceptive Language in General**

The first regulation warranting intermediate scrutiny is the "Deceptive Language in General" regulation, 940 Mass. Code Regs. § 31.04(2).  That regulation provides that "[i]t is an unfair or deceptive act or practice for a school to use language or make a claim . . . which has the tendency or capacity to mislead or deceive students . . . ."  *Id.*

MAPCS first challenges the regulation's "tendency or capacity to mislead or deceive" language, and contends that under *Central Hudson*, "the government may only ban forms of communication *more likely to deceive the public than to inform it*."  (Pl. Mem. 13) (citing *Central Hudson*, 447 U.S. at 563) (emphasis in original).  But that argument confuses the *Central Hudson* analysis.  Under the first step of *Central Hudson*, the government may place an outright ban on speech that is misleading on its face—that is, speech that is more likely to deceive the public than to inform it.  In short, only if the speech is not misleading on its face does it receive any First Amendment protection at all.  But a state can still promulgate regulations that give it the power to limit speech that has the tendency or capacity to mislead consumers; the regulation simply has to satisfy the remaining *Central Hudson* factors.  MAPCS does not appear to contend that § 31.04(2) does not satisfy those factors, nor could it.

The general prohibition against deceptive language is not based on a vague alleged threat of consumer harm, as MAPCS contends.  Rather, it is based on more than one thousand pages of written testimony and two public hearings that show credible evidence of at least some deceptive

practices in the Massachusetts for-profit-school industry.  Moreover, the regulation targets only speech that tends to mislead or deceive; thus, it directly advances the Commonwealth's interest in consumer protection and is not more extensive than necessary to serve the interests that support it.

The Court recognizes that the regulation grants the Attorney General great latitude in determining whether certain speech has the capacity to mislead students.  But many federal and state consumer-protection regulations are substantially similar, and courts have upheld them against First Amendment challenges.  *See, e.g.*, *Federal Trade Comm'n v. Colgate-Palmolive*, 380 U.S. 371, 384-85 (1965) (noting that the Federal Trade Commission Act prevents "unfair or deceptive acts or practices in commerce" and "necessarily gives the Commission an influential role in interpreting [the statute] and in applying it to the facts of particular cases arising out of unprecedented situations"); *Aspinall v. Philip Morris Cos., Inc.*, 442 Mass. 381, 394 (2004), *abrogated in part on other grounds by Tyler v. Michaels Stores, Inc.*, 464 Mass. 492, 502 n.15 (2013) ("Although our cases offer no static definition of the word 'deceptive,' we have stated that a practice is 'deceptive,' for purposes of [Chapter 93A], if it could reasonably be found to have caused a person to act differently from the way he or she otherwise would have acted . . . .  In the same vein, we have stated that conduct is deceptive if it possesses a tendency to deceive." (citations, alterations, and internal quotation marks omitted)).

Accordingly, the Court finds that the general prohibition of deceptive language in § 31.04(2) does not violate the First Amendment, because it directly advances the Commonwealth's interest in preventing consumer deception and does not restrict more speech than is necessary.

## ii.    <u>Time to Complete Program</u>

The second regulation warranting intermediate scrutiny is the "Time to Complete Program" regulation, 940 Mass. Code Regs. § 31.04(9).  That regulation provides that "[i]t is an unfair or deceptive act or practice for a school to misrepresent the amount of time it takes to finish a program, including a representation that a program can be completed 'in weeks' or similar language suggesting that the length of time to complete the program is shorter than the actual median completion time to obtain a certificate, diploma, or degree." *Id.*

MAPCS contends that the regulation, which absolutely bars a school from suggesting that a student can complete a program faster than the actual median completion time, fails under the final step of the *Central Hudson* test because it restricts more speech than is necessary to achieve the Commonwealth's purported interest.  The Court agrees.

Beginning with the first step of the *Central Hudson* analysis, the Commonwealth's asserted interest is to prevent for-profit schools from deceiving students by misrepresenting program-completion times.  That interest is not based on mere conjecture, but instead is realistic and substantial based on the public-comment evidence.  For example, one school advertised that its medical-assistant training programs could be completed in "just weeks," when in fact, its programs required at least seven and nine months, respectively.[9]  The United States Senate HELP committee, as a result of a two-year investigation into the for-profit school industry, concluded that many schools misled prospective students about their program-completion times.  Thus, the Attorney General has presented a substantial state interest.

Next, the regulation substantially furthers that asserted interest by preventing schools

---

[9] Of course, months and years (for that matter, decades and centuries) are literally composed of weeks; however, the clear implication of the phrase "just weeks" is that the program could be completed in a relatively short number of weeks, not seven or nine months.

from providing unfair estimates of their program-completion times.  According to its plain language, the regulation prohibits schools from advertising any program-completion time that is less than the median.  Therefore the regulation furthers the Commonwealth's interest by more than a material degree; it appears to prevent almost any conceivable attempt by a school to underestimate its program-completion time.

But the regulation fails under the final step of the *Central Hudson* test.  The outright prohibition on advertising a completion time that is less than the median is more sweeping than is necessary to serve the Commonwealth's interests.  There are "numerous and obvious less-burdensome alternatives to the restriction." *See City of Cincinnati*, 507 U.S. at 417 n.13.  For example, the Attorney General could have promulgated a regulation requiring schools simply to disclose their median and/or average completion times.  In fact, such a regulation is exactly what some commenters suggested in their testimony.  (R:461).  Or, the Attorney General could have required schools to provide students with a range of median or mean completion times, such as the 25th, 50th, and 75th percentiles.

But the regulation goes well beyond those alternatives, and restricts truthful speech.  The Attorney General's argument to the contrary is unpersuasive.  The Attorney General contends that the regulation is reasonably tailored because "[o]nce a for-profit school has told a student the median completion time, nothing in Section 31.04(9) stops the school from disclosing other facts, such as the range of times students have completed the program, including the fastest times.  Thus, the median completion time requirement is nothing more than a fact disclosure that easily satisfies *Zauderer*." (Def. Mem. 17).

By its plain language, however, the regulation imposes a restriction, rather than mandating a disclosure.  It prevents *any* representation "suggesting that the length of time to

complete the program is shorter than the actual median completion time."  That restriction prohibits a wide range of possible speech, particularly in light of the use of the term "suggesting."  By definition, half the students in a program complete it in less than the median time.  The regulation appears to prohibit a school from even mentioning that fact.

For example, suppose a school advertised—truthfully—as follows:  "The median time to complete our program is 40 weeks.  That means that half our students completed it in 40 weeks or less.  One-third of our students, however, finished it in less than 25 weeks.  And three-quarters finished it in less than 45 weeks."  That statement, even if truthful, suggests that for many students "the length of time to complete the program is shorter than the actual median completion time," and therefore would run afoul of the regulation.  Furthermore, even if a school used its average completion time, which could be lower than its median, it could be held liable.  And indeed, the Attorney General's own suggestion—that a school could disclose "the range of times students have completed the program, including the fastest times"—would violate the language of the regulation.

The fact that the Attorney General has demonstrated the capability to draft an actual disclosure requirement in the very same set of regulations suggests that the regulation is not intended merely to impose a disclosure.  *Compare* 940 Mass. Code Regs. § 31.05(2) ("It is an unfair or deceptive act or practice to fail to make the following *disclosure* . . . . " (emphasis added))*, with* 940 Mass. Code Regs. § 31.04(9) ("It is an unfair or deceptive act or practice for a school to misrepresent the amount of time it takes to finish a program, including . . . language suggesting that the length of time to complete the program is shorter than the actual median . . . .").

There are numerous, less-burdensome means by which the Attorney General could have

furthered the same governmental interest.  Those alternative means might further the

Commonwealth's interest less effectively than an outright ban like § 31.04(9), but *Central*

*Hudson* requires reasonable tailoring.

Accordingly, the Court finds that § 31.04(9) violates the First Amendment under

intermediate scrutiny because it prohibits more speech than is necessary to protect students from

deceptive advertisements about program-completion times.

### iii.    Credit Transfer

The third regulation warranting intermediate scrutiny is the "Credit Transfer" regulation,

940 Mass. Code Regs. § 31.05(7).  That regulation provides as follows:

> It is an unfair or deceptive act or practice for a school to represent to a student or
> prospective student or to any other person that its credits are or may be
> transferable to another educational institution without:
>
>> (a) identifying the school(s) with which it has written agreements or other
>> documentation verifying that credits can be transferred to said school(s);
>> and
>>
>> (b) indicating it is aware of no other schools that accept the transfer of its
>> credits.

*Id.*

MAPCS contends that the regulation is not sufficiently tailored because subpart (b)

compels false speech when a school has informal credit-transfer agreements (without a written

agreement or other documentation) with other schools.  The Attorney General contends that the

regulation restricts no speech following the two disclosures, and that it allows for-profit schools

to engage in follow-up discussions with students about more informal credit-transfer options.

At the outset, the Court notes the unique situation that the transfer-credit regulation

presents.  It appears that few courts have considered the constitutionality of disclosure

regulations that fail the "factual" or "uncontroversial" prerequisites of *Zauderer*.  Although it

may seem counterintuitive to apply *Central Hudson* intermediate scrutiny to a regulation that imposes a disclosure, if a disclosure is controversial enough or even compels false speech, it can act as a speech restriction.  Specifically, if a speaker is faced with a choice between including a false disclosure in an advertisement and not advertising at all, he may choose not to speak.  Thus, the disclosure regulation, if controversial enough, actually acts as a speech restriction, and must satisfy intermediate scrutiny, including its narrow-tailoring requirement.  At least one court has followed that line of reasoning, and an explanation of the case is helpful in analyzing the transfer-credit regulation.

In *Safelite Group, Inc. v. Jepsen*, 764 F.3d 258 (2d Cir. 2014), the Second Circuit invalidated a Connecticut law that required insurance-claims administrators who owned their own windshield-repair businesses to disclose the name of a competitor's repair shop to customers before mentioning their own affiliate.  Reversing the district court, which found the law to be a factual and uncontroversial disclosure regulation warranting reasonable-basis review, the court applied an intermediate scrutiny standard under *Central Hudson*.  *Safelite*, 764 F.3d at 262.  The court reasoned that the "disclosure" regulation was controversial enough to warrant intermediate scrutiny because "[p]rohibiting a business from promoting its own product on the condition that it also promote the product of a competitor is a very serious deterrent to commercial speech."  *Id.* at 264.  The court explained:

> The law does not mandate disclosure of any information about products and services of affiliated glass companies or of the competitor's products or services. Instead, it requires that insurance companies or claims administrators choose between silence about the products and services of their affiliates or give a (random) free advertisement for a competitor.  This is a regulation of content going beyond mere disclosure about the product or services offered by the would-be speaker.  Indeed, it prevents the speaker from making such disclosure by requiring advertisements for a competitor and thereby deters helpful disclosure to consumers.  Unlike the earlier mentioned cases that applied *Zauderer*'s rational basis test, the speech requirement here does more to inhibit First Amendment

values than to advance them.

*Id.*

In applying intermediate scrutiny, the court found that the regulation was more restrictive than necessary to achieve the government's interest. *Id.* at 265. According to the court, other regulations, such as requiring claims administrators to disclose ownership of repair businesses or to inform consumers that they had the right to choose any repair shop, would achieve the same interest without chilling commercial speech. *Id.*

Here, § 31.05(7)(b) is similar to the Connecticut law in *Safelite* because it requires commercial speakers to make a disclosure that is sufficiently controversial—or in this case, one that may actually be false—that it is likely to chill or restrict more speech than necessary. Subpart (a) of the regulation is a true disclosure requirement: it requires a school to disclose the list of schools with which it has written transfer agreements. But subpart (b) restricts more speech than necessary because even if a school is aware that other schools frequently accept its credits on a more informal or case-by-case basis, it must affirmatively represent to prospective students that "it is aware of no other schools that accept the transfer of its credits." Mass Code Regs. § 31.05(7)(b). Such a school, facing the decision between silence and being forced to make a false statement—one that would likely hurt its chance of recruiting the student—may very well choose silence.

Section 31.05(7)(b) directly advances the government's substantial interest in preventing for-profit schools from deceiving prospective students about credit transfers, but it restricts more speech than necessary. It is well-established that "if the Government could achieve its interests in a manner that does not restrict speech, or that restricts less speech, the Government must do so." *Thompson*, 535 U.S. at 371. The credit-transfer regulation does not need to be perfectly

tailored; however, there appear to be a variety of alternatives that would restrict less speech.  For example, the regulation could provide that schools may not represent that its credits are or may be transferable without (a) identifying any schools with which it has formal agreements; (b) identifying any school with which it has informal agreements; (c) identifying any schools that have refused to accept credits in the past; and (d) warning that the credits may not be transferable if the school does not have an agreement, or if the credits have not been accepted in other schools in the past.  Or subpart (b) could be more narrowly tailored to read "indicating it is aware of no other schools that have formally agreed or are otherwise required to accept the transfer of its credits."

Accordingly, the Court finds that § 31.05(7)(b) violates the First Amendment because it chills more speech than is necessary to protect students from deceptive statements about credit transfers.  Section 31.05(7)(a) does not appear to violate the First Amendment because it is a straight-forward *Zauderer* disclosure that is reasonably related to the Commonwealth's interest in preventing consumer deception concerning transfer credits.

### iv.     Engaging in High-Pressure Sales Tactics

The final regulation warranting intermediate scrutiny is the "Engaging in High-Pressure Sales Tactics" regulation, 940 Mass. Code Regs. § 31.06(9).  That regulation provides that "[i]t is an unfair or deceptive act or practice for a school to initiate communication with a prospective student, prior to enrollment, via telephone (either voice or data technology), in person, via text messaging, or by recorded audio message, in excess of two such communications in each seven-day period to either the prospective student's residence, business or work telephone, cellular telephone, or other telephone number provided by the student."  *Id.*

MAPCS contends that the regulation restricts more speech than necessary because it leads to results where "a school representative who greets a student at a [s]chool [f]air (communication number 1) and receives the student's [phone] number cannot follow up a call (communication number 2) with a text message for at least a week—even though classes frequently begin on a rolling basis." (Pl. Mem. 16).[10]

Section 31.06(9) furthers the Commonwealth's asserted interest in protecting consumers from high-pressure, "pain-based" recruiting methods. And it directly advances that interest by placing a limit on the number of times a school can *initiate* contact with a student before a mandatory cooling-off period. Finally, the regulation appears to be reasonably tailored to allow students and schools to communicate. For example, it does not limit the number of times a prospective student may initiate contact with a school, nor does it limit the total number of times that a school may contact a student. It does not appear to place a limit on the number of times a school can e-mail or mail a student. In short, the regulation prevents the high-pressure sales tactics that it targets, but does so in a measured way that continues to allow reasonable communication between prospective students and schools. *Central Hudson* does not demand perfectly tailored regulations, only reasonable ones. *See Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 634-35 (1995) (upholding Florida statute banning direct-mail solicitations within thirty days of an accident).

Accordingly, the Court finds that § 31.06(9)'s reasonable restraint on the frequency of communications does not violate the First Amendment.

---

[10] Among other things, the Court doubts that a student approaching a school representative at a fair would be considered a communication as defined by the regulation, because the school would not be "initiating communication."

B.       **Vagueness Challenges**

MAPCS contends that the "Failure to Disclose Facts" regulation, 940 Mass. Code Regs.

§ 31.05(1), and the "Enrolling Unqualified Students" regulation, 940 Mass. Code Regs.

§ 31.06(6), do not provide fair notice as required by the Due Process Clause of the Fourteenth

Amendment, and are therefore void for vagueness.  In addition, although not directly pleaded in

the complaint, MAPCS also contends that both regulations violate the First Amendment because

their vagueness chills protected speech.[11]

The Attorney General contends that MAPCS has failed to meet the heavy burden it faces

in its facial Due Process challenge because it has not shown that the regulations are

impermissibly vague in all applications.  According to the Attorney General, "[a]t least in this

facial [Due Process] challenge, the Court may reasonably presume that the scenarios where

MAPCS's member schools need to take action will be reasonably clear."  (Def. Mem. 22).  As

for the First Amendment challenge, the Attorney General contends that the two regulations are

not speech restrictions, and thus the vagueness of their enforcement boundaries does not cause a

school to "speak less or avoid speaking to avoid enforcement."  (Def. Reply 3).

There is little question that the regulations are troublesomely vague and overbroad.

Section 31.05(1) prohibits a school from concealing or failing to disclose to a prospective student

"any fact relating to the school or program, disclosure of which is likely to influence the

_____

[11] Notably, Count Four of the amended complaint, which is titled "[t]he regulations violate the due process clause of the United States Constitution," contains no reference to the First Amendment or any other direct allegation that either § 31.05(1) or § 31.06(6) chills protected speech.  (*See* Am. Compl. ¶¶ 89-97).  Paragraph 96, however, does allege that "MAPCS' member career schools wish to engage in certain marketing . . . but now neither MAPCS nor the member career schools can determine whether such practices violate" the regulations.  (Am. Compl. ¶ 96).  And while MAPCS did not directly address the First Amendment vagueness issue in its initial memorandum, it raised the issue in its reply brief, which the Attorney General responded to in a sur-reply.  Accordingly, while MAPCS has arguably failed to raise or otherwise waived the issue, the Court will nonetheless address the regulations' alleged vagueness and the implications for both the Due Process and First Amendment rights of MAPCS members.

prospective student not to enter into the transaction with the school."  That appears to impose a burden on the school to ascertain what facts might influence a prospective student *subjectively*, not what might influence an objectively reasonable person.  But even under an objective standard, the requirement is so open-ended that it could encompass an almost limitless number of "facts."  It is unclear, to say the least, how any school could know what type of information to disclose, and to what degree.

Section 31.06(6), in turn, prohibits a school from enrolling a student or inducing retention if the school "knows, or should know" that "due to the student's educational level, training, experience, physical condition, lack of language proficiency, or other material qualification," the student "will not or is unlikely to" graduate or "meet the requirements for employment in the occupation to which the program is represented to lead."  The regulation provides a safe harbor of sorts for students with disabilities, but otherwise the school must assess potential impediments on its own, and at the risk of an enforcement proceeding.  To point out one obvious problem, the likelihood of failure is no doubt substantially higher for a student who is the product of an inferior school or who has learned English as a second language.  Should the schools refuse to enroll such students?  Will the practical effect of the regulation be to discourage schools from enrolling students who are attempting to overcome the disadvantages of poverty, inferior education, or recent immigration?  How will that intersect with the laws preventing discrimination?

The vagueness of the regulations thus puts schools in a difficult position, compounded by the great degree of enforcement discretion that it places in the hands of the Attorney General's office.  However, it does not necessarily follow that the regulations are unconstitutional on their face.  MAPCS faces a heavy burden in establishing that the regulations are impermissibly vague

on a facial challenge.  To find that they are unconstitutional, the Court must conclude that "no set of circumstances exists under which [the regulations] would be valid."  *United States v. Salerno*, 481 U.S. 739, 745 (1987).  That it cannot do.  And that is true even if it is not difficult to foresee as-applied vagueness challenges if the regulations are enforced to the extent that their breadth allows.

As to the First Amendment challenges, again the breadth and vagueness of the regulations are troubling.  However, the two specific regulations at issue do not restrict speech; rather, they restrict certain behavior (in the case of § 31.06(6), admitting supposedly unqualified students) and mandate additional disclosures (in the case of § 31.05(1), requiring disclosure of supposedly negative information that would influence a student's enrollment decision).  As noted, the two regulations may have deleterious consequences, such as causing a school to reject admission to an otherwise qualified student who struggles with English or causing a school to deluge students with trivial disclosures.  But their vagueness does not appear to chill speech, because a school administrator who is uncertain of the boundaries of the regulations has no incentive to speak less or avoid speaking to avoid enforcement.  A school that admits students that it knows to be unqualified is equally likely to be held liable under § 31.06(6) whether it advertises or not.  A school that hides the fact that its teachers are not certified is equally likely to be held liable under § 31.05(1) whether it advertises or not.  Because the vague regulations do not chill speech, MAPCS's First Amendment challenge must fail.

### 1.   <u>Vagueness Challenges to § 31.05(1) and § 31.06(6) under the Due Process Clause</u>

MAPCS's facial challenge to the two regulations on due process vagueness grounds confronts a very high burden.  As the Supreme Court has noted, "[a] facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully."  *Salerno*, 481

U.S. at 745.  To succeed on a facial challenge to a regulation as unduly vague under the Due

Process Clause, "the complainant must demonstrate that the law is impermissibly vague in all of

its applications."  *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489,

497 (1982); *accord Salerno*, 481 U.S. at 745 (noting that for a facial challenge to succeed "the

challenger must establish that no set of circumstances exists under which the Act would be

valid").[12]

The Supreme Court set forth the standards for evaluating vagueness challenges under the

Due Process Clause in *Grayned v. City of Rockford*:

> Vague laws offend several important values.  First, because we assume that man
> is free to steer between lawful and unlawful conduct, we insist that laws give the
> person of ordinary intelligence a reasonable opportunity to know what is
> prohibited, so that he may act accordingly.  Vague laws may trap the innocent by
> not providing fair warning. Second, if arbitrary and discriminatory enforcement is
> to be prevented, laws must provide explicit standards for those who apply them.
> A vague law impermissibly delegates basic policy matters to policemen, judges,
> and juries for resolution on an ad hoc and subjective basis, with the attendant
> dangers of arbitrary and discriminatory applications.

408 U.S. 104, 108-09 (1972) (footnotes omitted); *see also FCC v. Fox Television Stations, Inc.*,

132 S. Ct. 2307, 2317 (2012) ("[The void for vagueness doctrine addresses [the] two connected

but discrete due process concerns [noted in *Grayned*].").

But the Court has noted that the degree of vagueness tolerated by the Due Process Clause

"depends in part on the nature of the enactment."  *Village of Hoffman*, 455 U.S. at 498

(upholding an ordinance regulating the sale of drug paraphernalia, in part, because it "simply

---

[12] In *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442 (2008), the Supreme Court noted that "some Members of the Court have criticized the *Salerno* formulation," but that "all agree that a facial challenge must fail where the statute has a 'plainly legitimate sweep.'" *Id.* at 1190 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 740 n.7 (1997) (Stevens, J., concurring in the judgment)).  The Court again declined to determine which of those formulations was controlling in *United States v. Stevens*, 559 U.S. 460 (2010):  "Which standard applies in a typical case is a matter of dispute that we need not and do not address, and neither *Salerno* nor *Glucksberg* is a speech case."  Regardless of any potential distinction between *Salerno* and *Glucksberg*, the standard is clear for facial challenges on vagueness grounds:  "the complainant must demonstrate that the law is impermissibly vague in *all of its applications*." *Village of Hoffman Estates*, 455 U.S. at 497 (emphasis added).

regulate[d] business behavior" and because it "impose[d] only civil penalties").  The Due

Process Clause has "greater tolerance of enactments with civil rather than criminal penalties

because the consequences of imprecision are qualitatively less severe."  *Id.* at 498-99.  Moreover,

the Court has noted that "economic regulation[s]" governing consumer transactions with

businesses are subject to a more relaxed vagueness standard because "businesses, which face

economic demands to plan behavior carefully, can be expected to consult relevant legislation in

advance of action."  *Id.* at 498.

A regulation need not be specific enough to resolve all potential hypothetical situations

on its face, because complainants can later bring as-applied challenges on vagueness grounds.

*See id.* at 504 ("'Although it is possible that specific future applications . . . may engender

concrete problems of constitutional dimension, it will be time enough to consider any such

problems when they arise.'" (quoting *Joseph E. Seagram & Sons, Inc. v. Hostetter*, 384 U.S. 35,

52 (1966))); *accord Grayned*, 408 U.S. at 110 n.15 ("It will always be true that the fertile legal

imagination can conjure up hypothetical cases in which the meaning of [disputed] terms will be

in nice question." (citations omitted)).  Rather, to survive a facial vagueness challenge, a

regulation need only be "marked by flexibility and reasonable breadth, [not] meticulous

specificity."  *Grayned*, 408 U.S. at 110 (citations omitted).

MAPCS contends that § 31.05(1), which prohibits for-profit schools from failing to

disclose "any fact relating to the school . . . which is likely to influence the prospective student

not to enter into the transaction with the school," is unconstitutionally vague under the Due

Process Clause.  As noted, the Court agrees that the regulation is vague, and that the "any fact"

requirement gives the Attorney General great latitude in bringing regulatory enforcement actions

under § 31.05(1).  The Court can easily foresee situations where, if the Attorney General

51

exercised her power to initiate an enforcement action to the furthest extent of the "any fact" requirement, a school would have strong grounds for an as-applied challenge.  However, as also noted, for its facial challenge to succeed, MAPCS "must demonstrate that the law is impermissibly vague in *all* of its applications."  *Village of Hoffman*, 455 U.S. at 497 (emphasis added).  And even more constitutional leeway is permitted because § 31.05(1) regulates business transactions with consumers and because it imposes only civil penalties.

MAPCS has failed to meet its demanding burden, because the regulation does not appear to be impermissibly vague in every possible application.  Among other things, the extensive record of complaints by current and former students at for-profit schools demonstrates examples of what facts, if disclosed, may have influenced them not to enroll.  For example, a school should know that it must disclose the fact that its classes are self-taught instead of instructor-taught, or the fact that its instructors are not certified in the relevant field of study.  The regulation need only be "marked by flexibility and reasonable breadth, [not] meticulous specificity."  *Grayned*, 408 U.S. at 110 (citation omitted); *see also United States v. National Dairy Prods. Corp.*, 372 U.S. 29, 32 (1963) (finding that "statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language"); *Boyce Motor Lines, Inc. v. United States,* 342 U.S. 337, 340 (1952) (explaining that regulations must "deal with untold and unforeseen variations in factual situations").  While broad and certainly vulnerable to future as-applied challenges, § 31.05(1) is not impermissibly vague in every possible application.

MAPCS also contends that § 31.06(6), which prohibits for-profit schools from enrolling a student "when the school knows, or should know" that due to the student's educational level, training, experience, physical condition, lack of language proficiency, or other material

qualification, the student will not or is unlikely to graduate or meet the requirements of their desired occupation.

In the context of MAPCS's facial challenge, the Court finds that there are at least some situations where the regulation imposes reasonably clear guidelines.  For example, a school knows, or at least should reasonably know, that it should not recruit a student that cannot speak any English when the school does not have English as a second language courses and when the student seeks employment in a field that requires English language skills.  "Although it is possible that specific future applications [of §31.06(6)] . . . may engender concrete problems of constitutional dimension, it will be time enough to consider any such problems when they arise."  *See Village of Hoffman*, 455 U.S. at 504 (quoting *Joseph E. Seagram & Sons*, 384 U.S. at 52).

Accordingly the Court finds that the "Failure to Disclose Facts" regulation, 940 Mass. Code Regs. § 31.05(1), and the "Enrolling Unqualified Students" regulation, 940 Mass. Code Regs. § 31.06(6), provide fair notice as required by the Due Process Clause, and are therefore not void for vagueness on facial grounds.

### 2.   Vagueness Challenges to § 31.05(1) and § 31.06(6) under the First Amendment

Where a regulation's vagueness threatens to chill free speech, courts must use a more demanding test than the *Salerno* standard.  *See Village of Hoffman*, 455 U.S. at 499 (noting that where a regulation "threatens to inhibit the exercise of constitutionally protected rights . . . [such as] the right of free speech or of association, a more stringent vagueness test should apply"); *see also Hightower v. City of Boston*, 693 F.3d 61, 78 (1st Cir. 2012) (noting that *Salerno* was not a "speech case" and therefore concluding that vagueness challenges to regulations impacting speech confronted a heavier burden).  "[T]he approach to vagueness . . . is different . . . in cases arising under the First Amendment.  There we are concerned with vagueness of the statute on its

face because such vagueness may itself deter constitutionally protected and socially desirable conduct." *National Dairy Prods. Corp.*, 372 U.S. at 37; *see also Reno v. American Civil Liberties Union*, 521 U.S. 844, 870-71 (1997) ("The vagueness of [a content-based regulation of speech] raises special First Amendment concerns because of its obvious chilling effect.").

Thus, to prevail on a facial vagueness challenge on First Amendment grounds, as opposed to Due Process grounds, a challenger "must demonstrate a substantial risk that application of the provision will lead to the suppression of speech." *National Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998) (citations omitted).

MAPCS contends that the vagueness of § 31.05(1) and § 31.06(6) chills speech in violation of the First Amendment. However, it does not explain how that vagueness might actually chill protected speech, let alone "demonstrate a substantial risk that the application of the provision[s] will lead to the suppression of speech." And the cases MAPCS cites in support of its argument appear to be inapposite. The regulations do not appear to silence, restrict, or otherwise limit any speech at all. Thus, even if the regulations are vague, a school would have no reason to avoid speaking because avoiding speaking would not alleviate the risk of an enforcement action under § 31.05(1) or §31.06(6).[13]

MAPCS cites *FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012), for the proposition that "[w]hen speech is involved," vagueness must be actively policed "to ensure that ambiguity does not chill protected speech." *See also Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 336 (2010) (noting that a law "which chills speech can and must be

---

[13] The argument that § 31.05(1)'s vagueness violates the First Amendment because it compels speech appears unpersuasive. Section 31.05(1), like thousands of other state and federal regulations, compels *truthful* disclosures. The fact that its vagueness places some discretion in the hands of schools to determine what facts may influence a student's enrollment decision does not mean that the regulation compels false or controversial speech in violation of *Zauderer*. *See Zauderer*, 471 U.S. at 651 (noting that a person's "constitutionally protected interest in not providing any particular factual information in his advertising is minimal").

invalidated where its facial invalidity has been demonstrated").  In *Citizens United*, the Court invalidated a vague statutory restriction on certain political messages because entities faced with such a restriction might choose not to speak at all, effectively silencing legitimate political expression.  In *Fox*, the Court invalidated vague FCC regulations that limited obscene television content because broadcasters might, fearful of liability, forego valuable protected expression.  But critically, in both cases the regulated entities faced potential enforcement of a vague law that *restricted speech* and may have chosen to not speak in order to avoid the risk of enforcement.  Here, a for-profit school that is uncertain of the reach of § 31.05(1) or § 31.06(6) has no incentive to speak less because the regulations do not restrict speech; they apply to all schools that fail to disclose important negative facts and all schools that admit patently unqualified students regardless of whether they speak at all.  Therefore, it is difficult to see how the regulations chill any speech, and MAPCS certainly has not met its burden of "demonstrat[ing] a substantial risk that application of the provision[s] will lead to the suppression of speech."

Accordingly the Court finds that the "Failure to Disclose Facts" regulation, 940 Mass. Code Regs. § 31.05(1), and the "Enrolling Unqualified Students" regulation, 940 Mass. Code Regs. § 31.06(6), are not void for vagueness under the First Amendment because they do not appear to chill protected expression.

## C.   Preemption Challenges

Finally, MAPCS contends that the "Engaging in High-Pressure Sales Tactics" regulation, Mass. Code Regs. § 31.06(9), is preempted by the Telephone Consumer Protection Act of 1991 ("TCPA"), 47 U.S.C. § 227, and the Telemarketing and Consumer Fraud and Abuse Prevention Act of 1994 ("Telemarketing Act"), 15 U.S.C. §§ 6101-6108, under the doctrines of express and

implied preemption.  Specifically, MAPCS contends that the TCPA preempts § 31.06(9) insofar as the Massachusetts regulation applies to interstate and consensual telephone calls.

"A fundamental principle of the Constitution is that Congress has the power to preempt state law."  *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372 (2000) (citations omitted).  "Federal law preempts state law (1) when Congress has expressly so provided, (2) when Congress intends federal law to 'occupy the field' and (3) to the extent that state law conflicts with any federal statute."  *American Steel Erectors, Inc. v. Local Union No. 7, Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers*, 536 F.3d 68, 84 (1st Cir. 2008) (citing *Crosby*, 530 U.S. at 372-73).  In determining whether a federal statute preempts state laws, "[i]t has long been the case that our sole task is to determine the intent of Congress, and in so doing we have been mindful that Congress does not cavalierly pre-empt state-law causes of action."  *In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 173 (1st Cir. 2009) (citations, alterations, ellipsis, and internal quotation marks omitted).

## 1.     Presumption Against Preemption

Courts addressing preemption claims must ordinarily "start with the assumption" that Congress did not intend to supplant state law.  *See Wyeth v. Levine*, 555 U.S. 555, 565 (2009) ("[I]n all pre-emption cases, and particularly in those cases in which Congress has legislated . . . in a field which the States have traditionally occupied, . . . we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." (citations and internal quotation marks omitted)); *see also King v. Collagen Corp.*, 983 F.2d 1130, 1137 (1st Cir. 1993) (noting that there is a "heavy burden" upon the party asserting preemption).  However, that "assumption of nonpreemption is not triggered when the State regulates in an area where there has been a

history of significant federal presence." *United States v. Locke*, 529 U.S. 89, 108 (2000).
MAPCS contends that the Court should not apply the presumption against preemption here
because telemarketing, especially interstate telemarketing, is an area that has long had a
significant federal presence.

However, the Supreme Court held in *Wyeth* that "[t]he presumption [against
preemption] . . . accounts for the historic presence of state law *but does not rely on the absence
of federal regulation*." *Wyeth*, 555 U.S. at 565 n.3 (emphasis added). In other words, the
presumption against preemption is not triggered only if there is a significant history of extensive
federal regulation to the exclusion of state regulation. In *Wyeth*, the Court applied the
presumption against preemption in a case concerning drug labeling despite extensive federal
regulation. *Id.* at 575. Therefore, Congress's telemarketing regulations, including the TCPA, do
not in themselves provide a basis for not applying the presumption against preemption.

Furthermore, as most cases addressing preemption challenges to telemarketing laws have
noted, telemarketing has historically been the subject of extensive state regulation, and the TCPA
was intended to allow concurrent, non-exclusive federal regulation for interstate calls. *See
Patriotic Veterans, Inc. v. Indiana*, 736 F.3d 1041, 1045 (7th Cir. 2013) (applying the
presumption against preemption in a challenge to Indiana's telemarketing law and noting that "in
passing the TCPA, Congress particularly noted that over forty states had enacted" similar
telemarketing laws); *Van Bergen v. Minnesota*, 59 F.3d 1541, 1548 (8th Cir. 1995) (noting that
the Congressional findings and legislative history of the TCPA "suggest[ ] that the TCPA was
intended not to supplant state law, but to provide interstitial law preventing evasion of state law
by calling across state lines"); *Sussman v. I.C. Sys., Inc.*, 928 F. Supp. 2d 784, 789 (S.D.N.Y.
2013) ("The Court finds that the intention of Congress in enacting the TCPA was not to preempt

state laws, but rather to regulate the telecommunications industry concurrently with the states, which 'have had a long history of regulating telemarketing practices.'" (quoting *In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991, Report and Order*, 18 F.C.C.R. 14014, 14060-62 (2003))); *Southwell v. Mortgage Investors Corp. of Oh., Inc.*, 2013 WL 6049024, at *1 (W.D. Wa. Nov. 15, 2013) (applying the presumption against preemption in a challenge to Washington's telemarketing law and noting that "only a clear and manifest purpose of Congress to preempt state law can overcome the presumption"); *see also Gottlieb v. Carnival Corp.*, 436 F.3d 335, 342 (2d Cir. 2006) ("The legislative history indicates that Congress intended the TCPA to provide 'interstitial law preventing evasion of state law by calling across state lines.'  Congress thus sought to put the TCPA on the same footing as state law, essentially supplementing state law where there were perceived jurisdictional gaps." (citation omitted)).

Accordingly, the Court will apply the presumption against preemption here.

## 2.    Express Preemption

MAPCS contends the savings clause of the TCPA, by negative implication, expressly preempts state regulations such as § 31.06(9) that place restrictions on interstate telemarketing. Specifically, MAPCS contends that "[t]he TCPA includes a saving[s] clause that explicitly excludes from preemption those state laws 'that impose[ ] more restrictive *intrastate* requirements or regulations' . . . [b]ut here, the [r]egulation[ ] would impose more restrictive *interstate* requirements, which the statute forbids."  (Pl. Mem. 25) (quoting 47 U.S.C. § 227(f)(1)) (emphasis in original).

But the plain language of the TCPA's savings clause does not explicitly forbid or preempt more restrictive state regulations on interstate telemarketing, and it appears that every

court to address that argument since *Wyeth* has rejected it.  Subsection (f) of the TCPA is the

only provision in the statute that addresses preemption.  It states:

> (f) Effect on State law.
>
>> (1) State law not preempted.  Except for the standards prescribed under
>> subsection (d) of this section and subject to paragraph (2) of this
>> subsection, nothing in this section or in the regulations prescribed
>> under this section shall preempt any State law that imposes more
>> restrictive intrastate requirements or regulations on, or which
>> prohibits:
>>
>>> (A)   the use of telephone facsimile machines or other electronic
>>>       devices to send unsolicited advertisements;
>>> (B)   the use of automatic telephone dialing systems;
>>> (C)   the use of artificial or prerecorded voice messages; or
>>> (D)   the making of telephone solicitations.

47 U.S.C. § 227(f)(1).  The restriction prohibiting schools from initiating phone contact with a

prospective student more than twice in a week under § 31.06(9) applies to all schools advertising

or doing business within Massachusetts, regardless of whether such schools maintain a campus,

facility, or physical presence in Massachusetts.  *See* 940 Mass. Code Regs. § 31.02.  Therefore,

MAPCS contends, it places more restrictive requirements on interstate calls into Massachusetts

than are imposed by the TCPA, and therefore are necessarily preempted.

But it appears that nothing in the savings clause, or any other provision of the TCPA,

expressly preempts a state law such as § 31.06(9) that regulates interstate communications.

Moreover, the fact that the TCPA expressly saves certain state laws does not suggest, by

negative implication, that other state laws not specifically saved by subsection (f) are preempted

by the federal law.  Express preemption occurs when the language of the statute explicitly states

that the federal law has a preemptive effect.  But the TCPA does not say what state laws *are*

preempted; it instead says certain state laws *are not* preempted.  It appears that every court, save

for one, to address the same argument presented by MAPCS has rejected it for those reasons.

*See Patriotic Veterans,* 736 F.3d at 1048; *Van Bergen*, 59 F.3d at 1548; *Sussman*, 928 F. Supp. 2d at 790; *Southwell*, 2013 WL 6049024, at *2.  To hold otherwise would not only undermine the concept of express preemption, but would also contradict the presumption against preemption.  *See, e.g.*, *Ishikawa v. Delta Airlines*, 343 F.3d 1129, 1132-33 (9th Cir. 2003) (noting that the presumption against preemption stands in the way of any inference that a savings clause carries a "negative pregnant" preempting state law).  The only case that MAPCS cites in support of its argument is *Chamber of Commerce v. Lockyer*, 2006 WL 462482, at *6-7 (E.D. Cal. Feb. 27, 2006), which was decided before the Supreme Court's reinforcement of the presumption against preemption in *Wyeth*.  *See Southwell*, 2013 WL 6049024, at *2 ("*Lockyer* held that the presumption against preemption does not apply in telecommunications, but its reasoning about the effect of federal legislation in the area was undermined by *Wyeth*.").

Accordingly, absent any evidence that "the clear and manifest purpose of Congress" in enacting the TCPA was to exclusively regulate the field of interstate telemarketing, the Court finds that § 31.06(9) is not expressly preempted.

### 3.      Implied Preemption

Of the two varieties of implied preemption, it does not appear that MAPCS contends that field preemption applies, presumably because the TCPA's express savings clause indicates that Congress could not have intended to supplant all state law in the area.  *See Patriotic Veterans*, 736 F.3d at 1052 ("[T]he federal rules on telemarketing indicate that Congress could not have intended to have a uniform telemarketing policy.  The very fact that Congress allows states to regulate their own intrastate telemarketing demonstrates this."); *Van Bergen*, 59 F.3d at 1548 ("[T]he preemption provision [of the TCPA] makes it clear that Congress did not intend to 'occupy the field' of [telemarketing] regulation . . . or to promote national uniformity of

[telemarketing] regulation, as it expressly does not preempt state regulation of intrastate
[telemarketing] calls that differs from federal regulations." (citations omitted)).  Rather, MAPCS
bases its argument for implied preemption on conflict or obstacle preemption, which occurs
when "compliance with both federal and state regulations is a physical impossibility" or when
"the challenged state law stands as an obstacle to the accomplishment and execution of the full
purposes and objectives of Congress."  *United States v. Arizona*, 132 S. Ct. 2492, 2501 (2012)
(internal quotation marks and citations omitted).

Although MAPCS does not argue that complying with § 31.06(9) and federal law is
impossible, it contends that the Attorney General's prohibition on schools initiating telephone
contact with a student more than twice per week stands as an obstacle to the objectives of the
TCPA.  Specifically, MAPCS contends that § 31.06(9)'s lack of an exception for consensual
calls stands as an obstacle to the TCPA, in which "Congress struck a precise balance that turns
on whether the calls are consensual." (Pl. Mem. 27).

Like express preemption, implied-obstacle preemption cannot be "lightly applied,"
*Patriotic Veterans*, 736 F.3d at 1049, because "[i]mplied preemption analysis does not justify a
'freewheeling judicial inquiry into whether a state statute is in tension with federal objectives';
such an endeavor 'would undercut the principle that it is Congress rather than the courts that
preempts state law.'" *Chamber of Commerce v. Whiting*, 131 S. Ct 1968, 1985 (2011) (citing
*Gade v. National Solid Wastes Mgmt. Ass'n.*, 505 U.S. 88, 111 (1992) (Kennedy, J., concurring
in part and concurring in judgment)).  "[The Supreme Court's] precedents 'establish that a high
threshold must be met if a state law is to be preempted for conflicting with the purposes of a
federal Act.'" *Whiting*, 131 S. Ct. at 1985 (citing *Gade*, 505 U.S. at 110).  Because the Court
must begin with the assumption that the Commonwealth's police powers cannot be preempted by

a federal act unless preemption was the clear intent of Congress, the burden is on MAPCS to present a showing of implied preemption that is strong enough to overcome the presumption that state and local regulations can coexist with federal regulation.  *See Hillsborough Cty., Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 715-16 (1985).

MAPCS contends that the TCPA and the Telemarketing Act have express carve-outs for consensual telephone calls.  *See* 47 U.S.C. § 227(a)(4) (regulating "telephone solicitations," which do not include calls where a person has given prior express invitation or permission or where the parties have an established business relationship); 15 U.S.C. § 6102 (authorizing the FCC to prescribe rules that telemarketers may not make "unsolicited telephone calls"). Therefore, according to MAPCS, "[t]he TCPA [and Telemarketing Act] thus allow[ ] for intrastate requirements on solicitations—but do[ ] not allow states to impose such requirements on the calls at issue here:  calls made to a prospective student who has given his phone number to a school as part of an inquiry or application to enroll in the school."  (Pl. Mem. 28).

But it is hard to see how § 31.06(9) does "major damage" to the clear and substantial federal interests served by the TCPA and Telemarketing Act.  *See Hillman v. Maretta*, 133 S. Ct. 1943, 1950 (2013).  Although § 31.06(9) does not have express carve-outs for consensual calls, its language defines what calls are consensual in the context of for-profit school telemarketing. Essentially, the regulation allows a school to initiate contact with student by phone up to twice per week without limitation.  Whether or not the school obtained the student's contact information directly or through a lead generator, those first two calls are considered consensual. However, where a student does not respond to the solicitation, the next school-initiated phone contact is considered non-consensual, and thus regulated, unless the school observes the one-week cooling-off period.  By restricting unsolicited telephone calls to students, and promulgating

a precise definition of what calls are considered non-consensual in the context of the for-profit school industry, the regulation does not appear to pose an obstacle to the objectives of the federal regulations; rather, it appears to be consistent with them.

In short, it is unclear how § 31.06(9) poses a major threat to the objectives of the TCPA. The TCPA promulgates general federal regulations limiting unsolicited telemarketing calls—that is, those that arise outside the context of prior express permission or an established business relationship. Section 31.06(9) focuses on telemarketing in the context of a specific industry, and in light of significant evidence of "boiler-room" recruiting practices, more specifically defines unsolicited calls to include those where a school initiates contact with a student more than twice in a week without receiving a student response. As other courts have found in preemption challenges to state telemarketing regulations, "the text and the legislative history of the TCPA suggest that Congress intended to set a uniform minimum while permitting the states, who have an obvious interest in protecting their citizens and are better able to understand their needs, to enact more restrictive regulations if necessary." *Sussman*, 928 F. Supp. 2d at 791; *see also Patriotic Veterans*, 736 F.3d at 1049 ("The fact that a state has more stringent regulations than a federal law does not constitute conflict preemption. Otherwise every time a state chose to apply a more rigorous standard when regulating conduct within the state, the result would be impermissible."); *Southwell*, 2013 WL 6049024, at *4 (finding that a state law requiring telemarketers to identify themselves within the first thirty seconds of a call, although more restrictive than an FCC rule that had no time restriction, did not "produce widely divergent practices—much less [ ] impede Congress's objectives in protecting consumers while continuing to permit telemarketing").

MAPCS urges the Court to defer to the FCC's interpretation of the TCPA and its

conclusion that the federal laws carry preemptive effect.  In a 2003 Order, the FCC stated, "[w]e therefore believe that any state regulation of interstate telemarketing calls that differs from our rules almost certainly would conflict with and frustrate the federal scheme and almost certainly would be preempted."  *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Report and Order, 18 F.C.C. Record 14014, ¶ 84 (2003).  However, the FCC declined to reach a definite conclusion, saying "[w]e will consider any alleged conflicts between state and federal requirements and the need for preemption on a case-by-case basis."  *Id.*

Although MAPCS argues that *Chevron* deference should apply to the FCC's statutory interpretation, such deference is inappropriate.  *Chevron* deference applies to agency interpretations of ambiguous statutes that they must enforce, not to an agency's mere pronouncement of an opinion on the subject of preemption.  *See Wyeth*, 555 U.S. at 576-77 (noting that a court may consider an agency's opinion but that "agencies have no special authority to pronounce on preemption absent delegation by Congress"); *see also Southwell*, 2013 WL 6049024, at *4 (not applying *Chevron* deference to a telemarketing preemption challenge and noting that "the weight accorded to an agency's explanation of state law's impact on the federal scheme depends on its thoroughness, consistency, and persuasiveness").[14]  Indeed, the FCC's opinion about the sweeping effect of the "federal scheme" is contradicted by the TCPA savings clause, which expressly saves state regulations on intrastate telemarketing and does not preempt further state regulations on interstate telemarketing.

Accordingly, the Court finds that § 31.06(9) is not expressly preempted because there is no express preemption clause in the TCPA, and because the TCPA savings clause cannot

---

[14] Among other things, the natural tendency of any governmental agency is to seek to expand its own authority and jurisdiction.  If the doctrine of *Chevron* deference is not carefully circumscribed to the interpretation of ambiguous statutes, a virtually inevitable consequence would be the expansion of agency power.

preempt a state regulation on interstate communications by negative implication.  In addition, § 31.06(9) is not impliedly preempted because it does not conflict with or frustrate the objectives of the TCPA or the Telemarketing Act.

## IV.    Conclusion

For the foregoing reasons, the cross-motions for summary judgment are granted in part and denied in part.  Specifically, the Court finds that the "Time to Complete Program" regulation, 940 Mass. Code Regs. § 31.04(9), and part (b) of the "Credit Transfer" regulation, 940 Mass. Code Regs. § 31.05(7)(b), violate the First Amendment to the United States Constitution, and are therefore invalid and unenforceable.  Plaintiffs are therefore entitled to declaratory and injunctive relief consistent with that finding.

The Court further finds that the remaining challenged regulations, which are as follows:

1.    The "Deceptive Language in General" regulation, 940 Mass. Code Regs.

§ 31.04(2);

2.    The "Failure to Disclose Facts" regulation, 940 Mass. Code Regs. § 31.05(1);

3.    The "Graduation-Rate Disclosure" regulation, 940 Mass. Code Regs. § 31.05(2);

4.    The "Consequences of Loan Default" regulation, 940 Mass. Code Regs.

§ 31.05(3);

5.    The "Total Placement-Rate Calculus" regulation, 940 Mass. Code Regs.

§ 31.05(4)(b);

6.    Part (a) of the "Credit Transfer" regulation, 940 Mass. Code Regs. § 31.05(7)(a);

7.    The "Enrolling Unqualified Students" regulation, 940 Mass. Code Regs.

§ 31.06(6); and

       8.     The "Engaging in High-Pressure Sales Tactics" regulation, 940 Mass. Code Regs.

                 § 31.06(9),

as set forth in this memorandum and order, do not on their face violate the First Amendment or

the Due Process Clause of the Fourteenth Amendment, and are not preempted by federal law.

       Summary judgment will therefore be granted in favor of plaintiff Massachusetts

Association of Private Career Schools as to part of Count I, insofar as it applies to 940 Mass.

Code. Regs. §§ 31.04(9) and 31.05(7)(b), and in favor of Maura Healey, in her official capacity

as the Massachusetts Attorney General, as to the remaining counts.

**So Ordered.**


                            /s/ F. Dennis Saylor
                            F. Dennis Saylor IV
Dated: January 25, 2016           United States District Judge